UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JACQUELINE STEVENS,        ) | |
|       ) | |
|       Plaintiff,       ) | |
|       ) | |
|       v.       ) | No. 20 C 2725 |
|       ) | |
| UNITED STATES DEPARTMENT OF       ) | Judge Rowland |
| HOMELAND SECURITY,       ) | |
| IMMIGRATION AND CUSTOMS       ) | |
| ENFORCEMENT,       ) | |
|       ) | |
|       Defendant.       ) | |

**L.R. 56.1 STATEMENT OF MATERIAL FACTS
IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant United States Department of Homeland Security, Immigration and Customs Enforcement, by Morris Pasqual, Acing United States Attorney for the Northern District of Illinois, submits the following statement of material facts as to which there is no genuine issue pursuant to Local Rule 56.1 of the United States District Court for the Northern District of Illinois.

**Jurisdiction and Venue**

1.     This is an action brought under the Freedom of Information Act (FOIA), and the court has subject matter jurisdiction under 5 U.S.C. § 552 and 28 U.S.C. § 1331. Dkt. 41 (Answer) ¶¶ 1, 4.

2.     Venue is proper in this district because plaintiff Jacqueline Stevens resides in this district. Dkt. 41 (Answer) ¶ 5.

**Parties**

3.     Plaintiff Jacqueline Stevens is a professor at Northwestern University. Dkt. 41 (Answer) ¶ 6.

4.     Defendant Immigration and Customs Enforcement, or ICE, is a component agency of the United States Department of Homeland Security.  Dkt. 41 (Answer) ¶¶ 12-13.

## FOIA Requests

5.     When ICE receives a proper FOIA request, ICE's FOIA office identifies which program offices are reasonably likely to possess responsive records and initiates searches within those offices.  Ex. A (Pineiro Decl.) ¶¶ 37-39.  This determination requires a familiarity with the holdings of ICE's record systems, applicable record disposition schedules, and the substantive and functional mandates of ICE's program offices.  *Id.*

6.     Each program office has a FOIA point-of-contact person who, based on their experience and knowledge of the program office's practices and activities, forwards the request to the individual employees or component offices that they believe are reasonably likely to have responsive records.  Ex. A (Pineiro Decl.) ¶¶ 40-41.

7.     The individuals in each office are directed to search the file systems that in their judgment are reasonably likely to contain responsive records.  Ex. A (Pineiro Decl.) ¶ 42.  The offices then provide any potentially responsive records to ICE's FOIA office, which reviews the records for responsiveness.  *Id.*

8.     ICE's individual employees and offices maintain records in different ways, and the determination of what locations to search and how to conduct those searches is necessarily based on the way each employee and office maintains files.  Ex. A (Pineiro Decl.) ¶ 43.

## August 6, 2018 Request

9.     Stevens submitted a FOIA request to ICE on August 6, 2018, seeking:

> 1) A list of all ICE Enforcement and Removal Field and Subfield offices by control city, including the complete phone numbers and addresses of these offices in the United States and abroad and information on holding cells in these locations, as well as the

number of unique individuals in custody at that location between Monday, July 30 and August 5, 2018. Please include as well all locations at which individuals were held for more than 24 hours and the dates on which that occurred between January 1, 2016 and the day of the release of information.

2) Please include the Excel spreadsheet and screen shots of the data base interface used to produce the search results.

3) A list of addresses for locations listed as "unavailable" in the release to the NIJC of 11/6/2017 (https://immigrantjustice.org/sites/default/files/uploaded-files/no-content-type/2018-06/ICE_Facility_List_11-06-2017-web.xlsx).

Dkt. 41 (Answer) ¶ 17.

10.    ICE's FOIA office emailed Stevens on August 17, 2018, stating:

In conducting a search for responsive records, the ICE FOIA office has determined that further clarification is needed regarding your request. Please describe what you mean by "information on holding cells" and "unique individuals in custody at that location." Please provide the ICE FOIA office with a response as soon as possible to avoid any further delay in the processing of your request. If a response is not received within 30 days, your request will be administratively closed.

Dkt. 41 (Answer) ¶ 18; Pineiro Decl. ¶ 7 n.4 (clarifying date).

11.    Stevens responded on September 5, 2018, stating:

1) "Holding cells" is a term of art used by ICE and federal courts to refer to areas where people arrested by ICE or other components of DHS are held. Hence the name "holding cells," e.g., here is a reference in an ICE document to "holding cells." https://www.ice.gov/doclib/foia/prea_audit/losAngelesStagingFacilityMar14_15_2017.pdf (Just use control/f.) You ca find dozens more references on your own website, if you go to ice.gov and type "holding cells" into the search box. Please see this reference as well from an ICE spokesperson. https://www.kansas.com/news/business/bizcolumnsblogs/carrie-rengers/article1114192.html.
2) Per the American Heritage Dictionary, A "unique individual" is one distinguishable human being. ICE maintains data on this, and I included a link to this data.

Dkt. 41 (Answer) ¶ 20.

12.     Stevens emailed ICE again on September 10, 2018, stating:

> Can you please advise as to the estimated date of completion, insofar as the agency has gone beyond the time allowed by statute? I am not sure about the nature of this delay. The information I am seeking is any description of the facility holding people, i.e., the square feet, availability of a toilet, security, access to visitors. And I want to know how many people are held in these facilities in a particular time frame, per my request.

Dkt. 41 (Answer) ¶ 21.

13.     Because the request explicitly related to ICE's Enforcement and Removal Operations office, ICE determined that that office was the office reasonably likely to have responsive records. Ex. A (Pineiro Decl.) ¶¶ 52-53.

14.     The Enforcement and Removal Operations office's Information Disclosure Unit (the unit that manages ERO-related FOIA requests) tasked several sub-offices to search for records, including Custody Management (which oversees ICE detention operations), Field Operations (which coordinates ERO's national field offices), and the Law Enforcement Systems and Analysis Statistical Tracking Unit (which provides official statistics for ERO operations). Ex. A (Pineiro Decl.) ¶ 54.

15.     The Custody Management office and the Field Operations office both responded that they did not maintain the requested information. Ex. A (Pineiro Decl.) ¶ 54. But the statistical tracking unit provided a spreadsheet showing initial "book-ins" for detention facilities during the requested time period, which ICE produced in March 2019 without redactions. *Id*.

16.     Stevens administratively appealed, contending that the spreadsheet omitted the full addresses, phone numbers, and other information, and in June 2019 ICE remanded the appeal to

its FOIA office to search for a list of field offices.  Dkt. 7 (Answer) ¶¶ 24-26; Ex. A (Pineiro Decl.) ¶¶ 8, 55.

17.     An Enforcement and Removal Operations mission support specialist, based on his knowledge of the office's mission, subsequently searched the office's intranet using the search terms "phone lists" and "field offices" and located responsive documentation.  Ex. A (Pineiro Decl.) ¶ 56.

18.     ICE released that documentation—consisting of an 11-page spreadsheet—on June 26, 2019.  Ex. A (Pineiro Decl.) ¶¶ 9, 56.

### August 23, 2018 Request

19.     Stevens submitted a FOIA request to ICE on August 23, 2018, seeking:

A. The most recent Jail Services Cost Statement (JSCS) for the following facilities ICE uses to hold people under immigration laws:
>    1) the Berks County Residential Center, Berks County, PA;
>    2) South Texas Family Residential Center, Dilley, TX;
>    3) Hudson County Jail, Hudson County, NJ;
>    4) Stewart County, GA, (CoreCivic);
>    5) Aurora, Colorado (GEO)
>    6) Tacoma, WA (GEO)
>    7) Otay Mesa, CA (CoreCivic)
>    8) Eloy, EZ (CoreCivic)
>    9) Pinal County Jail, AZ
>    10) Otero County Processing Center, NM (MTC)
>    11) Joe Corley Detention Facility, Conroe TX (GEO)
>    12) Houston, TX (CoreCivic on Export Drive)
>    13) IAH, Secure Adult Detention Center (MTC)
>        (Livingstone, TX)
>    14) LaSalle, LA

B. Memorandum from Michael J. Davidson, Chief, CALD, OPLA, ICE to William C. Randolph, Director and Head of Contracting Activity, OAQ, ICE, Funding Intergovernmental Service Agreements (Feb. 7, 2013).

C. All information in any medium including but but (sic) not limited to e-mail, text messages, reports, contracts, memoranda, letters, or faxes signed by, from, to OR about Charlie Dent, John McCormack,

Eric Ruth, Matthew Lerch, Judith Kraine, Mark Baldwin, William Dennis, Thomas Gajewski, Judith Schwank, Mark Scott in ICE components that handle Berks County, PA ICE Intergovernmental Service Agreements (IGSAs) and not responsive to previous requests. This means any document under ICE control associated with detention or removal operations, facility leases, purchases, sales, or services rendered in Berks County, PA that references any of the individuals listed above is responsive to this request. Please make sure to inquire of any ICE component responsible for any negotiations with Berks County. The time frame of this request is 2000 to present. The most likely location of records responsive to this request are offices responsible for the Berks County, PA operations, contracts, and reviews, including but not limited to litigation for that facility. In particular, there should be communications in 2006 about ICE –contracted facility firings based on allegations of unlawful actions. Components within ICE that are alerted about misconduct or possible litigation should be searched for responsive records.

D. All grievance logs and grievances for Berks County, PA, Hudson County, NJ, and Otero County Processing Center, January 1, 2010 to present (Names and other Personally Identifying information is of course exempt and may be redacted.)

E. All Jail Services Costs Statements for Berks County Family Facility and Hudson County, NJ 2001 to present.'

F. Since January 1, 1999, the earliest first 100 pages of documents associated with the IGSA for:
1. Berks County, PA
2. Hudson County, NJ
For "F" please request documents of the component of ICE predecessor INS that would initiate discussions of IGSAs for the purposes of holding people under immigration laws.

I am seeking the first information referencing these county governments as suitable detention locations by an INS component in any medium, including but not limited to emails, letters, proposals, memorandums, or reports.

G. All Evaluations associated with contracts for facilities below, including technical and performance evaluations by the Contracting Officers and ICE Detention Planning and Acquisition Unit and ongoing performance and renewals by contract officers EXCEPT Inspector reports. The time frame for this request is January 1, 2000

or the first year of the facility's submission of the JCSC through the present.

    1) the Berks County Residential Center, Berks County, PA;
    2) South Texas Family Residential Center, Dilley, TX;
    3) Hudson County Jail, Hudson County, NJ;
    4) Stewart County, GA, (CoreCivic);
    5) Aurora, Colorado (GEO)
    6) Tacoma, WA (GEO)
    7) Otay Mesa, CA (CoreCivic)
    8) Eloy, EZ (CoreCivic)
    9) Pinal County Jail, AZ
    10) Otero County Processing Center, NM (MTC)
    11) Joe Corley Detention Facility, Conroe TX (GEO)
    12) Houston, TX (CoreCivic on Export Drive)
    13) IAH, Secure Adult Detention Center (MTC)
       (Livingstone, TX)
    14) LaSalle, LA

H. Evaluations of JCSCs by Contracting Officers and ICE Detention Planning and Acquisition Unit for all detention contracts since January 1, 2008.

I. Evaluations of the FIRST JCSCs by Contracting Officers and ICE Detention Planning and Acquisition Units (or their predecessors) for all currently operating ICE/INS detention facilities except as covered by (H).

Dkt. 41 (Answer) ¶ 52.

20.    ICE determined that its Office of Acquisition Management and its Enforcement and Removal Operations offices were reasonably likely to have responsive records and tasked those offices to search for records in September 2018. Ex. A (Pineiro Decl.) ¶ 82.

21.    At the Office of Acquisition Management, a senior advisor contract specialist spent 48 hours searching the office's Procurement Request Information System Management database—a procurement database that DHS has used since 2004 for all phases of its procurement cycle including acquisition planning through contract closeout—using the detention facility location codes for each of the 14 sites identified in the request, which identified all contract numbers for those facilities. Ex. A (Pineiro Decl.) ¶ 83; *see also id.* ¶ 78. The office gathered 11,855 pages of

potentially responsive contract-related records and gave them to ICE's FOIA office, which processed them and released the responsive records in multiple releases from January 2021 to March 2023. *Id*.

22.     The Enforcement and Removal Operations office tasked its Custody Management Division and its Detention Planning and Acquisition Unit too search for records, which identified responsive Excel spreadsheets, which ICE produced in August 2023. Ex. A (Pineiro Decl.) ¶¶ 84-85.

23.     ICE also tasked its Office of Professional Responsibility to search for records. Ex. A (Pineiro Decl.) ¶ 86. A management and program analyst in that office spent 8 hours searching the Joint Integrity Case Management System—a case management system that ICE uses to record claims of employee misconduct, manage criminal and administrative investigations, and track employee and contractor disciplinary actions—for grievance logs relating to the Otero, Berks County, and Hudson County facilities. Ex. A (Pineiro Decl.) ¶ 86. The search located an Excel spreadsheet with grievance data, which ICE produced in October 2023. *Id*.

### December 2018 Request

24.     Stevens submitted a FOIA request to ICE on December 16, 2018, seeking:

> All contracts and associated attachments, memorandums of understanding, e-mail, and all other items associated with the submission, acceptance, and review of the CFG Health Systems, LLC, contracts with Hudson County for health care provided to people held under immigration laws.
>
> All logs of grievances (oral and written) submitted by people detained at the Hudson County facility.
>
> All medical expense reports submitted to ICE, including via Hudson County.
>
> All reviews and reports on health care services provided to people held under immigration laws at the Hudson County facility,

8

> including regular reports, ad hoc reports, and those based on specific
> grievances or complaints generated by any source.
>
> All reports of hunger strikes.
>
> All reports of hospitalization outside of the Hudson County facility
> for people held under immigration laws by Hudson County.

Dkt. 41 (Answer) ¶ 67.

25.     ICE tasked its Office of Professional Responsibility, its Office of Acquisition Management, and its Enforcement and Removal Operations office to search for records.  Ex. A (Pineiro Decl.) ¶ 87.

26.     In the Office of Professional Responsibility, a section chief performed a computer search using the search terms "medical" and "grievance," a manual search of computer files for inspections relating to the Hudson County jail, and an Outlook search using the terms "Hudson," "medical, "grievance," and "hunger."  Ex. A (Pineiro Decl.) ¶ 88.  The search located responsive records.  *Id.*

27.     Also in the Office of Professional Responsibility, a management and program analyst spent six hours searching the Joint Integrity Case Management System—a case management system that ICE uses to record claims of employee misconduct, manage criminal and administrative investigations, and track employee and contractor disciplinary actions—using the terms "case summary," "ROI synopsis," "ROI narrative," "hunger strike," "medical treatment," and "hospital," and identified responsive records.  Ex. A (Pineiro Decl.) ¶ 88; *see also id.* ¶ 86.

28.     At the Office of Acquisition Management, an employee familiar with the office's practices and contract activities responded that the office had no contracts with the medical care provider CFG Health Systems for the Hudson County jail, and that therefore any search would not be reasonably calculated to uncover responsive records.  Ex. A (Pineiro Decl.) ¶ 89.

29.     The Enforcement and Removal Operations office determined that its Newark and New York City field offices, as well as the ICE Health Service Corps, should be tasked to search because those offices had oversight for ICE detainees housed at the Hudson County facility.  Ex. A (Pineiro Decl.) ¶ 90.

30.     In that Newark field office, two supervisory detention and deportation officers, based on their supervisory duties and their knowledge of the office's recordkeeping, spent three hours searching the office's shared drive and Outlook using the search terms "hunger strike," "hospitalization," "hospital admission," "Hudson hunger strike," "SIR Hudson" (referring to "significant incident report"), and "Hudson," and located responsive records.  Ex. A (Pineiro Decl.) ¶ 91.

31.     In the New York field office, an assistant field office director knowledgeable of the office's recordkeeping searched the office's shared drive and Outlook using the search terms "grievance," "medical expense," "health care services," "hunger strikes," and "hospital," and located responsive records.  Ex. A (Pineiro Decl.) ¶ 91.

32.     Also in the New York field office, a supervisor detention and deportation officer searched the office's database for Hudson County jail records using the search term "grievance" and manually checked paper files and located responsive records.  Ex. A (Pineiro Decl.) ¶ 91.

33.     At the ICE Health Service Corps, a commander and field medical coordinator spent three hours searching the office's tracker using the search terms "NYC AOR" (referring to area of responsibility) and "Hudson," conducted a computer search using the terms "Hudson hunger strike" and "Hudson hospital report," and conducted an Outlook search using the terms "Hudson AND hunger strike" and "Hudson AND hospital report," and located responsive records.  Ex. A (Pineiro Decl.) ¶ 91.

34.     ICE produced responsive records in December 2019, November 2020, and January

2021.  Ex. A (Pineiro Decl.) ¶ 91.

### January 2019 Request

35.     Stevens submitted a FOIA request to ICE in on January 16, 2019, seeking:

> for the following maintained, received, or required to be produced
> by ICE related to health care services at the Kenosha County, WI
> jail for individuals held under immigration laws.  The component
> most likely to have responsive records is the ICE Health Service
> Corps, though contract and civil rights monitoring components of
> ICE also are likely locations for such records.
>
> 1. All contracts and associated attachments, memorandums of
> understanding, email, and all other items associated with the
> submission; acceptance, and review of detainee health with Kenosha
> County, WI for health care provided to people held under
> immigration laws.
>
> 2. All logs of grievances (oral and written) submitted by people
> detained at the Kenosha County facility.
>
> 3. All medical expense reports submitted to ICE for the Kenosha
> County facility.
>
> 4. All reviews and reports on health care services provided to people
> held under immigration laws at the Kenosha County facility,
> including regular reports, ad hoc reports, and those based on specific
> grievances or complaints generated by any source.
>
> 5. All reports of hunger strikes.
>
> 6. All reports of hospitalization outside of the Kenosha County
> facility for people held under immigration laws by Hudson County.
> The time frame for this request is January 1, 2015 to the present.
>
> Databases that may have information responsive to this request
> include but are not limited to: CaseTrakker, MedEZ, Dental Xray
> System, Criminal Institution Pharmacy System, Medical Payment
> Authorization Request Web System (MedPAR) and Medical
> Classification Database.

Dkt. 41 (Answer) ¶ 44.

36. ICE determined that its Enforcement and Removal Operations office, its Office of Acquisition Management, and its Office of Professional Responsibility were reasonably likely to have responsive records and tasked those offices to search for records in February 2019. Ex. A (Pineiro Decl.) ¶ 74.

37. The Enforcement and Removal Operations office responded that it does not maintain medical records for detention centers such as the Kenosha County jail and that it does not maintain grievance logs for the Kenosha County jail. Ex. A (Pineiro Decl.) ¶¶ 75-76.

38. However, a supervisory detention deportation officer in ERO's Chicago field office, who based on his duties was the person reasonably likely to have access to responsive records, also searched Outlook using the terms "Kenosha," "hunger strike," and "grievance" and found no responsive records. Ex. A (Pineiro Decl.) ¶ 76.

39. In the Office of Acquisition Management, a contracting officer's representative—who, due to his duties in overseeing the contract between ICE and Kenosha County, was knowledgeable about how to search for responsive records—spent 12 hours conducting a computer search, manually reviewing computer folders, and searching Outlook, using the terms "Kenosha," "Kenosha Medical," "Kenosha Invoices," "Kenosha 2015," "Kenosha 2016," "Kenosha 2017," "Kenosha 2018," "Kenosha 2019," "Medical Issues," "G-514s" (the name of ICE's purchase requisition forms), "Contracts/MODS" (referring to contract modifications), and "Approved Invoices." Ex. A (Pineiro Decl.) ¶ 77. The search returned responsive records. *Id.*

40. Also in the Office of Acquisition Management, a senior advisor and procurement analyst in the office's detention, compliance and removals unit searched the office's Procurement Request Information System Management database—a procurement database that DHS has used since 2014 for all phases of its procurement cycle including acquisition planning through contract

closeout—using the search terms "Kenosha" and "Kenosha County." Ex. A (Pineiro Decl.) ¶ 78. The search returned responsive records. *Id*.

41.     In the Office of Professional Responsibility, a management program analyst who was reasonably likely to locate responsive records based on his duties in the office searched the office's Inspections and Detention Oversight database using search terms from the FOIA request itself. Ex. A (Pineiro Decl.) ¶ 79. Meanwhile, a unit chief searched the office's shared drive using the terms "Kenosha medical" and "Kenosha grievance." *Id*. Both searches returned responsive records. *Id*.

42.     ICE produced the responsive records to Stevens in June 2019, October 2020, January 2021, July 2023, and August 2023. Dkt. 41 (Answer) ¶ 46; Ex. A (Pineiro Decl.) ¶ 80.

**March 2019 Request**

43.     Stevens submitted a FOIA request to ICE on March 25, 2019, seeking:

> All documents ICE has referencing the Butler County Jail work program for detainees, including but not limited to documents with the language about porters Chief Dwyer stated he had personally read in an IGSA, as well as all other correspondence about the Butler County's use of people held under immigration law to perform work in and around the facility. People likely to have or have access to responsive documents include but are not limited to Tae Johnson and Kevin Landy.

> All formal and informal compliance reports and follow-up correspondence, including but not limited to email, attachments, grievances or complaints, and contract addenda for Butler County, in particular associated with the deficiencies noted in the reports.

> All data tracking the length of time people are held in the Butler County facility; if there is a db with the number of days/alien please send me an output from that db with the individually identifying information redacted but including the date of arrival and transfer from the facility, as well as the status of the case at the time of transfer, i.e., VD, removal, termination, transfer to another ICE facility. The date for this request is April 11, 2014 through the time the documents are submitted from the component to the ICE FOIA

> office for redaction or the time frame when the documents are
> produced in litigation, whichever is most contemporary to their
> production to me.

Dkt. 41 (Answer) ¶ 36.

44.    ICE subsequently received clarification from Stevens that, of the three Butler County jails the FOIA request could be referring to, the jail in question was the jail in Butler County, Ohio.  Ex. A (Pineiro Decl.) ¶ 63.

45.    ICE determine that its Enforcement and Removal Operations office was reasonably likely to have responsive records and tasked that office to search for records in July 2019.  Ex. A (Pineiro Decl.) ¶ 63.

46.    A mission support specialist in ERO's Custody Management office searched ERO's sharepoint site using the detention location code for the Butler County jail.  Ex. A (Pineiro Decl.) ¶ 64.  A consultant in the same office searched ERO's shared drive using the search term "facility list report."  *Id*.  The searches identified potentially responsive records.  *Id*.

47.    A statistician at ICE's Law Enforcement Systems and Analysis Statistical Tracking Unit searched the unit's Enforcement Integrated Database (a repository for records relating to the investigation, arrest, booking, detention, and removal of individuals encountered during immigration and law enforcement investigations and operations) using the search terms "length of stay" and "Butler County Jail" run together.  Ex. A (Pineiro Decl.) ¶ 65.  The search identified responsive records relating to intakes and releases from the Butler County jail and length-of-stay information for Fiscal Year 2014 onward.  *Id*.

48.    After this lawsuit was filed, ICE's FOIA office also tasked Custody Management's headquarters and the Enforcement and Removal Operations field office in Detroit.  Ex. A (Pineiro Decl.) ¶ 66.  Custody Management headquarters responded that it had no additional records

beyond what the mission support specialist and the consultant had previously identified. *Id*. The field office in Detroit, which had oversight for ICE detainees at the Butler County jail, found eight responsive email strings relating to work performed by detainees. *Id*.

49. ICE's FOIA office also tasked its Office of Professional Responsibility and its Office of Acquisition Management to search for responsive records. Ex. A (Pineiro Decl.) ¶ 67.

50. The professional responsibility office's Office of Detention Oversight's acting unit chief searched their hard drive, the office's shared drive, and Outlook using the search term "Butler County" and found potentially responsive inspection-related reports and communications for the Butler County jail for 2015, 2018, 2019, 2020, and 2021. Ex. A (Pineiro Decl.) ¶ 68. The office also determined that it did not inspect the Butler County jail in 2014, 2016, or 2017. *Id*.

51. In the Office of Acquisition Management, a contract specialist and policy analyst for the Detroit field office found 15 pages of responsive records including the original service agreement between ICE and Butler County as well as a modification to the agreement. Ex. A (Pineiro Decl.) ¶ 69. The office also determined that it would not have any records responsive to parts 2 or 3 of the request. *Id*.

52. ICE also determined that its Office of the Chief Information Officer could search for archived emails of the two custodians that Stevens had identified in the request (Tae Johnson and Kevin Landy). Ex. A (Pineiro Decl.) ¶¶ 70-71.

53. The Office of the Chief Information Officer collected all sent, deleted, and received emails from the two custodians from 2009 to present (2009 being when the earliest year of saved emails) and sent them to ICE's FOIA office. Ex. A (Pineiro Decl.) ¶ 72. The FOIA office searched the emails using the following search terms: "Butler County Jail" AND "work program"; "Butler County Jail" AND "voluntary work program" or "VWP"; "Butler County Jail" AND "porters";

15

and "Butler County Jail" AND "same rate as prisoners." *Id.* The search returned responsive records. *Id.*

54. ICE processed the records described above and produced them to Stevens. Ex. A (Pineiro Decl.) ¶¶ 65-66, 68-69, 72.

**November 2019 Request**

55. Stevens sent DHS a FOIA request on November 22, 2019, seeking:

> 1) all communications and related materials created, received, or maintained by the Department of Homeland Security to which Rep. Lauren Underwood (D-IL) or any member of her staff were a party. This includes but is not limited to all email, text messages, notes, reports, memorandums, proposed bill texts, and bill evaluations. In a floor speech of 9/26/2019 Rep. Underwood stated she received information from the "Department of Homeland Security" indicating a request for an integrated Electronic Health Records system she referenced as "EHR." She refers to this in her remarks on HR 3525 as a "direct ask from medical officers at the Department of Homeland Security."

> 2) DHS communications and related materials created by or received from other components of DHS or the Department of Health and Human Services Office of Refugee Resettlement about the use of Electronic Health Records systems already in place as well as the establishment of an EHR for use by offices of CBP.

> 3) Information on meetings and communications with private individuals, including but not limited to lobbyists or company officials related to past, current, or potential "enterprise" or other information technologies for collecting, coordinating, or maintaining health records data for those encountered or detained by DHS or any component of DHS. Technical reports, email, text messages, or other communications with the private sector tied to past, current, or potential contracts tied to EHR systems.

Dkt. 41 (Answer) ¶ 28.

56. The Electronic Health Records System is the result of ICE's having transformed its detainee health recordkeeping system by replacing multiple stand-alone legacy systems and paper-

based files with a centralized, web-based electronic health recordkeeping system for the medical treatment and care for detainees in ICE custody. Ex. A (Pineiro Decl.) ¶ 57. ICE determined that its Enforcement and Removal Operations office and its Office of Congressional Relations were the offices reasonably likely to have responsive records and tasked those offices to search in March 2020. Ex. A (Pineiro Decl.) ¶ 58.

57.　　The Enforcement and Removal Operations office tasked ICE's Health Service Corps to search for records. Ex. A (Pineiro Decl.) ¶¶ 57, 59. That office's IT chief (who was ICE's point-of-contact for the electronic health records integration project) searched his email using the search terms "Thomas Wilkinson" (DHS headquarters' chief medical officer), "DHS ehr," and "ehr integration." Ex. A (Pineiro Decl.) ¶ 59. Another officer who was involved in the electronic health records integration project also searched his email for "Tom Wilkinson." *Id.* The searches identified responsive records. *Id.*

58.　　At the Office of Congressional Relations, two liaison specialists searched their computers and emails using the search terms "Lauren Underwood (D-IL)," "Underwood," "Rep. Underwood," and "HR 3525" and found no records. Ex. A (Pineiro Decl.) ¶ 61. A legislative analyst also conducted a computer and email search using the term "Lauren Underwood (D-IL_" and found no records. *Id.*

59.　　ICE produced records in October 2020 and January 2021. Dkt. 41 (Answer) ¶¶ 49-50.

### Overall

60.　　Overall, ICE produced more than 12,000 pages of responsive records in response to Stevens's six FOIA requests. Ex. A (Pineiro Decl.) ¶ 92.

61.     ICE has prepared a *Vaughn* index that describes a sampling of 421 pages jointly agreed to by the parties on which ICE redacted information under FOIA Exemptions 3, 4, 5, 6, 7(C), and 7(E).  Ex. A (Pineiro Decl.) ¶ 92; Ex. B (table of productions); Ex. C (*Vaughn* index).

### FOIA Exemption 3

62.     Under FOIA Exemption 3, ICE redacted information on a single page of its production because the information relates to a medical update on an ICE detainee subject to statutory protections that prohibit ICE from disclosing information regarding that detainee, and disclosing the particular statute that prohibits disclosure would in itself reveal information that is protected from disclosure.  Ex. A (Pineiro Decl.) ¶ 96.

### FOIA Exemption 4

63.     Under FOIA Exemption 4, ICE withheld commercial and financial information that was submitted to the government by private entities and that is customarily and actually treated by those entities as private.  Ex. A (Pineiro Decl.) ¶ 97.

64.     For example, ICE withheld cost information submitted by a contractor called STG International, which provides staffing for medical services for ICE detainees at multiple detention facilities.  Ex. A (Pineiro Decl.) ¶ 98.

65.     Similarly, ICE withheld cost information contained in contract documents between ICE and Berks County, Pennsylvania, including financial information submitted by private contractors to provide detention-related services, including education and medical care to ICE detainees.  Ex. A (Pineiro Decl.) ¶ 98.

66.     ICE also withheld cost-related information submitted by CoreCivic Corporation and the GEO Group relating to contracts with ICE or intergovernmental service agreements between ICE and cities or counties providing detention-facility space for ICE detaniees.  Ex. A

(Pineiro Decl.) ¶ 98.  The cost-related information includes discount terms, bed day rates, hourly wages for staffing, the fee for transport service miles, not-to-exceed amounts, and other items.  *Id*.

67.    ICE also withheld, as proprietary commercial information, schematic drawings submitted by CoreCivic for construction additions to detention facilities.  Ex. A (Pineiro Decl.) ¶ 98.

### FOIA Exemption 5

68.    Under FOIA Exemption 5, ICE withheld, for example, portions of an email chain between various ICE executives—including the acting director of ICE, several assistant directors, and ICE's acting principal legal advisor—discussing how to respond to questions regarding detention facilities holding ICE detainees.  Ex. A (Pineiro Decl.) ¶ 100.  The redacted information includes, for example, comments from the assistant director of ICE's Office of Detention Policy and Planning providing his opinion on whether a statement from the sheriff of Butler County, if true, would violate ICE's detention standards.  *Id*. ¶ 101.

69.    Disclosure of the deliberative communications that ICE withheld would chill ICE's decision-making process because it would discourage the sharing of candid opinions, would inhibit the free and frank exchange of information and ideas between ICE personnel, and could cause ICE personnel to be less inclined to produce and circulate material for consideration by peers.  Ex. A (Pineiro Decl.) ¶ 105.

70.    As another example of an Exemption 5 withholding, ICE withheld portions of an email chain containing legal analysis from ICE's Acting Principal Legal Advisor Riah Ramlogan and subsequent executives' responses.  Ex. A (Pineiro Decl.) ¶ 106.  The withheld information is pre-decisional, deliberative, and attorney-client privileged.  *Id*.  The exchanges consist of recommendations, analysis, and discussions undertaken to aid ICE's decision-making, as well as

attorney-client information, opinions, and analysis provided by ICE's acting principal legal advisor. *Id*. ¶¶ 106-07.

### FOIA Exemptions 6 and 7

71.     Under FOIA Exemptions 6 and 7(C), ICE withheld the names, initials, signatures, phone numbers, email addresses, and suite numbers of federal law enforcement officers, other government employees, and non-public-facing employees of private detention service providers and medical-care staffing companies. Ex. A (Pineiro Decl.) ¶ 114.

72.     The employees whose information was withheld assist ICE with its law enforcement mission, which includes providing housing, education, and healthcare for detainees. Ex. A (Pineiro Decl.) ¶ 115.  The employees have a privacy interest in not becoming targets of harassment by anyone who may begrudge them for their involvement in immigration law enforcement and in remaining free from interference in the performance of their duties by anyone who opposes ICE's mission.  *Id*.  Disclosure could also result in their being subjected to personal requests for law enforcement information or information about ongoing or closed investigations. *Id*. ¶ 116.

73.     Having determined that the employees have a privacy interest in not having their information released, ICE then balanced their privacy interest against the public's interest in disclosure and determined that releasing the employees' personal information would not shed further light on ICE's operations or activities.  Ex. A (Pineiro Decl.) ¶ 117.

74.      On top of that, the third-party employees whose information was withheld have not provided their consent to the information's release, as would be required by 6 C.F.R. §§ 5.3(a), 5.21(d).

75.     Under FOIA Exemption 7(E), ICE withheld information regarding specific security measures for detention officers, including information on hold rooms, armed transportation, and management of the keys and locks at detention facilities, the use and storage of firearms and body armor, internal ICE accounting information, detention facility schematics (showing the layout, ingress and egress locations, and the proximity of guard stations to and security surveillance of areas within a detention facility), staffing plans by shift for security operations at detention facilities, schedules and routes for busing detainees between facilities, schedules for perimeter surveillance, procedures regarding detainee use of certain tools, and the frequency and schedule of detainee counts.  Ex. A (Pineiro Decl.) ¶ 120.

76.     Disclosure of the information ICE withheld under Exemption 7(E) could reasonably be expected to reveal where a particular detention facility would be most vulnerable to efforts to avoid detection and apprehension when organizing an escape or disturbance and how to thwart or frustrate security measures to prevent or quell such incidents.  Ex. A (Pineiro Decl.) ¶ 121.  Public awareness of the information would aid anyone seeking to gain unauthorized entry, because they would know the facility's layout and security procedures, which could be exploited to access the facility and frustrate the security measures.  *Id.*  ¶¶ 121-22.

### Segregability

77.     ICE conducted a line-by-line review to identify any information exempt from disclosure or for which a discretionary waiver of exemption could be applied and determined that all information was correctly segregated, with the non-exempt portions released.  Ex. A (Pineiro Decl.) ¶ 124-25.

78.     ICE did not withhold any non-exempt information on the grounds that it was not segregable.  Ex. A (Pineiro Decl.) ¶ 125.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By: s/ Alex Hartzler
    ALEX HARTZLER
    Assistant United States Attorney
    219 South Dearborn Street
    Chicago, Illinois 60604
    (312) 886-1390
    alex.hartzler@usdoj.gov

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JACQUELINE STEVENS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 20 C 2725 |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | Judge Rowland |
| HOMELAND SECURITY, | ) | |
| IMMIGRATION AND CUSTOMS | ) | |
| ENFORCEMENT, | ) | |
| | ) | |
| Defendant. | ) | |

**INDEX OF EXHIBITS TO**
**DEFENDANT'S RULE 56.1 STATEMENT OF FACTS**

| Exhibit A | Declaration of Fernando Pineiro |
|---|---|
| Exhibit B | Table of Productions |
| Exhibit C | *Vaughn* index |

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By: s/ Alex Hartzler
　　ALEX HARTZLER
　　Assistant United States Attorney
　　219 South Dearborn Street
　　Chicago, Illinois 60604
　　(312) 886-1390
　　alex.hartzler@usdoj.gov

# Exhibit A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

JACQUELINE STEVENS,

        Plaintiff,

     v.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT and U.S. DEPARTMENT OF
HOMELAND SECURITY,

        Defendants.

No. 20 C 2725

Judge Rowland

**DECLARATION OF FERNANDO PINEIRO
IN SUPPORT OF U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT**

**I.     INTRODUCTION**

I, Fernando Pineiro, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

    1.      I am the FOIA Director of the U.S. Immigration and Customs Enforcement

("ICE") Freedom of Information Act ("FOIA") Office.  I have held this position since August

14, 2022, and I am the ICE official immediately responsible for supervising ICE responses to

requests for records under the Freedom of Information Act, 5 U.S.C § 552 ("the FOIA"), the

Privacy Act, 5 U.S.C. § 552a ("the Privacy Act"), and other applicable records access statutes

and regulations.  Prior to this position, I was the Deputy FOIA Officer of the ICE FOIA Office

from December 29, 2013, to August 13, 2022, and prior to that I was the FOIA Officer for three

years at the Office for Civil Rights and Civil Liberties ("CRCL") at the U.S. Department of

Homeland Security ("DHS").

2.      The ICE FOIA Office is responsible for processing and responding to all FOIA, 5 U.S.C. § 552, and Privacy Act, 5 U.S.C. § 552a, requests received at ICE.

3.      As the FOIA Director of the ICE FOIA Office, my official duties and responsibilities include the general management, oversight, and supervision of the ICE FOIA Office. I manage and supervise a staff of ICE FOIA Paralegal Specialists, who report to me regarding the processing of FOIA and Privacy Act requests received by ICE. In connection with my official duties and responsibilities, I am familiar with ICE's procedures for responding to requests for information pursuant to provisions of the FOIA and the Privacy Act. In that respect, I am familiar with ICE's processing of the six FOIA requests submitted to ICE that are the subject of this litigation.[1]

4.      I make this declaration in my official capacity in support of Defendants[2] in the above-captioned action. The statements contained in this declaration are based upon my personal knowledge, my review of documents kept by ICE in the ordinary course of business, and information provided to me by other ICE employees in the course of my official duties.

5.      Additionally, in accordance with *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), this declaration describes, in a sampling of 421 pages of records jointly agreed to by the parties, the portions of records ICE withheld in response to Plaintiff's FOIA requests and

---

[1] As discussed herein, FOIA Request No. 1, 2018-ICFO-56530, was submitted on August 6, 2018; FOIA Request No. 2, 2020-ICFO-18634, was submitted on November 22, 2019; FOIA Request No. 3, 2019-ICFO-33429, was submitted on March 25 2019; Request No. 4, 2019-ICFO-29171, was submitted on January 16, 2019; FOIA Request No. 5, 2018-ICFO-59138, was submitted on August 23, 2018, and Request No. 6, 2019-ICFO-24680, was submitted on December 16, 2018.

[2] One of the six FOIA requests was initially directed to DHS but determined to more appropriately be directed to ICE, a component of DHS.  Hence, the ICE FOIA Office responded to all 6 FOIA requests included in this lawsuit.

2

the basis for ICE's withholdings pursuant to FOIA Exemptions (b)(3), (b)(4), (b)(5), (b)(6),

(b)(7)(C) and (b)(7)(E). *See Exhibit C – Vaughn Index.*

## II. PROCEDURAL HISTORY OF THE PLAINTIFF'S FOIA REQUESTS AND THE INSTANT LITIGATION

### Request No. 1 – 2018-ICFO-56530  Subfield Office Locations

6.      Plaintiff submitted FOIA Request No. 1[3] to ICE on August 6, 2018, seeking the

following:

> 1)  A list of all ICE Enforcement and Removal Field and Subfield offices by control city, including the complete phone numbers and addresses of these offices in the United States and abroad and information on holding cells in these locations, as well as the number of unique individuals in custody at that location between Monday, July 30 and August 5, 2018. Please include as well all locations at which individuals were held for more than 24 hours and the dates on which that occurred between January 1, 2016 and the day of the release of information.

> 2)   Please include the Excel spreadsheet and screen shots of the data base interface used to produce the search results.

> 3)  A list of addresses for locations listed as "unavailable" in the release to the NIJC of 11/6/2017 (https://immigrantjustice.org/sites/default/files/uploaded-files/no-content-type/2018-06/ICE_Facility_List_11-06-2017-web.xlsx).

7.      In a letter to Plaintiff dated August 17, 2018[4], the ICE FOIA Office

acknowledged receipt of the FOIA request dated August 6, 2018, assigned it ICE FOIA case

number 2018-ICFO-56530, and tasked the program office reasonably likely to have responsive

---

[3] The FOIA Requests are addressed in the order they were presented in the Complaint as opposed to chronological order.

[4] Defendants' answer to the amended complaint erroneously cited a September 5, 2018 acknowledgement letter; the letter was dated August 17, 2018.

3

records. On March 15, 2019, ICE provided Plaintiff with a spreadsheet of responsive information with no withholdings.

8.      On May 10, 2019, Plaintiff appealed the determination, claiming that the spreadsheet omitted the full addresses and phone numbers as well as other information requested. On May 20, 2019, ICE's Office of the Principal Legal Advisor (OPLA), Government Information Law Division (GILD) acknowledged receipt of the appeal and assigned it ICE FOIA appeal number 2019-ICAP-00377. On June 18, 2019, GILD advised Plaintiff that it was remanding the appeal to the ICE FOIA Office for completion of processing, including tasking for additional searches and direct response to Plaintiff.

9.      On June 26, 2019, the ICE FOIA Office produced an 11-page spreadsheet of responsive information with withholdings under FOIA Exemptions (b)(6) and (b)(7)(C) to the names, titles, and phone numbers of ICE personnel associated with the ICE field and subfield offices. On June 27, 2019, Plaintiff replied that she had to squint to read the spreadsheet and that it appeared to be missing some subfield offices, and a responsive field for the number of people detained.

10.      ICE considered its response on the appeal remand to be final and no further documents were released.

**Request No. 2 – 2020-ICFO-18634 Lauren Underwood and Electronic Health Records**

11.      Plaintiff submitted FOIA Request No. 2 to ICE on November 22, 2019, to the U.S. Department of Homeland Security (DHS) seeking the following:

> 1) All communications and related materials created, received, or maintained by the Department of Homeland Security to which Rep. Lauren Underwood (D-IL) or any member of her staff were a party. This includes but is not limited to all email, text messages, notes,

4

reports, memorandums, proposed bill texts, and bill evaluations. In a floor speech of 9/26/2019 Rep. Underwood stated she received information from the "Department of Homeland Security" indicating a request for an integrated Electronic Health Records System she referenced as "EHR." She refers to this in her remarks on HR 3525 as a "direct ask from medical officers at the Department of Homeland Security."

2) DHS communications and related materials created by or received from other components of DHS or the Department of Health and Human Services Office of Refugee Resettlement about the use of Electronic Health Records systems already in place as well as the establishment of an EHR for the use by offices of CBP.

3) Information on meetings and communications with private individuals, including but not limited to lobbyists or company officials related to past, current, or potential "enterprise" or other information technologies for collecting, coordinating, or maintaining health records data for those encountered or detained by DHS or any component of DHS. Technical reports, email, text messages, or other communications with the private sector tied to past, current, or potential contracts tied to EHR systems.

The time frame of this request is January 1, 2017 to the present, by which I mean the date a search is initiated by the tasked component.

12.     On December 2, 2019, the U.S. Department of Homeland Security (DHS) acknowledged Plaintiff's FOIA Request, assigned it request tracking number 2020-HQFO-00215, and advised Plaintiff that due to the subject matter of the request, it was being transferred to FOIA Officers for ICE and U.S. Customs and Border Protection (CBP) for processing under the FOIA and direct response to Plaintiff.

13.     On January 22, 2020, the ICE FOIA Office advised Plaintiff that her request was assigned ICE FOIA Case No. 2020-ICFO-18634, that the request was too broad in scope and did not specifically identify the records or only posed questions to the agency, and asked that Plaintiff perfect her request with a reasonable description of the records sought. Subsequently, on March 2, 2020, ICE FOIA advised that the appropriate program offices had been tasked with

searches.

### Request No. 3 – 2019-ICFO-33429 Butler County Jail

14.     On March 25, 2019, Plaintiff submitted a FOIA request for the following:

> All documents ICE has referencing the Butler County Jail work
> program for detainees, including but not limited to documents with
> the language about porters Chief Dwyer stated he had personally
> read in an IGSA, as well as all other correspondence about the Butler
> County's use of people held under immigration law to perform work
> in and around the facility. People likely to have or have access to
> responsive documents include but are not limited to Tae Johnson
> and Kevin Landy.

> All formal and informal compliance reports and follow-up
> correspondence, including but not limited to email, attachments,
> grievances or complaints, and contract addenda for Butler County,
> in particular associated with the deficiencies noted in the reports.

> All data tracking the length of time people are held in the Butler
> County facility; if there is a db with the number of days/alien please
> send me an output from that db with the individually identifying
> information redacted but including the date of arrival and transfer
> from the facility, as well as the status of the case at the time of
> transfer, i.e., VD, removal, termination, transfer to another ICE
> facility. The date for this request is April 11, 2014 through the time
> the documents are submitted from the component to the ICE FOIA
> office for redaction or the time frame when the documents are
> produced in litigation, whichever is most contemporary to their
> production to me.

15.     On April 8, 2019, ICE acknowledged receipt of the FOIA request, and assigned it

tracking number 2019-ICFO-33429. ICE asked Plaintiff to clarify to which of the three Butler

County jails the request was directed, and Plaintiff clarified that it was the Butler County, Ohio

facility. ICE FOIA tasked certain program offices likely to have responsive records with searches

and responsive records were provided ICE FOIA for processing and release to Plaintiff.

### Request No. 4 – 2019-ICFO-29171 Kenosha County Jail

6

16.    On January 16, 2019, Plaintiff submitted the following FOIA request to ICE:

for the following maintained, received, or required to be produced by ICE related to health care services at the Kenosha County, WI jail for individuals held under immigration laws. The component most likely to have responsive records is the ICE Health Service Corps, though contract and civil rights monitoring components of ICE also are likely locations for such records.

1. All contracts and associated attachments, memorandums of understanding, email, and all other items associated with the submission; acceptance, and review of detainee health with Kenosha County, WI for health care provided to people held under immigration laws.

2. All logs of grievances (oral and written) submitted by people detained at the Kenosha County facility.

3. All medical expense reports submitted to ICE for the Kenosha County facility.

4. All reviews and reports on health care services provided to people held under immigration laws at the Kenosha County facility, including regular reports, ad hoc reports, and those based on specific grievances or complaints generated by any source.

5. All reports of hunger strikes.

6. All reports of hospitalization outside of the Kenosha County facility for people held under immigration laws by Hudson County. The time frame of this request is January 1, 2015 to the present.

Databases that may have information responsive to this request include but are not limited to: CaseTrakker, MedEZ, Dental XRay System, Criminal Institution Pharmacy System, Medical Payment Authorization Request Web System (MedPAR) and Medical Classification Database.

17.    On February 26, 2019, ICE acknowledged receipt of the FOIA request, assigned it tracking number 2019-ICFO-29171, and tasked various ICE program offices reasonably likely to have responsive documents with the search. On February 27, 2019, in a partial response to ICE FOIA from one of the program offices, Enforcement and Removal Operations (ERO), ERO

7

advised that it does not maintain medical records for detention centers, such as Kenosha County Jail, that are not ICE Service Processing Centers, and that such records should be sought from the Kenosha County Jail directly.

18.     On June 10, 2019, ICE provided a final response releasing 15 pages of contract-related responsive records to Plaintiff with partial redactions under FOIA Exemptions (b)(4), (b)(6) and (b)(7)(C).

19.     On August 29, 2019, ICE received Plaintiff's appeal letter dated August 16, 2019, regarding ICE's final response, challenging the adequacy of the search, and assigned it ICE FOIA appeal number 2019-ICAP-00567. On September 26, 2019, GILD advised Plaintiff that the contract between ICE and Kenosha County was limited to detention and transportation services; that to request records pertaining to medical services, Plaintiff should submit a request directly to the Kenosha County detention facility, and that, notwithstanding, GILD was remanding the appeal to the ICE FOIA Office for completion of processing of other records gathered, and including tasking for additional searches and direct response to Plaintiff. Additional records were located and subsequently processed and released to Plaintiff on October 7, 2020 and January 6, 2021.

**Request No. 5 – 2018-ICFO-59138 Jail Services Costs Statements**

20.     On August 23, 2018, Plaintiff submitted a request to ICE for the following information:

> A. The most recent Jail Services Cost Statement (JSCS) for the following facilities ICE uses to hold people under immigration laws:
> 1) the Berks County Residential Center, Berks County, PA;
> 2) South Texas Family Residential Center, Dilley, TX;
> 3) Hudson County Jail, Hudson County, NJ;
> 4) Stewart County, GA, (CoreCivic);
> 5) Aurora, Colorado (GEO)

8

6) Tacoma, WA (GEO)
7) Otay Mesa, CA (CoreCivic)
8) Eloy, EZ (CoreCivic)
9) Pinal County Jail, AZ
10) Otero County Processing Center, NM (MTC)
11) Joe Corley Detention Facility, Conroe TX (GEO)
12) Houston, TX (CoreCivic on Export Drive)
13) IAH, Secure Adult Detention Center (MTC)
    (Livingstone, TX)
14) LaSalle, LA

B. Memorandum from Michael J. Davidson, Chief, CALD, OPLA, ICE to William C. Randolph, Director and Head of Contracting Activity, OAQ, ICE, Funding Intergovernmental Service Agreements (Feb. 7, 2013).

C. All information in any medium including but but (sic) not limited to e-mail, text messages, reports, contracts, memoranda, letters, or faxes signed by, from, to OR about Charlie Dent, John McCormack, Eric Ruth, Matthew Lerch, Judith Kraine, Mark Baldwin, William Dennis, Thomas Gajewski, Judith Schwank, Mark Scott in ICE components that handle Berks County, PA ICE Intergovernmental Service Agreements (IGSAs) and not responsive to previous requests. This means any document under ICE control associated with detention or removal operations, facility leases, purchases, sales, or services rendered in Berks County, PA that references any of the individuals listed above is responsive to this request. Please make sure to inquire of any ICE component responsible for any negotiations with Berks County. The time frame of this request is 2000 to present. The most likely location of records responsive to this request are offices responsible for the Berks County, PA operations, contracts, and reviews, including but not limited to litigation for that facility. In particular, there should be communications in 2006 about ICE –contracted facility firings based on allegations of unlawful actions. Components within ICE that are alerted about misconduct or possible litigation should be searched for responsive records.

D. All grievance logs and grievances for Berks County, PA, Hudson County, NJ, and Otero County Processing Center, January 1, 2010 to present (Names and other Personally Identifying information is of course exempt and may be redacted.)

E. All Jail Services Costs Statements for Berks County Family Facility and Hudson County, NJ 2001 to present.'

9

F. Since January 1, 1999, the earliest first 100 pages of documents associated with the IGSA for:

    1. Berks County, PA

    2. Hudson County, PA

For "F" please request documents of the component of ICE predecessor INS that would initiate discussions of IGSAs for the purposes of holding people under immigration laws.

I am seeking the first information referencing these county governments as suitable detention locations by an INS component in any medium, including but not limited to emails, letters, proposals, memorandums, or reports.

G. All Evaluations associated with contracts for facilities below, including technical and performance evaluations by the Contracting Officers and ICE Detention Planning and Acquisition Unit and ongoing performance and renewals by contract officers EXCEPT Inspector reports. The time frame for this request is January 1, 2000 or the first year of the facility's submission of the JCSC through the present.

    1) the Berks County Residential Center, Berks County, PA;

    2) South Texas Family Residential Center, Dilley, TX;

    3) Hudson County Jail, Hudson County, NJ;

    4) Stewart County, GA, (CoreCivic);

    5) Aurora, Colorado (GEO)

    6) Tacoma, WA (GEO)

    7) Otay Mesa, CA (CoreCivic)

    8) Eloy, EZ (CoreCivic)

    9) Pinal County Jail, AZ

    10) Otero County Processing Center, NM (MTC)

    11) Joe Corley Detention Facility, Conroe TX (GEO)

    12) Houston, TX (CoreCivic on Export Drive)

    13) IAH, Secure Adult Detention Center (MTC)

      (Livingstone, TX)

    14) LaSalle, LA

H. Evaluations of JCSCs (sic) by Contracting Officers and ICE Detention Planning and Acquisition Unit for all detention contracts since January 1, 2008.

I. Evaluations of the FIRST JCSCs (sic) by Contracting Officers and ICE Detention Planning and Acquisition Units (or their predecessors) for all currently operating ICE/INS detention facilities except as covered by (H).

21.    On September 5, 2018, ICE acknowledged Plaintiff's FOIA request, assigned it tracking number 2018-ICFO-59138, and tasked various ICE program offices reasonably likely to have responsive documents with a search. On October 25, 2018, ICE provided Plaintiff's with a final response letter indicating that a search of program offices ERO and Office of Acquisition Management (OAQ) returned a no records found response.

22.    On November 26, 2018, ICE received Plaintiff's appeal of the no records found determination and assigned it appeal case number 2019-ICAP-00109. On February 19, 2019, GILD advised Plaintiff that upon a review of the administrative record, it was determined that new searches could be made and therefore it was remanding the request to the ICE FOIA Office for further processing and re-tasking to the appropriate program offices.

23.    On about February 7, 2020[5], ICE released a 7-page document responsive to part B. of Plaintiff's FOIA request which sought the Memorandum from Michael J. Davidson, Chief, CALD, OPLA, ICE to William C. Randolph, Director and Head of Contracting Activity, OAQ, ICE, regarding funding Intergovernmental Service Agreements, withheld almost in full pursuant to FOIA Exemptions (b)(5), (b)(6) and (b)(7)(C).

**Request No. 6 – 2019-ICFO-24680 Hudson County Jail**

24.    On December 16, 2018, Plaintiff submitted a FOIA request seeking all items maintained, received or required to be produced by ICE related to health care services at the Hudson County jail for individuals held under immigration laws, including:

> i.    All contracts and associated attachments, memorandums of understanding, e-mail, and all other items associated with

---

[5] The release cover letter was erroneously dated February 4, 2019.

11

the submission, acceptance, and review of the CFG Health Systems, LLC, contracts with Hudson County for health care provided to people held under immigration laws.

ii. All logs of grievances (oral and written) submitted by people detained at the Hudson County facility.

iii. All medical expense reports submitted to ICE, including via Hudson County.

iv. All reviews and reports on health care services provided to people held under immigration laws at the Hudson County facility, including regular reports, ad hoc reports, and those based on specific grievances or complaints generated by any source.

v. All reports of hunger strikes.

vi. All reports of hospitalization outside of the Hudson County facility for people held under immigration laws by Hudson County.

25. On December 17, 2018, ICE acknowledged Plaintiff's FOIA request, assigned it tracking number 2019-ICFO-24680, and tasked various ICE program offices reasonably likely to have responsive records for a search. On September 18, 2019, ICE released 6 pages plus an Excel spreadsheet of responsive records to Plaintiff.

26. On October 3, 2019, Plaintiff appealed ICE's determination claiming that responsive documents were omitted. ICE acknowledged receipt of Plaintiff's appeal on November 4, 2019 and assigned it tracking number 2020-ICAP-00063. On December 4, 2019, GILD advised Plaintiff that upon review of the administrative record, it was determined that new searches could be made, and the request was remanded to the ICE FOIA Office for re-tasking to appropriate program offices and direct response to Plaintiff. Additional records were located and subsequently processed and released to Plaintiff on November 24, 2020 and January 6, 2021.

**Plaintiff's Complaint Allegations**

12

27.     Plaintiff filed her complaint on May 5, 2020 (DOC. #1), and her Amended

Complaint on April 22, 2022 (Doc. #38), alleging the following as to each of the six FOIA

requests:  As to Request 1, 2018-ICFO-56530, regarding ICE ERO subfield office locations,

Request 4, 2019-ICFO-29171, regarding Kenosha County Jail, and Request 6, 2019-ICFO-

24680, regarding Hudson County Jail, that the responses to the FOIA requests had not been

completed; as to Request 2, 2020-ICFO-18634 regarding Representative Lauren Underwood and

electronic healthcare records, and Request 3, 2019-ICFO-33429, regarding Butler County Jail,

that no documents had been received, and as to Request 5, 2018-ICFO-59138, regarding Jail

Services Costs Statements, that though multiple interim releases of records had been provided

(subsequent to the filing of the Complaint on May 5, 2020 and prior to the filing of the Amended

Complaint on April 22, 2022), the cover letters for the releases did not identify the total number

of pages of records gathered nor identify to which portion of the FOIA request the released

records pertained,

**Post-Litigation Production of Records**

28.     After Plaintiff's Complaint and Amended Complaint were filed, ICE continued to

process and release responsive records that had been previously gathered for five of the six FOIA

requests[6], and additional records gathered pursuant to new searches tasked upon litigation

review, as follows:

**Request 2 -- 2020-ICFO-18634 – Lauren Underwood and
Electronic Healthcare Records**

---

[6] As to Request 1, 2018-ICFO-56530, regarding ERO subfield office locations, ICE had produced responsive records prior to the lawsuit and considered its response complete.

13

29.     On January 27, 2021[7], in a combined production of records responsive to two of Plaintiff's FOIA requests, including this one, ICE released four pages of responsive records to Plaintiff, with two pages release in full and two with redactions under FOIA Exemptions (b)(6) and (b)(7)(C).  Of the 73 pages of records collected by ERO for this FOIA request, ICE determined that 30 pages were non-responsive, 12 pages needed consultation with other components of DHS, and 27 pages were referred to another DHS component for review and processing directly to Plaintiff.

30.     Upon litigation review, ICE determined that the 12 pages flagged for consultation with DHS may not have been sent out for consultation; the ICE FOIA Office thereafter sought consultation from DHS on 8 pages of email communications and 1 Excel spreadsheet that had been split into four "pages" and subsequently produced those records to Plaintiff in a supplemental release on October 5, 2023, with withholdings under FOIA Exemptions (b)(3), (b)(6), (b)(7)(C).

**Request 3 – 2019-ICFO-33429 Butler County Jail**

31.     ICE released nearly 800 pages of records potentially responsive to this FOIA request in the first three interim productions on October 7, 2020, November 24, 2020, and January 6, 2021. These releases were combined productions with records responsive to two of Plaintiffs' FOIA requests, including this one, to which ICE applied redactions under FOIA Exemptions (b)(5), (b)(6), (b)(7)(C) and (b)(7)(E). ICE also released in full an Excel spreadsheet from ERO's Law Enforcement Systems and Analysis Division responsive to this request in a

_____

[7] The 4th interim release cover letter for this post-litigation production is erroneously dated January 27, 2020, rather than January 27, 2021.

combined production of Excel spreadsheets responsive to several of Plaintiff's FOIA requests, including this one, in a supplemental release on August 23, 2023.

32.     Upon litigation review and subsequent search taskings to the Office of Professional Responsibility (OPR) on July 15, 2023, and the Office of the Chief Information Officer (OCIO) on September 15, 2023, ICE processed and released additional potentially responsive records from OPR on September 19, 2023, applying redactions under FOIA Exemptions (b)(6), (b)(7)(C) and (b)(7)(E), and from OCIO on November 22, 2023, applying redactions under FOIA Exemptions (b)(5), (b)(6), (b)(7)(C) and (b)(7)(E).

33.     Upon further litigation review and subsequent search taskings to the ERO Detroit Field Office (which had oversight for ICE detainees held at the Butler County Jail in Ohio), additional potentially responsive email records were provided to the ICE FOIA Office which processed the emails, consisting of 169 pages, and released them to Plaintiff on April 30, 2024, applying redactions under FOIA Exemptions (b)(5), (b)(6), (b)(7)(C) and (b)(7)(E).

### Request 4 – 2019-ICFO-29171 Kenosha County Jail

34.     In addition to the pre-litigation June 10, 2019 release of 15 pages of contract-related records to Plaintiff, ICE released an additional 763 pages of records in response to this FOIA request in combined productions responsive to two of Plaintiffs' FOIA requests, including this one, on October 7, 2020 and January 6, 2021, applying partial redactions under FOIA Exemptions (b)(5), (b)(6), (b)(7)(C) and (b)(7)(E). In supplemental releases on July 17, 2023 and August 28, 2023, ICE released an additional 7 pages and one Excel spreadsheet responsive to this request from OPR related to detainee grievances at Kenosha County Jail, applying partial withholdings to certain pages under FOIA Exemptions (b)(6) and (b)(7)(C).

### Request 5 – 2018-ICFO-59138 Jail Services Costs Statements

35.     In addition to the pre-litigation release of the 7-page memorandum from OPLA on February 7, 2020, ICE produced approximately 11,885 pages of additional records from OAQ potentially responsive to this FOIA request in 25 interim releases sent to Plaintiff from January 24, 2021 to March 22, 2023, with partial withholdings under FOIA Exemptions (b)(4), (b)(5), (b)(6), (b)(7)(C) and (b)(7)(E). Upon litigation review, there were Excel spreadsheets that were provided by OAQ pertaining to jail services costs that were not previously processed and those were released in full to Plaintiff on August 28, 2023.

**Request 6 – 2019-ICFO-24680 Hudson County Jail**

36.     ICE processed approximately 819 pages and 3 Excel spreadsheets of potentially responsive documentation for this request. ICE determined that 68 pages were non-responsive or duplicates, 254 pages and the 3 Excels were released in full, and portions of 497 pages were withheld in part under FOIA Exemptions (b)(5), (b)(6), (b)(7)(C) and (b)(7)(E).

## III.     INFORMATION REGARDING ICE'S STANDARD PROCEDURES FOR INITIATING SEARCHES IN RESPONSE TO FOIA REQUESTS

37.     When the ICE FOIA Office receives a FOIA request, the intake staff evaluates it to determine if it is a proper FOIA request per the DHS FOIA regulation, 6 C.F.R. § 5.3[8]. If it is a proper request, it is assigned a case tracking number.

38.     If a FOIA request does not reasonably describe the records sought, the ICE FOIA Office will seek clarification from the requestor. If the requested information is under the purview of a DHS component other than ICE, the ICE FOIA Office will refer the request to the appropriate DHS component for processing and a direct response to the requestor.

---

[8] 6 C.F.R. § 5.3 sets forth the requirements for making proper FOIA requests, including describing the records in sufficient detail to allow agency personnel to locate them with a reasonable amount of effort.

39.     Based upon a requestor's description of the records being sought and the ICE FOIA Office's knowledge of the missions of the various program offices, the ICE FOIA Office identifies which program offices within ICE are reasonably likely to possess responsive records, if any, and to initiate searches within those program offices.  This determination requires a familiarity with the holdings of ICE's records systems, applicable records disposition schedules, and the substantive and functional mandates of numerous ICE program offices.

40.     ICE records are maintained by leadership offices and within ICE directorates (also called program offices), such as relevant here - ICE Enforcement and Removal Operations at Headquarters (ERO) and ERO Field Offices; ICE Office of Acquisition Management (OAQ); ICE Office of Professional Responsibility (OPR); ICE Office of the Principal Legal Advisor (OPLA); ICE Office of Congressional Relations (OCR), and ICE office of the Chief Information Officer (OCIO). Each program office within ICE has a designated point of contact ("POC") who is the primary person responsible for communications between the program office and the ICE FOIA Office. Each of these FOIA POCs is a person with detailed knowledge about the operations of their program office. Once the ICE FOIA Office determines the appropriate program offices for a given request, it provides the FOIA POCs within each of those program offices with a copy of the FOIA request and instructs them to conduct a search for responsive records.

41.     The FOIA POCs then review the FOIA request along with any case-specific instructions that may have been provided by the ICE FOIA Office, and based on the FOIA POCs' experience and knowledge of their program office's practices and activities, forward the request and instructions to individual employee(s) or component office(s) within the program office that they believe are reasonably likely to have responsive records.

17

42.     Per the ICE FOIA Office's instructions, the individuals and component offices are directed to conduct searches of their file systems, including both paper files and electronic files, which in their judgment, based on their knowledge of the way they routinely keep records, would most likely be the files to contain responsive documents. After those searches are completed, the individuals and component offices provide any potentially responsive records to their program office's FOIA POC, who in turn provides the records to the ICE FOIA Office.  The ICE FOIA Office then reviews the collected records for responsiveness and application of appropriate withholdings.

43.     ICE individual employees and program offices use various systems to maintain records such as investigative files, records regarding the operation of ICE programs, and administrative records.  Similarly, ICE employees maintain records in several ways, including storing electronic records on their individual computer hard drives, their program office's shared drive (if the office uses one), DVDs, CDs, or USB storage devices.  The determination of whether these electronic locations need to be searched in response to a particular FOIA tasking, as well as how to conduct any necessary searches, is necessarily based on the way the employee/office  maintains the relevant files.

44.     Additionally, ICE employees use the Microsoft Outlook email system. ICE employees use various methods to store their Microsoft Outlook email files: some archive their files monthly, without separating by subject; others archive their email by topic or by program, and still others may create PST files of their emails and store them on their hard drive or shared drive.  Like other searches of emails, an employee will complete a search of email archives if determined that the archive may contain potentially responsive documents; this determination is based on the FOIA request, the FOIA tasking and instructions provided by the ICE FOIA Office

18

and/or the program office FOIA POC, and the individual employees' knowledge of the methods in which they store emails according to their individual work-related needs.

## IV.    DESCRIPTION OF THE ICE PROGRAM OFFICES TASKED AND THE SEACHES CONDUCTED FOR PLAINTIFF'S FOIA REQUESTS IN THIS LAWSUIT

45.    Based on the categories and descriptions of records requested in Plaintiff's six FOIA requests, and following the ICE standard procedures for initiating searches set forth in Section III above, the ICE FOIA Office determined that ERO,OAQ, OPR, OPLA,OCR, and OCIO should be tasked as the program offices reasonably likely to have responsive records.

### ERO

46.    ERO identifies and apprehends removable noncitizens, detains these individuals when necessary, and removes undocumented noncitizens from the United States. ERO also transports removable noncitizens from point to point, manages undocumented noncitizens in custody or in an alternative to detention program, provides access to legal resources and representatives of advocacy groups, and removes individuals from the United States who have been ordered to be deported. ERO comprises multiple headquarters divisions including Field Operations, Enforcement, Custody Management (CM), Removal, ICE Health Service Corps. (IHSC), Operations Support, Law Enforcement Systems and Analysis (LESA), Non-Detained Custody Management, plus 25 ERO Field Offices across the country, and more than 7,900 employees. The ERO Information Disclosure Unit (IDU) manages and processes FOIA requests which seek records reasonably likely to be generated and maintained by ERO, and serves as the FOIA POC for this program office.

### OAQ

47.    OAQ, a component of ICE's Management and Administration program office,

provides acquisition solutions in support of the ICE and DHS missions. Acquisition management and solutions includes traditional contracting functions, requirements definition, assessment and oversight of contract performance, and technical and management direction. OAQ includes the Detention Compliance and Removal unit (DCR), which provides acquisition support to ICE Headquarters and Field Offices, and to ERO in the planning, awarding, and administering contracts for law enforcement and compliance requirements, including contracts related to detention services.

**OPR**

48.　　OPR is charged with upholding ICE's professional standards through a multi-disciplinary approach to security, inspections, and investigations. OPR is responsible for ICE's entire security portfolio, conducting independent reviews of ICE programs and operations, impartially investigating allegations of criminal and/or serious misconduct and other wrongdoing impacting ICE personnel and operations, to support the larger ICE mission of promoting homeland security and public safety by safeguarding organizational integrity.

**OPLA**

49.　　OPLA is the legal program in ICE with over 1,250 attorneys and 290 support personnel.  OPLA serves as the representative of ICE is removal proceedings in immigration court and provides specialized legal advice and legal services to all ICE directorates and program offices.  In addition to OPLA Headquarters in Washington D.C., there are 25 OPLA field locations in more than 60 cities throughout the United States.  OPLA's Government Information Law Division (GILD) provides ICE with legal advice on all matters relating to the disclosure of agency information, works with the ICE FOIA Office to review their work at the administrative level, adjudicates FOIA appeals, and works closely with ICE's FOIA Office and the U.S.

20

Department of Justice in coordinating the agency's response to FOIA litigation.

**OCR**

50.     OCR, a component of the ICE Director's Office, is the primary POC for the U.S.

Congress and represents ICE on Capitol Hill through a broad variety of federal Congressional

Liaison activities.  OCR helps ICE leadership engage with Members of Congress and staff,

evaluate potential legislative impacts to ICE, and provide information to Congressional decision-

makers about the agency's mission and operations.

**OCIO**

51.     OCIO provides information technology service and products that enable ICE and

DHS to meet their respective missions, including gathering emails of DHS custodians that are

archived or pertaining to custodians no longer employed by the agency, as was needed in

responding to one of the FOIA requests in this case.

**Search re Request No. 1 – 2018-ICFO-56530 Subfield Office Locations**

52.     Plaintiff's August 6, 2018 FOIA request sought a list of all ERO field and

subfield offices by control city with phone numbers and addresses as well as the number of

unique individuals in custody at those locations between certain timeframes.

53.     Upon review of Plaintiff's request, the ICE FOIA office determined that ERO was

the program office reasonably likely to have responsive records.

**ERO Search**

54.     On October 1, 2018, the ICE FOIA Office tasked the ERO IDU, which in turn

tasked several sub-offices within ERO, including  Custody Management (CM), Field Operations,

and Law Enforcement Systems and Analysis Statistical Tracking Unit (LESA STU). ERO CM

provides policy and oversight for and manages ICE detention operations to ensure safety,

security, and care of noncitizens in ICE custody. ERO Field Operations provides guidance and

coordination to ERO's national field offices and headquarters, and provides guidance on policy

and procedures, facilitating coordination to the ERO field offices. ERO's LESA STU is the

official reporting entity for ERO providing statistical reporting of ERO operations. STU

provides routine reports on performance metrics for DHS components and provides ad hoc

reporting to support requests that include congressional inquiries, inter-agency data, litigation

and FOIA requests. On October 26, 2018, ERO's CM responded that it did not maintain such

information and deferred to either Field Operations or LESA. On October 29, 2018, ERO's

Field Operations responded that it also did not maintain such information. On March 15, 2019,

ERO released to Plaintiff a LESA STU spreadsheet, with no redactions, showing initial book-ins

to detention facilities provided for the time identified in the request.

55.     On June 18, 2019, after receiving Plaintiff's appeal dated May 10, 2019, OPLA

GILD remanded the FOIA request to the ICE FOIA Office to conduct additional searches for a

list of domestic and abroad field and subfield offices to include phone numbers and addresses of

the locations, but noting that an ERO POC had confirmed that ERO did not track individuals

who were held for over 24 hours for the requested time period.

56.     On June 21, 2019, an ERO IDU Mission Support Specialist, who based on the
knowledge of the offices mission, conducted a search of the ERO Intranet Home Page
using search terms "phone lists" and "field offices" and located responsive
documentation which was provided to the ICE FOIA Office on June 21, 2019. The ICE
FOIA Office reviewed the documentation and released responsive, nonexempt portions
of the documentation to Plaintiff on June 26, 2019.

**Search re Request No. 2 – 2020-ICFO-18634 Lauren Underwood and
Electronic Health Records**

57.     Plaintiff's November 22, 2019 FOIA request sought DHS communications to

which Representative Lauren Underwood (D-IL), or any member of her staff were a party to related to DHS creating an integrated Electronic Health Records System (eHR). The eHR is the result of ICE transforming the detainee health recordkeeping system by replacing multiple stand-alone legacy systems and paper-based files with a highly-automated, web-based centralized electronic health record system for medical treatment and care for detainees in ICE custody. ICE's Health Service Corps (IHSC) oversees the eHR for detainees held in custody by ERO, and is a component program office of ERO.

58.    Upon review of Plaintiff's request, the ICE FOIA office determined that ERO and OCR were the program offices reasonably likely to have records responsive to Plaintiff's request and tasked those program offices with a search on March 2, 2020.

**ERO Search**

59.    On March 4, 2020, within ERO, IHSC was tasked to conduct a search. The IHSC Chief of Health Information Technology, who was the POC for the eHR integration project that is the subject of Plaintiff's FOIA request, searched his Outlook using the search terms "Thomas Wilkinson" (the Chief Medical Officer for DHS Headquarters), "DHS ehr" and "ehr integration." In addition, on March 4, 2020, an ERO program officer familiar with the DHS Health System coordination activities searched his Outlook using the search term "Tom Wilkinson" as he was the POC coordinating the effort to get an eHR for CBP.  Both ERO POCs conducting searches located responsive documentation and provided it to the ICE FOIA Office on March 18, 2020.

60.    Pursuant to litigation, the ICE FOIA Office released responsive, nonexempt portions of the documentation pursuant to these searches by ERO to Plaintiff on January 27, 2021, August 28, 2023 and October 5, 2023.

**OCR Search**

23

61.     On March 9, 2020, two OCR liaison specialists conducted computer searches and an Outlook search using the terms "Lauren Underwood (D-IL)", "Underwood", "Rep. Underwood", and HR 3525 and found no records.  On March 10, 2020, an OCR legislative analyst conducted a computer search and Outlook search using the terms "Lauren Underwood (D-IL)" and found no records.

**Search re Request No. 3 – 2019-ICFO-33429 Butler County Jail**

62.     Plaintiff's March 25, 2019 FOIA request sought documents ICE has regarding Intergovernmental Service Agreements (IGSAs) related to the Butler County Jail work program for detainees; compliance reports and follow-up correspondence; grievances or complaints, contract addenda, and data tracking the length of time people are held in the facility for the timeframe April 11, 2014 to the time of production, and identified Tae Johnson and Kevin Landy as people likely to have responsive documents.

63.     Upon initial review of Plaintiff's request, the ICE FOIA office determined that ERO was the program office reasonably likely to have responsive records and, after obtaining clarification from Plaintiff on which of three Butler County jails was at issue, tasked ERO with a search related to the Butler County Jail in Ohio, on July 15, 2019.

**ERO Search**

64.     On July 16, 2019, an ERO CM Mission Support Specialist conducted a search on ERO's Sharepoint site using the detention location code (a.k.a. "DETLOC") for the Butler County jail at issue, and on July 23, 2019, an ERO CM Consultant conducted a computer search by using the search function of the ERO shared drive using the search term "facility list report" noting that the phrase would pull up information potentially responsive to the FOIA request. Both ERO CM POCs located responsive documentation which was provided to the ICE FOIA

Office on July 26, 2019.

65.     On August 2, 2019, a Statistician from ERO LESA STU conducted a search of the

Enforcement Integrated Database (EID) via the ICE Integrated Decision Support (IIDS)

Database using the search terms "length of stay" and "Butler County Jail" run together as that

was the focus of the FOIA request for LESA STU.  The EID is a common database repository

for all records created, updated, and accessed by several software applications. The EID captures

and maintains information related to the investigation, arrest, booking, detention, and removal of

individuals encountered during immigration and law enforcement investigations and operations

conducted by ICE and CBP.  IIDS contains a subset of the EID database repository that provides

a continuously updated snapshot of selected EID data.  The LESA STU Statistician located

responsive documentation regarding intakes and releases from the Butler County Jail as well as

length of stay for Fiscal Year 2014 onward, covering the relevant timeframe for the request, and

provided those records to the ICE FOIA Office.  This information was released it to Plaintiff on

August 28, 2023.

66.     Upon litigation review, the ICE FOIA Office re-tasked ERO CM for a new

search, and the ERO Detroit Field with a search. ERO CM responded that it had no further

documentation to provide other than what was previously submitted to the ICE FOIA Office in

2019, and deferred to field operations for anything specific to the Butler County Jail regarding

the Voluntary Work Program (VWP), which would be the ERO Detroit Field Office. The ERO

Detroit Field Office completed its search on April 15, 2024, and eight email strings were

provided to the ICE FOIA Office which processed and released to Plaintiff on April 30, 2024.

67.     Upon litigation review, the ICE FOIA Office additionally tasked OPR and OAQ

on July 18, 2023, given that the request sought Intergovernmental Service Agreement (IGSA)

25

information related to any voluntary work program (VWP) at Butler County Jail, and information regarding inspection reports and grievances.

### OPR Search

68.    On July 18, 2023, an Acting Unit Chief for OPR Office of Detention Oversight (ODO) spent an hour conducting a computer search of the hard drive and shared drive, and of Outlook, using the search term "Butler County" as the name used for the facility, and gathered potentially responsive records consisting of inspection-related reports and communications for the Butler County Jail for the years 2015, 2018, 2019, 2020 and 2021, and provided those records to the ICE FOIA Office which processed and released these records to Plaintiff on September 19, 2023.  OPR ODO provided further information that ODO did not inspect the Butler County Jail in 2014, 2016, or 2017, and that OPR Investigations conducted a search with no results.

### OAQ Search

69.    On September 18, 2023, a Contract Specialist and Policy Analyst associated with the Detroit Field Office for OAQ who conducted a search responded to GILD's follow up on the supplemental search tasking.  The Contract Specialist stated that responsive documents related to Butler County were previously provided in response to a FOIA request associated with another FOIA request of Plaintiff's involved in this litigation, and that there were no supplemental submissions from OAQ for this request. However, after further discussions, it was determined that due to a misunderstanding as to subject of the supplemental tasking on July 18, 2023, OAQ had not previously included Butler County in the search.  On April 8, 2024, OAQ expedited and completed its search for this request and located 15 pages of potentially responsive records to the first item in Plaintiff's request, including the original IGSA between ICE and Butler County, and

26

a modification that refers to various detention standards that reference the VWP. OAQ advised

that it would not have records responsive to items 2 and 3 of Plaintiff's request. The records were

processed by ICE FOIA and nonexempt portions were released to Plaintiff on April 10, 2024.

70.     Upon further litigation review, it was determined that it was reasonably likely that

responsive records could be located by an OCIO search for archived emails of two custodians

identified by Plaintiff in this FOIA request.

**OCIO Search**

71.     On September 15, 2023, ICE FOIA tasked OCIO via a Request for Electronic

Data ("RED") Ticket for email communications of Tae Johnson and Kevin Landy for the

relevant timeframe specified in this FOIA request. Managed by the Enterprise Operations Branch

(EOB) within the OCIO at ICE, the RED application is designed to assist with all requests for

electronic data including requests to preserve and retrieve electronic data such as email, hard

drive images, and electronic files. Through the RED application ICE uses Enterprise Vault (EV)

and Microsoft Office 365 systems to capture and preserve all sent, deleted, and received

electronic records of all ICE users. EV holds old email from January 2009 to June 2018;

Microsoft Office 365 holds email from July 2018 to present. The RED Ticket was used in this

case because the email custodians identified were no longer employed by DHS. OCIO EOB

conducted the search in this case using a search function to collect all email, including

attachments sent or received by the identified custodians for the relevant timeframe.

72.     The emails and attachments gathered by OCIO were made available to the ICE

FOIA Office which uploaded them to Relativity for de-duplication and threading. Relativity is

an eDiscovery tool which was used to process and further filter the results for responsive data.

Relativity's analytics email threading greatly reduces the time and complexity of reviewing

emails by identifying and reviewing only inclusive emails. An inclusive email is the final email message in an email thread that contains all the previous content of that email thread, thus saving reviewers the time and effort required to review each email in that thread and focus only on the last one that contains the entire thread; it is an email that contains unique content not included in any other email. Next, the ICE FOIA Office filtered the email against the following search term formulas suggested by the OPLA GILD attorney familiar with the request and handling this litigation to further narrow the data for potentially responsive records: "Butler County Jail" AND "work program"; "Butler County Jail" AND "voluntary work program" OR "VWP"; "Butler County Jail" AND "porters"; "Butler County Jail" AND "same rate as prisoners". The ICE FOIA Office thereafter processed and released responsive nonexempt portions of the emails with their attachments to Plaintiff on November 22, 2023.

**Search re Request No. 4 – 2019-ICFO-29171 Kenosha County Jail**

73. Plaintiff's January 16, 2019 FOIA request sought ICE records related to health care services at the Kenosha County Jail for ICE detainees, including contracts and addenda, logs of grievances, medical expense reports, reports of hunger strikes, and reports of outside hospitalizations for ICE detainees.

74. Upon review of Plaintiff's request, the ICE FOIA office determined that ERO, including its Chicago Field Office, as well as OAQ and OPR, were the program offices reasonably likely to have records responsive to Plaintiff's request and tasked those offices with a search on February 26, 2019.

**ERO Search**

75. In a partial response provided on February 27, 2019, ERO advised that it did not maintain medical records for detention centers that are not ICE Service Processing Centers, such

28

as Kenosha County Jail, and that such records must be sought from the detention facility directly.

76.     On February 27, 2019, a Supervisory Detention Deportation Officer from ERO's Chicago Field Office, who due to his duties would be the person in the office reasonably likely to have access to responsive records, conducted a search of Outlook using the search terms "Kenosha", "hunger strike" and "grievance" and did not locate responsive records. On October 21, 2019, ERO advised the ICE FOIA Office that it does not maintain grievance logs for the Kenosha County Jail and that the requester should contact the County directly for any such records.

**OAQ Search**

77.     On March 4, 2019, a Contracting Officer's Representative for ERO's Chicago Field Office, who due to his OAQ duties in overseeing the contract between ICE and Kenosha County would be knowledgeable about searching for responsive records, spent 12 hours conducting a computer search, manually reviewing individual computer folders, and also searched Outlook using search terms "Kenosha", "Kenosha Medical", "Kenosha Invoices", "Kenosha 2015", Kenosha 2016", "Kenosha 2017", "Kenosha 2018", "Kenosha 2019", "Medical Issues", "G-514s" (ICE purchase requisition forms), "Contracts/MODS" (for contract modifications) and "Approved Invoices".  Responsive documentation was located and provided to the ICE FOIA Office on March 15, 2019.

78.     During March 22 to March 28, 2019, a Senior Advisor and Procurement Analyst with OAQ's Detention, Compliance & Removals (DCR) unit conducted a search of OAQ's Procurement Request Information System Management (PRISM) database using the search terms "Kenosha", "Kenosha County", and various DUNS numbers and contract award numbers; a computer search of various shared drives, and the Facilities List using the search terms

"Kenosha" and "Kenosha County." The PRISM database is a software product used at DHS since 2004, which provides full procurement lifecycle support including all phases from advanced acquisition planning through the contract closeout. Responsive documentation was located and provided to the ICE FOIA Office on March 29, 2019 and April 1, 2019. The POC who conducted the search for OAQ advised the ICE FOIA Office that the contracts with Kenosha County were limited to detention and transportation services; do not include medical services which the U.S. Marshal Service Agreement associated with the Kenosha County Jail indicates would be provided by the local government, and that most of the information identified in the FOIA request would come from ERO.

### OPR Search

79.     During February 26 to April 30, 2019, an ICE OPR Management Program Analyst, who due to his duties would be the person in the office reasonably likely to locate responsive records, if any, conducted a search for all aspects of the FOIA request in the database for OPR's Inspections and Detention Oversight using search terms from the FOIA request. On March 12, 2019, an OPR Unit Chief, due to his duties and knowledge of his program offices recordkeeping, used a search engine on the shared drive using the search terms "Kenosha medical" and "Kenosha grievance." Both OPR FOIA POCs located responsive documentation and provided it to the ICE FOIA Office on about May 1, 2019.

80.     In addition to the pre-litigation June 10, 2019 release of OAQ documents mentioned above, pursuant to litigation, the ICE FOIA Office released the remaining responsive, nonexempt portions of the documentation gathered from ERO and OPR to Plaintiff on October 7, 2020 and January 6, 2021, and in supplemental releases on July 17, 2023 and August 28, 2023.

**Search re Request No. 5 – 2018-ICFO-59138 Jail Services Cost Statements**

81.     Plaintiff's August 23, 2018 FOIA Request sought the most recent Jail Services

Costs Statements (JSCS) for a list of 14 detention facilities that house ICE detainees under

Intergovernmental Service Agreements (IGSAs); a particular memorandum from a former OPLA

Chief of the Commercial and Administrative Law Division regarding funding IGSAs;

communications from ICE components that handle Berks County, PA IGSAs, to include

grievance logs for Berks County, PA, Hudson County, NJ and Otero County Processing Center;

JSCS and contracts for Berks County Family Residential Facility and Hudson County, NJ, and

evaluations for JSCS for the list of 14 IGSA detention facilities.

82.     Upon the initial review of Plaintiff's request, the ICE FOIA Office determined

that because of the subject matter of the FOIA request, OAQ and ERO were the program offices

reasonably likely to have records responsive to Plaintiff's request and tasked those offices with a

search on September 5, 2018.

**OAQ Search**

83.     OAQ's initial response on September 16, 2018 was that OAQ did not oversee

JSCS and recommended the request be directed to ERO.  After GILD remanded Plaintiff's

appeal for further searches, on February 27, 2019, OAQ was re-tasked for new searches.  From

September 2, 2020 through September 8, 2020, an OAQ Senior Advisor Contract Specialist,

based on her duties and knowledge of her program office's recordkeeping, spent 48 hours

conducting a search in the PRISM database using detention facility location codes for each of the

14 IGSA detention sites identified in the FOIA request, which in turn identified all agency

contract numbers for those facilities.  OAQ gathered 11,855 pages of contract-related documents

potentially responsive to Plaintiff's FOIA request and provided them to the ICE FOIA Office.

31

OAQ provided the following considerations for its production of potentially responsive documents: some of the contract-related documents sought were no longer available for a variety of reasons, including beyond records retention timeframes and because personal files of executing contracting officers and contract specialists no longer with the agency were not accessible; for contracts directly between the agency and various cities and/or counties, the agency would not have contract copies for third party contractors which may be other detention, guard and transportation service providers. The ICE FOIA Office processed and released these records to Plaintiff in multiple releases from January 24, 2021 to March 22, 2023.

### ERO Search

84.     ERO's initial response on October 23, 2018 was that ERO's Budget Formulation Unit (BFU), Budget Execution Unit (BEU) and Contract Management Unit (CMU) had no responsive records, but that the BFU recommended deferring to ERO's Custody Management Division (CM) and the Detention Planning and Acquisition Unit (DPAU), and OAQ.

85.     After GILD remanded Plaintiff's appeal for further searches, on February 19, 2019, the ICE FOIA Office tasked ERO's CM and DPAU; ERO thereafter provided responsive documentation to the ICE FOIA Office. Upon litigation review, the ICE FOIA Office processed and released nonexempt portions of the ERO Excel spreadsheets, that had been gathered but inadvertently omitted from prior release, and released those to Plaintiff, on August 28, 2023, as part of a combined supplemental production related to Plaintiff's other FOIA requests, including this one.

### OPR Search

86.     On February 27, 2019, OPR was also tasked with a search. From August 27, 2020 to August 31, 2020, an OPR Management and Program Analyst, based on his duties and knowledge

32

of his program office's recordkeeping systems, spent 8 hours searching the Joint Integrity Case Management System (JICMS) database for grievance logs pertaining to the Otero, Berks County, and Hudson County detention facilities and located responsive documentation which was provided to the ICE FOIA Office. The JICMS is a case management system used by ICE and other components of DHS operated by ICE OPR to record claims of employee misconduct, manage criminal and administrative investigations, and to track employee and contractor disciplinary actions. Upon litigation review, the ICE FOIA Office determined that responsive documentation from OPR, which was an Excel spreadsheet with grievance data for Otero, Berks County and Hudson County facilities, was inadvertently omitted from prior productions, and released the nonexempt portions of the OPR Excel spreadsheet to Plaintiff on October 5, 2023.

### Search re Request No. 6 – 2019-ICFO-24680 Hudson County Jail

87.     Plaintiff's December 16, 2018 FOIA request sought ICE records related to health care services for ICE detainees at the Hudson County Jail, including contracts, grievance logs, medical expense reports, reviews of the health care service, reports of hunger strikes and hospitalization of ICE detainees outside of the detention facility. Upon review of Plaintiff's request, the ICE FOIA office tasked OPR, OAQ and ERO.

### OPR Search

88.     On February 22, 2019, an OPR Section Chief, based on his duties and knowledge of his office's recordkeeping, spent 2.5 hours conducting a computer search using search terms "medical", "grievance", and a manual search of computer file folders for inspections related to the Hudson County Jail, and an Outlook search using the terms "Hudson", and "medical", grievance" and "hunger" in connection with the Hudson County facility, and located responsive documentation.  On April 15 and 16, 2019, an OPR Management and Program Analyst, also

33

familiar with the program office's recordkeeping, spent 6 hours searching the JICMS database using search terms "case summary", "ROI synopsis", "ROI narrative", "hunger strike", "medical treatment", "hospital" and for FY2015 (fiscal year 2015) through FY2019 (fiscal year 2019) in connection with "Hudson County" and "not CBP cases", and located responsive documentation. Both of these OPR FOIA POCs provided the records to the ICE FOIA Office which processed and released nonexempt portions to Plaintiff.

### OAQ Search

89.     The FOIA POC for OAQ reviewed the substance of the request and based on experience and knowledge of OAQ's practices and contract activities with detention facilities responded that it had no contracts associated with the medical care provider CFG Health Systems for the Hudson County Jail, and that therefore a search would not be reasonably calculated to uncover any relevant documents.

### ERO Search

90.     The FOIA POC for ERO interpreted the request to be seeking medical records which it did not maintain for the Hudson County facility and so initially determined that a search would not locate responsive documentation. After Plaintiff's appeal, GILD remanded the request with further instructions to ERO to conduct searches. An ERO FOIA POC determined that both the Newark and New York City Field Offices and IHSC (a component of ERO) should be tasked with searches as these program offices had oversight for ICE detainees housed at the Hudson County Facility.

91.     On December 2, 2019, two ERO Newark Field Office Supervisory Detention and Deportation Officers (SDDOs), based on their supervisory duties and knowledge of their program offices' recordkeeping, spent 3 hours conducting a computer search of the hard drive

34

and shared drive and search of Outlook using search terms "hunger strike", "hospitalization",
"hospital admission", "Hudson hunger strike", "SIR[9] Hudson" and "Hudson". That same date,
an ERO New York Field Office Assistant Field Office Director (AFOD) performed a search. The
AFOD assists the Field Office Director in managing the field office employees and is
knowledgeable of the office's recordkeeping systems. The AFOD conducted a computer search
of the hard drive and shared drive and Outlook search using the terms "grievance", "medical
expense", "health care services", "hunger strikes" and hospital" in connection with the Hudson
County Jail, and an IHSC Commander and Field Medical Coordinator spent 3 hours searching
the IHSC tracker using the search terms "NYC AOR[10]" and "Hudson", and conducting a
computer search using the search terms "Hudson hunger strike" and "Hudson hospital report", as
well as an Outlook search using the terms "Hudson AND hunger strike" and "Hudson AND
hospital report." Additionally, over the course of three days from November 29 to December 3,
2019, a New York Field Office SDDO searched the database for Hudson County Jail Records
using the search term "grievance" and manually checking paper files on the requested subject
matter. Each of these searches resulted in responsive documentation which was provided to the
ICE FOIA Office in December 2019, and the ICE FOIA Office processed and released
nonexempt portions to Plaintiff in interim releases on November 24, 2020 and January 6, 2021.

## V.     DESCRIPTION OF THE RECORDS AT ISSUE

92.     ICE produced over 12,000 pages of responsive records to Plaintiff in response to

---

[9] SIR stands for Significant Incident Report.

[10] NYC AOR stands for New York City Area of Responsibility.

the 6 FOIA requests. The records at issue in this case are 421 pages selected by the parties to be included in the *Vaughn* Index, which are primarily ICE contract-related documents, as well as some emails, and inspection and compliance-related reports. As illustrated in table format in *Exhibit B to the Statement of Facts*, the *Vaughn* sampling of the 421 pages at issue as agreed to by the parties, includes records from most of the interim releases. *See Exhibit B to the Statement of Facts – Table of Production Dates, Bates Stamp Numbers as applicable, Page Counts for Release in Full/Part or Withheld in Full, Vaughn Sample Page Count and Exemptions Asserted in the Productions.* A complete description of the 421 pages of records at issue and the bases for the withholding of information in those documents, are detailed in ICE's *Vaughn* Index attached here as Exhibit C.

93.     Upon preparation of the *Vaughn* Index for this case, ICE voluntarily conducted a supplemental review of 199 pages included in the *Vaughn* sampling and lifted certain redactions that were applied in error, and, as a matter of discretion, lifted certain challenged redactions specifically regarding FOIA Exemption (b)(4) applied to certain cost information in ICE contracts directly with governmental entities (cities and/or counties) that were relatively remote in time. Those 199 pages were re-released to Plaintiff via DOJ's USAfx Box Folder shared with Plaintiff on September 6, 2023, with their original Bates page numbers.

## VI.     ORGANIZATION OF ICE'S *VAUGHN* INDEX

94.     Pursuant to the requirements set forth in *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), a *Vaughn* index accompanies this declaration providing a description of each redaction and applicable exemption in the pages that are at issue. *See Exhibit C – Vaughn Index.*

95.     The *Vaughn* index is in a table format and contains four columns. The first

column identifies the interim release number, Bates page numbers or description of the document; the second column identifies the extent of withholdings taken on the documents (partial or full); the third column in detail describes the records and redactions applied, the reasons for the redactions and notes instances where ICE – during supplemental review – is lifting certain portions of the redactions. The fourth column identifies the FOIA exemptions applied by citing the full statute.

## VII.    APPLICABLE FREEDOM OF INFORMATION ACT WITHHOLDINGS

### FOIA Exemption (b)(3)

96.     ICE partially withheld from 1 page of the documents (Bates page number 2022-ICLI-00042 807) information protected by FOIA Exemption (b)(3), 5 U.S.C. §552(b)(3), because the information withheld related to the medical health update on an ICE detainee who is protected by a confidentiality statute that ICE may not identify because doing so would circumvent the confidentiality protections the statute is intended to establish.

### FOIA Exemption  (b)(4)

97.     ICE partially withheld from 168 pages of documents (Bates page numbers 2022-ICLI-00042 527, 1308-1315, 1347-1350, 1786-11789, 2056, 2183, 2185-2190, 2192-2194, 2704-2707, 2721, 2736, 2739-2742, 2744-2747, 2913, 2918, 2932, 2938-2939, 2980, 3907-3910, 3915, 4120-4123, CoreCivic 3-4, CoreCivic 7-16, CoreCivic 31-36, CoreCivic 62, GEO Group 2-28, GEO Group 34, STGi 12-15, STGi 47-49, GEO Group 387, GEO Group 393-394, GEO Group 407, GEO Group 770-772, 8136-8145, 8729-8734, 8905, 9201, 9203-9204, CoreCivic 122, 10350, 10365-10375, 10428-10429, 10544-10552, and 11086-11093) information protected by FOIA Exemption (b)(4), 5 U.S.C. § 552(b)(4), which protects trade secrets and commercial or

financial information obtained from a person that is privileged or confidential.  This exemption protects the interests of both the government and submitters of information to the government. The responsive records in this case to which (b)(4) withholdings were applied fall under the commercial or financial information that is both customarily and actually treated as private by its owner.

98.     ICE withheld cost information related to contracts with STG International Inc. to provide medical staffing services for ICE detainees at multiple detention facilities across the United States, many of which are operated under Intergovernmental Service Agreements (IGSAs) with ICE to house ICE detainees in detention facilities owned by city and county government agencies.  ICE similarly withheld cost information contained in contract documents with Berks County, Pennsylvania, which costs include financial information submitted by private contractors to provide detention-related services, including education and medical care for ICE detainees which are treated as confidential commercial or financial information.  ICE withheld cost-related information submitted by private detention services contractors CoreCivic Corporation and The GEO Group related to direct contracts with ICE or via IGSAs between ICE and cities or counties providing detention facility space for ICE detainees, such as discount terms, bed day rates, hourly wage items for staffing, transport service miles to be under a fixed fee, and not to exceed cost amounts, among other items.  ICE also withheld as proprietary commercial information schematic drawings submitted by CoreCivic for construction additions to detention facilities.

**FOIA Exemption (b)(5)**

99.     The FOIA Exemption (b)(5), 5 U.S.C. § 552(b)(5), allows the withholding of inter- and intra-agency records that are normally privileged in the civil discovery context.

38

Pursuant to Exemption (b)(5), the three most frequently involved privileges are the deliberative process privilege, the attorney work-product privilege, and the attorney-client privilege.

100.     Specifically, ICE applied FOIA Exemption (b)(5) to partially withhold information on 6 pages of the documents at issue (Bates page numbers 2022-ICLI-00042 12056-12058, 12060, 12222, and 12225) which consist of April 2014 email communications among Kevin Landy, Assistant Director, Office of Detention Policy and Planning; Tae D. Johnson, Assistant Director, Custody Management, ERO; several ERO Executives for Custody Management; the Acting Director of ICE, Thomas Homan; Assistant Director of ICE Office of Public Affairs; the ICE Press Secretary and Deputy Press Secretary, and ICE OPLA's Acting Principal Legal Advisor Riah Ramlogan, in formulating responses to questions from the New York Times regarding detention facilities holding ICE detainees that have Voluntary Work Programs, the applicable detentions standards, and how and whether detainee workers are compensated.

101.     Redacted information under Exemption (b)(5) in these pages include Mr. Landy providing his intra-agency opinion in email to his fellow ICE Executives whether it would be a violation of ICE detention standards, if the Butler County Sherrif's statement were true that immigrant detainees in Butler County Jail perform upkeep of their housing units without being paid, and what actions should be taken to address any issue (Bates pg. 12058, April 11, 2014 email sent 1:15 p.m.).

102.     Exemption (b)(5) was applied to portions of an email from the Deputy Assistant Director for Custody Management (DAD CM) to the ICE Deputy Press Secretary; Mr. Landy; Mr. Johnson, and the DAD for Custody Programs, that identifies two detention facilities, where the DAD CM seeks clarification whether the reporter was claiming that detainee workers were

not receiving monetary compensation at those facilities, but then asks that the question be disregarded as more information is gathered from the Chief of Staff for CM (Bates pg. 12057, April 11, 2014 email sent 1:31 p.m.).

103.    Exemption (b)(5) was applied to portions of a draft proposed statement for the media in an email from the DAD for Custody Programs to fellow ICE Executives, which Mr. Landy opposes, and to portions of Mr. Landy's email providing his intra-agency opinion to fellow ICE Executives that the proposed statement may contradict prior information released which may adversely impact the agency, and his recommendations on how to address the issue (Bates pg. 12056, April 11, 2014 email sent 4:03 p.m.).

104.    Exemption (b)(5) was also applied to a draft proposed statement to the media sent by email from Mr. Johnson to ICE Executives, including Acting ICE Director, Thomas Homan, which contains suggestions for interpreting ICE detention standards related to the VWP, and whether there were incidents of detention facilities not providing monetary compensation to detainee workers, and whether additional measures should be taken to oversee the issue (Bates pg. 12060, April 11, 2014 email sent 8:37 p.m.).  Also redacted under Exemption (b)(5) were portions of Mr. Landy's email to the Acting Unit Chief for the Detention Standards Compliance Unit and the DAD CM offering his opinions, suggestions and critiques to a proposed ERO Custody Management Division Authorized Facilities List (spreadsheet) with detainee work programs for potential release to the media (Bates pg. 12225, April 22, 2014 email sent 2:51 p.m.).

105.    Redacted information from the emails described above, which include discussion among ICE Executives of proposed responses to the media and proposed spreadsheet data on detention facilities with VWPs is deliberative.  The ICE Executives in these emails are sharing

40

thoughts, opinions, and recommendations for responding to media inquiries on how the VWP is implemented in detention facilities, and decisions were not finalized. The deliberative process privilege protects the internal deliberations of the government by exempting recommendations, analysis, and discussions undertaken to aid agency decision-making. Draft documents may never evolve into a final form; material is withdrawn during the decision-making process, and the process by which a draft evolves into a final document may itself be considered deliberative. Release of draft material and thoughts, suggestions, critiques and opinions on matters as part of agency decisions would serve to chill the decision-making process because it would discourage the expression of candid opinions and inhibit the free and frank exchange of information and ideas between agency personnel. It may also cause agency personnel to be less inclined to produce and circulate materials for the consideration and comment of their peers. The privilege serves to maintain the integrity of agency decision-making processes by encouraging open and candid discussions.

106.    Exemption (b)(5) was applied to portions of ICE Acting Principal Legal Advisor Riah Ramlogan's email to her ICE clients Mr. Landy and ICE Deputy Director Dan Ragsdale, copying other ICE Executive clients, providing her legal analysis and opinion of ICE's authority to pay VWP participants $1 per day (Bates pg. 12222, May 28, 2014, sent 9:29 a.m.); to portions of Mr. Landy's comments and opinions in response and Ms. Ramlogan's providing further background and opinion on whether the $1 per day is a maximum or a minimum rate (Bates pg. 12222, May 28, 2014 email sent 9:18 a.m.), and to portions of Ms. Ramlogan's email to Mr. Landy, Mr. Johnson and other ICE Executive clients providing her legal opinion on ICE's authority to pay VWP participants and what questions remain as to the authorized rate of pay (Bates 12222, May 2, 2014 email sent 10:55 a.m.). The information withheld on this page was

41

deliberative as it contained recommendations, analysis, and discussions undertaken to aid agency decision-making. The information redacted also contained attorney-client privileged information provided by the Acting Principal Legal Advisor for ICE, Ms. Ramlogan to her clients.

107. The attorney-client privilege protects confidential communications between attorneys and their clients relating to a legal matter for which the client has sought professional advice. It applies to facts divulged by a client to his attorney, and encompasses any opinions given by an attorney to her client based upon those facts, as well as communications between attorneys that reflect client-supplied information. The attorney-client privilege is not limited to protecting documents created in anticipation of litigation. The attorney-client privilege applies to the emails chain identified above (Bates pg. 12222) because the redacted portions constitute and/or reflect opinions and analysis of ICE OPLA attorneys regarding the VWP in detention facilities holding ICE detainees.

**FOIA Exemption (b)(7) Threshold**

108. The FOIA Exemption (b)(7), 5 U.S.C. § 552(b)(7), establishes a threshold requirement that to withhold information based on Exemption (b)(7), the records or information must be compiled for law enforcement purposes. The information for which FOIA Exemption (b)(7) has been asserted in the instant matter satisfies this threshold requirement. Pursuant to the Immigration and Nationality Act codified under Title 8 of the U.S. Code, the Secretary of Homeland Security is charged with the administration and enforcement of laws relating to the immigration and naturalization of noncitizens, subject to certain exceptions. *See* 8 U.S.C. § 1103. ICE is the largest investigative arm of DHS, and the second largest investigative agency in the federal government. ICE is responsible, among other duties, for identifying and eliminating vulnerabilities within the nation's borders. Created in 2003 through a merger of the investigative

42

and interior enforcement elements of the U.S. Customs Service and the Immigration and Naturalization Service, ICE now has more than 20,000 employees and offices in all 50 states and dozens of foreign countries. ICE is responsible for enforcing the nation's immigration laws and identifying and eliminating vulnerabilities within the nation's borders.

109. The ICE ERO directorate oversees programs and conducts operations to identify and apprehend removable noncitizens, to detain these individuals when necessary, and to remove illegal noncitizens from the United States. Within ICE, ERO has broad authority and prioritizes the apprehension, arrest, and removal of convicted criminals. ERO manages all logistical aspects of the removal process, including domestic transportation, detention, alternatives to detention programs, bond management, and supervised release.

110. The ICE information at issue in this case was compiled by ICE because it relates to ICE's obligation to enforce the immigration laws of the United States by investigating non-U.S. individuals who may be illegally present in the United States, and housing and caring for those individuals subject to detention during the immigration and/or deportation process, which necessarily includes records associated with the detention-related services, including medical care provided to ICE detainees. Therefore, all the responsive records at issue in this lawsuit were compiled for law enforcement purposes and meet the threshold requirement of FOIA Exemption (b)(7).

**FOIA Exemptions 5 U.S.C. § 552(b)(6) & (7)(C)**

111. FOIA Exemption (b)(6), 5 U.S.C. § 552(b)(6), protects from disclosure matters that are "personnel and medical files and similar files, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."

112.     FOIA Exemption (b)(7)(C), 5 U.S.C. § 552(b)(7)(C), protects from disclosure records or information "compiled for law enforcement purposes" if a release of the records or information "could reasonably be expected to constitute an unwarranted invasion of personal privacy."

113.     When asserting FOIA Exemptions (b)(6) and (b)(7)(C), ICE balances an individual's personal privacy interest against the public's interest in the disclosure of the information and shedding light on ICE's performance of its statutory duties.

114.     Here, ICE applied FOIA Exemption (b)(6) in conjunction with Exemption (b)(7)(C) to protect from disclosure the names, initials, signatures, phone numbers, email addresses, and suite numbers of federal law enforcement officers and other government employees, as well as non-public facing employees of private detention services and medical care staffing companies that are found in the documents.

115.     The federal employees, city and county employees and private company employees referenced in the responsive records assist ICE with its law enforcement mission which includes providing housing, education, and healthcare for ICE detainees. ICE recognizes that these government employees and private contractors' employees have privacy interests in not becoming targets of harassment by individuals who may begrudge them for their involvement in immigration law enforcement and in remaining free of interference in the performance of their duties by persons who are currently of interest to law enforcement or who oppose the ICE mission.

116.     Public identification of these individuals identified in these records could also result in them being subjected to personal requests for access to law enforcement information or

requests for information about ongoing or closed investigations, or otherwise expose them to undue public attention.

117.    Having determined that the individuals identified in the responsive records have a cognizable privacy interest in not having their information released, ICE FOIA then balanced the interest in safeguarding the individuals' privacy from unnecessary public scrutiny against the public's interest in the disclosure of the information for purposes of shedding light on the operations and activities of ICE in the performance of its statutory duties. In each instance where Exemptions (b)(6) and (b)(7)(C) were applied, the redaction was limited to the name of the individual or other personally identifiable information.  This information, if released, would not shed further light as to the operations or activities of ICE. Plaintiff has failed to articulate any public interest that could be advanced by releasing the personally identifiable information of the individuals in question. Plaintiff's personal interest in obtaining the records does not factor into the analysis conducted by ICE.

118.    Based upon the traditional recognition of strong privacy interests in law enforcement records, the categorical withholding of third-party information of non-public facing persons identified in law enforcement records is appropriate. Moreover, the third parties identified in these records have not provided consent to the release of their personally identifying information as required by 6 C.F.R. §§ 5.3(a) & 5.21(d).

**FOIA Exemption (b)(7)(E)**

119.    FOIA Exemption (b)(7)(E), 5 U.S.C. § 552(b)(7)(E), protects from disclosure records compiled for law enforcement purposes, the release of which would disclose techniques and/or procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if disclosure could reasonably be

45

expected to risk circumvention of law. It also protects from disclosure techniques and procedures that are not well known to the public.

120. ICE has withheld from 113 pages of documents at issue (Bates page numbers 2020-ICLI-00042 481, 527, 1307, 1321, 1346, 2183, 2185-2192, 2194, 2705-2706, 2721, 2736, 2740-2742, 2746-2747, 3740-3746, 3755, 3913, 4670-4672, 5085, CoreCivic 31-36, CoreCivic 62, CoreCivic 3-8, CoreCivic 11-21, CoreCivic 23-28, STGi 14-15, 7432, 7490-7492, GEO Group 771-772, 8178, 8180, 8730-8731, 8733-8734, 9151-9153, 9201, 9382-9383, 9445, CoreCivic 122, CoreCivic 127, CoreCivic 143-145, 9437-9538, 10428, 10602-10603, 10607-10608, 10616, 11087, 11090, and 11093) information protected by FOIA Exemption (b)(7)(E). Specifically, ICE has asserted FOIA Exemption (b)(7)(E) to protect from disclosure information regarding specific security measures for detention officers regarding hold rooms, armed transportation and managing the keys and locks at detention facilities; the use and storage of firearms and body armor; internal ICE accounting information; detention facility schematics showing the layout including ingress/egress locations, proximity of guard stations and security surveillance of areas within a detention facility; staffing plan by shift for security operations at detention facilities, and schedules and routes for busing detainees between facilities; schedules for perimeter surveillance, procedures regarding detainee use of certain tools, and the frequency and schedule for detainee counts.

121. The release of this information could reasonably be expected to reveal where the detention facility would be most vulnerable to efforts to avoid detection and apprehension when organizing an escape or disturbance, and how to frustrate or thwart security measures or procedures to prevent or quell such incidents. Public awareness of this operational information would aid those seeking to gain unauthorized entry to the detention facility holding ICE

detainees, as they would readily know the detention facility's layout and security staffing and security related procedures, which could be exploited to overrun and gain unauthorized entry to the facility or frustrate security measures while transporting ICE detainees. Disclosing ICE internal accounting information could allow unauthorized access to those accounts.

122.     Specifically with regard to the detention site schematics which were part of contract documents but not themselves substantively responsive to the FOIA requests, ICE asserted FOIA Exemption (b)(7)(E) because, while the public may generally know that detention facilities house ICE detainees and those facilities include various rooms such as offices, holding cells, sally ports, armories, guard stations, for examples, the public does not know the exact layout of the facilities. If the exact layouts were publicly known, plans and countermeasures could be developed to frustrate security measures at the facilities or while transporting detainees, thus undermining the integrity of ongoing security and operational plans at the facilities, and potentially compromising facility staff and detainee safety.

## VIII.   SEGREGABILITY

123.     5 U.S.C. § 552(b) requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt."

124.     ICE conducted a line-by-line review to identify information exempt from disclosure or for which a discretionary waiver of exemption could be applied.

125.     With respect to the records at issue that were released, all information not exempted from disclosure pursuant to the FOIA exemptions specified above was correctly segregated and non-exempt portions were released. ICE did not withhold any non-exempt

information on the grounds that it was non-segregable.

**JURAT CLAUSE**

I declare under penalty of perjury under the laws of the United States of America that the

forgoing is true and correct to the best of my knowledge and belief.

Signed this ___ day of April 2024.

FERNANDO
PINEIRO JR

Digitally signed by
FERNANDO PINEIRO JR
Date: 2024.05.01 10:59:42
-04'00'

Fernando Pineiro, FOIA Director
Freedom of Information Act Office
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
500 12th Street, S.W., Stop 5009
Washington, DC 20536-5009

# Exhibit B

| Release # Production Date Bates #s | Page Count | Page Count Released in Full | Page Count Partially Withheld | Page Count Withheld in Full | Page Count in *Vaughn* Sampling | Exemptions Applied |
|---|---|---|---|---|---|---|
| 1st Interim 10/7/2020 1-523 | 523[1] | 340 | 182 | 0 | 4 | 5,7E |
| 2nd Interim 11/24/2020 524-1033 | 510 | 234 | 276 | 0 | 9 | 3,5,6,7C,7E |
| 3rd Interim 1/19/2021 1034-1274 | 241 + 3 excels | 20 + 3 excels | 221 | 0 | 1 | 5,6,7C,7E |
| 4th Interim 1/27/2021 1275-1705 | 431 | 0 | 431 | 0 | 40 | 4,5,6,7C,7E |
| 5th Interim 4/7/2021 1706-2205 | 500 | 438 | 62 | 0 | 58 | 4,5,6,7C,7E |
| 6th Interim 5/21/2021 2206-2702 | 497 | 492 | 5 | 0 | 0 | 6,7C |
| 7th Interim 7/1/2021 2703-3228 | 526 | 340 | 186 | 0 | 51 | 6,7C,7E |
| 8th Interim 8/26/2021 3229-3863 | 635 | 166 | 469 | 0 | 19 | 4,5,6,7C,7E |
| 9th Interim 10/19/2021 3864-4384 | 521 | 192 | 329 | 0 | 24 | 4,5,6,7C,7E |
| 10th Interim 11/5/2021 4385-4900 | 516 | 295 | 221 | 0 | 13 | 4,5,6,7C,7E |
| 11th Interim 1/20/2022 4901-5306 | 406 | 268 | 138 | 0 | 9 | 4,5,6,7C,7E |
| 12th Interim 1/20/2022 5307-5806 | 500 | 498 | 2 | 0 | 0 | 6,7C |
| 13th Interim 2/11/2022 CoreCivic 1-108 | 108 | 7 | 101 | 0 | 23 | 4,6,7C,7E |

[1] 10/7/2020 release cover letter erroneously indicates 522 pages.

| Release # Production Date Bates #s | Page Count | Page Count Released in Full | Page Count Partially Withheld | Page Count Withheld in Full | Page Count in *Vaughn* Sampling | Exemptions Applied |
|---|---|---|---|---|---|---|
| 14th Interim 4/8/2022 5807-6050, STGi 1-11 | 255 | 220 | 35 | 0 | 0 | 4,6,7C,7E |
| 15th Interim 4/15/2022 GEO Group 1-273 | 273 | 78 | 195 | 0 | 35 | 4,6,7C,7E |
| 16th Interim 4/25/2022 6051-6603 | 553 | 548 | 5 | 0 | 0 | 6,7C |
| 17th Interim 5/24/2022 6604-7042 | 439 | 423 | 16 | 0 | 0 | 6,7C,7E |
| 18th Interim 6/17/2022 7043-7424, STGi 12-83 | 454 | 361 | 93 | 0 | 7 | $4^2$,6,7C,7E |
| 19th Interim 6/27/2022 GEO 274-385 | 112 | 0 | 112 | 0 | 0 | 4,6,7C,7E |
| 20th Interim 8/19/2022 7425-7583 | $172^3$ | 140 | 32 | 0 | 9 | 4,6,7C,7E |
| 21st Interim 9/1/2022 7584-8079 | 496 | 494 | 2 | 0 | 0 | 6,7C |
| 22nd Interim 9/20/2022 GEO 386-918 | 528 | 21 | 507 | 0 | 15 | 4,6,7C,7E |
| 23rd Interim 10/20/2022 8080-8728 | 649 | 535 | 114 | 0 | 15 | 4,6,7C,7E |
| 24th Interim 11/1/2022 8729-9201 | 473 | 204 | 269 | 0 | 12 | 4,6,7C,7E |
| 25th Interim 12/19/2022 9202-9497, CoreCivic 109-264 | 452 | 277 | 175 | 0 | 11 | 4,6,7C,7E |

---

[2] 18 interim release letter omitted that Exemption (b)(4) was also applied.
[3] 20th interim release letter enclosure page count omitted the STGi page count; total pages released was 172.

| Release # Production Date Bates #s | Page Count | Page Count Released in Full | Page Count Partially Withheld | Page Count Withheld in Full | Page Count in *Vaughn* Sampling | Exemptions Applied |
|---|---|---|---|---|---|---|
| 26th Interim 1/20/2023 9498-10316 | 819 | 346 | 43 | 0 | 9 | 4,6,7C,7E |
| 27th Interim 2/21/2023 10317-11085 | 769 | 430 | 339 | 0 | 34 | 4,6,7C,7E |
| 28th Interim 3/22/2023 11086-11886 | 801 | 349 | 452 | 0 | 8 | 4,6,7C,7E |
| 29th Interim (Supplemental) 7/17/2023 11887-11893 | 7 | 3 | 4 | 0 | 0 | 6,7C |
| 30th Interim (Supplemental) 8/28/2023 No Bates | 6 excels | 3 | 3 | 0 | 0 | 6,7C,7E |
| 31st Interim 9/6/2023 Reprocessed pages w/orig. Bates #s | 199 | 77 | 122 | 0 | 199 | 4,6,7C,7E |
| 32nd Interim (Supplemental) 9/19/2023 11894-11963 | 70 | 46 | 24 | 0 | 0 | 6,7C,7E |
| 33rd Interim (Supplemental) 11964-11971 | 8 + 1 excel | 0 | 8 | 0 | 0 | 3,6,7C,7E |
| 34th Interim (Supplemental) 11/22/2023 11972-12238 | 267 + 4 excels | 79 + 4 excels | 188 | 0 | 15 | 5,6,7C,7E |
| 35th Interim (Supplemental) 4/10/2024 12239-12253 | 15 | 10 | 5 | 0 | 0 | 6,7C |
| 36th Interim (Supplemental) 4/30/2024 | 169 | 93 | 76 | 0 | 0 | 5,6,7C,7E |

# Exhibit C

| Interim Release Number and Bates Stamp Page Numbers or Description | Extent Withheld | Description of Records and Redactions, and Reasons for Redactions | Exemption(s) Applied |
|---|---|---|---|
| 1st Release 2020-ICLI-00042 Pages 1 to 5 | Partial | **Document:** ICE emails to/from U.S. Marshal Services, Prisoner Operations Division, Office of Detention Services, Intergovernmental Agreement Branch and ICE Office of Acquisition Management Contract Specialists dated July 22, 2015 to March 8, 2019, re the County charging detainees for copies of their medical records in re U.S. Marshal Services Agreement # 89-00-0133 re Kenosha County Jail.<br><br>**(b)(6),(b)(7)(C) Redactions:** ICE applied FOIA Exemption (b)(6),(b)(7)(C) on pgs. 1-5 to the names of ICE employees, such as ICE Contractors and ICE Health Unit Members who are federal employees, and third party senders and receivers of the emails who are United States Marshal Service (USMS) employees, also federal employees, from the Intergovernmental Agreement Branch and ICE Contract Specialist, including their email addresses, telephone and facsimile numbers. **Note:** ICE has reprocessed these pages to partially lift some of these redactions to reveal the email domain names and the area codes and first 3 digits of the telephone numbers.<br><br>**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the personally identifiable information (PII) of ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information.<br><br>FOIA Exemptions (b)(6) and (b)(7)(C) protect from disclosure PII pertaining to third parties, such as the USMS personnel, who have not provided consent, to prevent an unwarranted invasion of privacy by: (1) conceivably subjecting USMS personnel to harassment and annoyance in conducting their official duties and in their private lives, and (2) potentially placing them in danger as targets of law enforcement may begrudge personnel for an indefinite time period and seek revenge. Furthermore, without explicit consent of the individuals named in the records sought, ICE cannot release those records to any member of the public. Members of the public may draw adverse inferences from the mere fact that an individual is mentioned in the files of a criminal law enforcement agency. Moreover, Plaintiff has not shown how the privacy interests of the individuals in the records requested outweigh any | Freedom of Information Act 5 U.S.C. § § 552 (b)(6), (b)(7(C) |

| | | | |
|---|---|---|---|
| | | minimal public interest in the disclosure of the information. Such disclosure would also not shed light on the operations or activities of the government.<br><br>**Additional Note:** ICE lifted the (b)(5) redactions previously applied to pgs. 2, 3 and 5, where the USMS and ICE email parties were discussing whether there was a practice at Kenosha County Jail of charging detainees for copies of medical records and discussing what the practice may be at other detention facilities, and whether the County was charging all inmates or just the ICE inmates. | |
| 1st Release<br>2020-ICLI-00042<br>Page 481 | Partial | **Document:** National Detention Standards Inspection Worksheet for Over 72 Hour Facilities, Hold Rooms in Detention Facilities-Reviewer Summary, Completion Date: January 12, 2017.<br><br>**(b)(7)(E) Redactions:** ICE applied FOIA Exemption (b)(7)(E) to information on pg. 481 related to security measures when officers enter the hold rooms.<br><br>**Reason:** FOIA Exemption (b)(7)(E) exempts from release information compiled for law enforcement purposes that would disclose law enforcement techniques or procedures, such as security measures for detention officers. This information describes the type of security measures and/or techniques the detention facilities has implemented, such as what is done to inspect detainees arriving or whether or not officers carry firearms or other non-deadly force devices into the hold room, the disclosure of which could reasonably be expected to risk circumvention of the law by bad actors in facilitating escape from the detention facility or harming detention officers. The disclosure of this information serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. | Freedom of Information Act 5 U.S.C. § 552 (b)(7)(E) |
| 2nd Release<br>2020-ICLI-00042<br>Pages 524 to 530 | Partial | **Documents:** Annual Detention Inspection of the Butler County Jail, February 2018. .<br><br>**(b)(6),(b)(7)(C) Redaction:** ICE applied FOIA Exemption (b)(6),(b)(7)(C) on pgs. 524, 526-527 and 530 to the names of ICE Enforcement and Removal Operations (ERO) Assistant Director for Detention Management, a federal employee, and The Nakamoto Group Lead Compliance Inspector and Nakamoto Group team members' names, who are private third parties.<br><br>**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and | Freedom of Information Act 5 U.S.C. §§ 552 (b)(6), (b)(7)(C), (b)(7)(E) |

(3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information.

FOIA Exemptions (b)(6) and (b)(7)(C) protect from disclosure PII pertaining to non-public facing third parties who have not provided consent, such as the Nakamoto Group personnel and the CFG Health Network nurses and doctors, to prevent an unwarranted invasion of privacy by: (1) conceivably subjecting the Nakamoto Group and CFG Health Network personnel to harassment and annoyance in conducting their official duties and in their private lives, and (2) potentially placing them in danger as targets of law enforcement may begrudge personnel for an indefinite time period and seek revenge. Furthermore, without explicit consent of the Nakamoto Group and CFG Health Network personnel and non-public facing ICE detainee patients named in the records sought, ICE cannot release those records to any member of the public. Members of the public may draw adverse inferences from the mere fact that an individual is mentioned in the files of a criminal law enforcement agency. Moreover, Plaintiff has not shown how the privacy interests of the individuals in the records requested outweigh any minimal public interest in the disclosure of the information. Such disclosure would also not shed light on the operations or activities of the government.

**(b)(7)(E) Redaction:** ICE applied FOIA Exemption (b)(7)(E) to information on pg. 527 related to facility staffing level for security and related support staff.

**Reason:** FOIA Exemption (b)(7)(E) exempts from release information compiled for law enforcement purposes that would disclose law enforcement techniques or procedures, such as security staffing levels for detention facilities, the disclosure of which could reasonably reveal a vulnerability to being overrun by detainees and/or detainees in concert with non-detainees who enter the facility to facilitate escape or other disturbance, and potentially compromise facility staff and detainee safety or undermine security measures taken while transporting ICE detainees. The disclosure of this information serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. **Note:** ICE reprocessed pg. 527 to lift the (b)(6),(b)(7)(C) redaction to the contract number. Upon litigation review, ICE would also lift the (b)(4) redaction on pg. 527 to the basic rate per man day in Box F, which is $58.78, as that information has been publicly released in the Intergovernmental Services Agreement (IGSA) between ICE and Butler County OH. There were no redactions applied to pgs. 525 or 528-529.

| 2nd Release 2020-ICLI-00042 Pages 806 to 808 | Partial | CFG Health Network, Hudson County Corrections & Rehabilitation Center (aka Hudson County Jail) email dated August 28, 2018, re health updates for ICE detainees. | Freedom of Information Act 5 U.S.C. §§ 552 (b)(3), (b)(6), (b)(7)(C) |
|---|---|---|---|
| | | **(b)(3) Redaction:** ICE applied FOIA Exemption (b)(3) on pg. 807 to the health update entry dated August 28, 2018 at 10:29 p.m. related to a certain ICE detainee because a confidentiality statute prohibits the agency from disclosing any information regarding this individual without the subject's consent. | |
| | | **Reason:** All information related to the ICE detainee was withheld pursuant to FOIA Exemption (b)(3) which permits an agency to withhold records "specifically exempted from disclosure by statute . . . provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld." In this case, the unspecified statute that applies to these withholdings explicitly prohibits the disclosure of any information pertaining to the protected individual, except pursuant to exceptions not applicable here. The agency is unable to identify the applicable statute because doing so would circumvent the confidentiality protections the statute is intended to establish. | |
| | | **(b)(6),(b)(7)(C) Redactions:** ICE applied FOIA Exemption (b)(6),(b)(7)(C) on pages 806-808 to the name, email and phone number of the CFG Health Network Acting Health Service Administrator for the Hudson County Jail, a doctor and ICE detainee patients identified in the ICE medical updates, who are private third parties, and to the names of the ERO Detention Service Manager and ERO Officers from ERO's Newark Field Office, who are federal employees, all of whom have not signed a privacy waiver in this case. | |
| | | **Reason:** FOIA Exemptions (b)(6) and (b)(7)(C) protect from disclosure PII pertaining to non-public facing third parties who have not provided consent, such as the CFG Health Network Acting Health Service Administrator and the doctor, to prevent an unwarranted invasion of privacy by: (1) conceivably subjecting these individuals to harassment and annoyance in conducting their official duties and in their private lives, and (2) potentially placing them in danger as targets of law enforcement may begrudge personnel for an indefinite time period and seek revenge. Furthermore, without explicit consent of the CFG Health Network Acting Health Service Administrator, doctor and the non-public facing ICE detainee patients named in the records sought, ICE cannot release those records to any member of the public. As to the ICE detainee patients, not only would it be an unwarranted invasion of privacy in disclosing their health care information, but as to both the ICE detainee patients and CFG Health Systems employees, members of the public may draw adverse inferences from the mere fact that an individual is mentioned in the files of a criminal law enforcement agency. Moreover, Plaintiff has not shown how the privacy interests of the individuals in the records requested | |

| | | outweigh any minimal public interest in the disclosure of the information. Such disclosure would also not shed light on the operations or activities of the government.

Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information. | |
|---|---|---|---|
| 2nd Release 2020-ICLI-00042 Pages 846 to 854 | Partial | **Document:** Emails from March 2018 and October 2018 between ICE IHSC Commanders, Field Medical Coordinators in New York and Houston Field Offices, Hudson County Department of Corrections Scheduler and CFG Health Systems Regional Managers regarding handling medical care of ICE detainees.

**(b)(6),(b)(7)(C) Redactions:** ICE applied FOIA Exemption (b)(6),(b)(7)(C) on pgs. 846-854 to the names of the ICE personnel, who are federal employees; the Hudson County and CFG Health Systems employees in these email strings, including their email addresses, telephone and facsimile numbers, and the names of ICE detainee patients, who are private third parties, all of whom have not signed a privacy waiver in this case. **Note:** ICE has reprocessed these pages to partially lift the redactions to reveal the email domain names and the area codes and first 3 digits of the telephone numbers.

**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information. | Freedom of Information Act 5 U.S.C. § § 552 (b)(6), (b)(7)(C) |

| | | FOIA Exemptions (b)(6) and (b)(7)(C) protect from disclosure PII pertaining to third parties who have not provided consent, such as the non-public facing CFG Health Systems employees to prevent an unwarranted invasion of privacy by: (1) conceivably subjecting these individuals to harassment and annoyance in conducting their official duties and in their private lives, and (2) potentially placing them in danger as targets of law enforcement may begrudge personnel for an indefinite time period and seek revenge. Furthermore, without explicit consent of the CFG Health Systems employees and the ICE detainee patients named in the records sought, ICE cannot release those records to any member of the public. As to the ICE detainee patients, not only would it be an unwarranted invasion of privacy in disclosing their health care information, but as to both the ICE detainee patients and CFG Health Systems employees, members of the public may draw adverse inferences from the mere fact that an individual is mentioned in the files of a criminal law enforcement agency. Moreover, Plaintiff has not shown how the privacy interests of the individuals in the records requested outweigh any minimal public interest in the disclosure of the information. Such disclosure would also not shed light on the operations or activities of the government. | |
|---|---|---|---|
| 3rd Release (No Bates No.) Excel 03.04_P00014 | None | **Document:** Excel 03.04_P0014, Attachment A – Family Facilities – Berks Detailed Cost-Redacted – a comparison of then current cost elements for detention services and programs and estimated costs after expansion of the facility.<br><br>**(b)(4),(b)(7)(E) Redactions:** ICE applied FOIA Exemptions (b)(4) to costs for dental care dated 2017, educational services dated 2015, and a one-time expansion cost dated 2014, which items are provided by third party private entities related to housing ICE detainees at the Berks County Family Residential Center. Exemption (b)(4) was also applied to detention rates and annual fixed costs though there is no indication these costs are attributed to a private contractor, and to the voluntary work rate for ICE detainees which is set by Congress. Exemption (b)(7)(E) was inadvertently applied to portions of the excel spreadsheet which would not apply.<br><br>**Reason for the (b)(4) Redactions:** FOIA Exemption (b)(4) is asserted to withhold Berks County pricing that, at least in part, contains subcontractor pricing for items such as dental services by private doctors and educational services provided by Berks County Intermediate Unit (BCIU), a private company that offers alternative and special educational services to public and private schools and other human service organizations in Berks County, such as the Berks County residential detention facility. Such pricing information is confidential and proprietary to these private entities. FOIA Exemption 4 protects trade secrets and commercial or financial information obtained from a company that is privileged or confidential. The term "financial/commercial" has been interpreted very broadly to encompass any information in which the submitter has a commercial interest and that generally pertains to | Freedom of Information Act 5 U.S.C. § 552 (b)(4) |

| | | | |
|---|---|---|---|
| | | commerce. To qualify as confidential, financial/commercial information must be both customarily treated as private by its owner and provided to the government under either an express or implied assurance of privacy. The doctors providing dental services and BCIU providing educational services to ICE detainees are for-profit private entities which partner with ICE via subcontracts with cities or counties contracting directly with ICE to provide safe environments where detainees can reside temporarily as they go through their immigration process. Such private entities compete for the awards of subcontracts with Berks County to provide such services to ICE detainees, and have a clear commercial interest in maintaining competitive pricing to win contract awards. Such private entities customarily treat the pricing structure of their contracts as confidential. Further ICE does not customarily release this type of pricing information contained in detention service contracts belonging to a private, for-profit entities, to the public. **Note:** Given that the detention rates and annual fixed costs appear to be provided by the County, and not a private contractor, and because the VWP rate is capped by Congress, ICE would lift those redactions; also, given the age of the pricing information related to dental care and educational costs, ICE would agree to lift the (b)(4) redactions as a matter of discretion, however, the ICE FOIA Office in concert with ERO were unable to locate a clean copy of the Excel spreadsheet. | |
| 3rd Release 2020-ICLI-00042 Page 1040 | Partial | **Document:** Email dated October 4 and 5, 2018, between Correct Care Solutions Registered Nurse and ICE IHSC Commander, Field Medical Coordinator for New York City re ICE detainee patients at Hudson County Jail being sent out for emergency room treatment and returned, with medical status updates.<br><br>**(b)(6),(b)(7)(C) Redactions:** ICE applied FOIA Exemptions (b)(6),(b)(7)(C) on pg. 1040 to the names of the ICE personnel, who are federal employees, and Correct Care Solutions personnel, who are private third parties, including their email addresses, telephone and facsimile numbers, as well as the names of ICE detainee patients, also private third parties, who have not signed a privacy waiver in this case. **Note:** ICE has reprocessed pg. 1040 to partially lift some of the redactions to reveal the email domain names and the area codes and first 3 digits of the telephone numbers.<br><br>**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying | Freedom of Information Act 5 U.S.C. §§ 552 (b)(6), (b)(7)(C) |

| | | | |
|---|---|---|---|
| | | out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information.<br><br>FOIA Exemptions (b)(6) and (b)(7)(C) protect from disclosure PII pertaining to third parties who have not provided consent, such as the non-public facing Correct Care Solutions employees to prevent an unwarranted invasion of privacy by: (1) conceivably subjecting these individuals to harassment and annoyance in conducting their official duties and in their private lives, and (2) potentially placing them in danger as targets of law enforcement may begrudge personnel for an indefinite time period and seek revenge. Furthermore, without explicit consent of the Correct Care Solutions employees and the ICE detainee patients named in the records sought, ICE cannot release those records to any member of the public. As to the ICE detainee patients, not only would it be an unwarranted invasion of privacy in disclosing their health care information, but as to both the ICE detainee patients and Correct Care Solutions employees, members of the public may draw adverse inferences from the mere fact that an individual is mentioned in the files of a criminal law enforcement agency. Moreover, Plaintiff has not shown how the privacy interests of the individuals in the records requested outweigh any minimal public interest in the disclosure of the information. Such disclosure would also not shed light on the operations or activities of the government. | |
| 4th Release 2020-ICLI-00042 Pages 1306 to 1315, 1322 to 1342, 1343 to 1350, and 1482 to 1483 | Partial | **Document:** Amendment of Solicitation / Modification of Contract 70CDCR18C00000003, Modification ("Mod.") No. P00003 between ICE and STG International Inc. dated February 2018 and signed June 2018 to release suspension of performance; Mod. No. P00004 signed August 1, 2018, assigning contracting officer reps., incorporating regs. and adding detention locations; Mod. No. P00005 signed September 4, 2018, to incorporate wage determinations, regs., and IHSC's instructions, and approving a 30-day extension on non-critical vacancies on the contract; Section G –Contract Administration Data (attachment to Contract between ICE and STG International).<br><br>**(b)(4) Redactions:** ICE applied FOIA Exemption (b)(4) on pgs. 1308-1315, and pgs. 1347-1350 to proposed cost information submitted by contractor STG International Inc.<br><br>**Reason:** FOIA Exemption (b)(4) is asserted to withhold STG International's pricing that is confidential and proprietary to the company. FOIA Exemption 4 protects trade secrets and commercial or financial information obtained from a company that is privileged or confidential. The term "financial/commercial" has been interpreted very broadly to encompass any information in which the submitter has a commercial interest and that generally pertains to commerce. To qualify as confidential, financial/commercial information must be both customarily treated as private by its owner and provided to the government under either an express or implied assurance of privacy. STG | Freedom of Information Act 5 U.S.C. § § 552 (b)(4), (b)(6), (b)(7)(C), (b)(7)(E) |

International is a for-profit private national firm which specializes in the areas of healthcare services, social services, training services and facility management on government contracts at the federal, state and local level, which competes for the awards of ICE contracts to provide such services to ICE detainees. The company has a clear commercial interest in maintaining competitive pricing to win contract awards. STG International customarily treats the pricing structure of their contracts as confidential. Further ICE does not customarily release this type of pricing information, belonging to a private, for-profit company, to the public.

**(b)(6),(b)(7)(C) Redactions:** ICE applied FOIA Exemptions (b)(6),(b)(7)(C) on pgs. 1306, 1307, 1343, 1344, and 1482 to the names of ICE Office of Acquisition Contracting Officer and Administrative Contracting Officer, and the IHSC Lt. Commander and Captain serving as Contracting Officers, including their email addresses and telephone numbers, who have not signed a privacy waiver in this case.

**Note:** ICE has reprocessed these pages to partially lift some of these redactions to reveal the email domain names and the area codes and first 3 digits of the telephone numbers. Upon further litigation review, ICE would also lift the redaction on pgs. 1306, to the name of the President and CEO of STG International, Michelle S. Lee, as a public facing individual.

**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information.

**(b)(7)(E) Redactions:** ICE applied FOIA Exemption (b)(7)(E) to internal ICE Accounting Information from ICE's Office of Acquisition Management on pgs. 1307, 1321 and 1346. **Note:** ICE also inadvertently applied this exemption to the contract numbers/purchase order numbers on pgs. 1306, 1308-1315, and 1343-1346, and has reprocessed those pages to lift those exemptions.

**Reason:** FOIA Exemption (b)(7)(E) exempts from release information that would disclose law enforcement techniques or procedures, the disclosure of which could reasonably be expected to risk circumvention of the law. Disclosure of internal ICE account numbers could assist unauthorized parties in gaining improper access to ICE financial accounts

| | | where bad actors could alter information or perpetrate identity theft or other harm. The disclosure of this information serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities.<br><br>**Additional Note:** ICE has determined that pgs. 1322-1338 red-lined modified contract provisions were incorporated into the ICE contract with STG International Inc. and therefore reprocessed these pages to be released in full. ICE has also reprocessed pgs. 1339-1342 to lift the (b)(5) redaction in full and to partially release these pages with the (b)(4) redactions for STG International costs information for the reason referenced above. | |
|---|---|---|---|
| 5th Release<br>2020-ICLI-00042<br>Pages 1786 to 1789 | Partial | **Document:** Attachment to Amendment of Solicitation/ Modification of Contract 70CDCR18C00000003, Mod. No. P00006 between ICE and STG International Inc. dated February 2018 and signed September 2018, containing STG International bill rates.<br><br>**(b)(4) Redactions:** ICE applied FOIA Exemption (b)(4) on pgs. 1786-1789 to proposed cost information submitted by contractor STG International Inc.<br><br>**Reason:** FOIA Exemption (b)(4) is asserted to withhold STG International's pricing that is confidential and proprietary to the company. FOIA Exemption 4 protects trade secrets and commercial or financial information obtained from a company that is privileged or confidential. The term "financial/commercial" has been interpreted very broadly to encompass any information in which the submitter has a commercial interest and that generally pertains to commerce. To qualify as confidential, financial/commercial information must be both customarily treated as private by its owner and provided to the government under either an express or implied assurance of privacy. STG International is a for-profit private national firm which specializes in the areas of healthcare services, social services, training services and facility management on government contracts at the federal, state and local level, which competes for the awards of ICE contracts to provide such services to ICE detainees. The company has a clear commercial interest in maintaining competitive pricing to win contract awards. STG International customarily treats the pricing structure of their contracts as confidential. Further ICE does not customarily release this type of pricing information, belonging to a private, for-profit company, to the public. | Freedom of Information Act 5 U.S.C. § 552 (b)(4) |
| 5th Release<br>2020-ICLI-00042<br>Pages 1790 to 1795 | None | **Document:** Attachment J-2 to Amendment of Solicitation/Modification of Contract 70CDCR18C00000003, Mod. No. P00006 between ICE and STG International Inc. dated February 2018 and signed September 2018, containing Quality Assurance Surveillance Plan (QASP) with red-lined modifications.<br>**Note:** ICE previously applied FOIA Exemption (b)(5) to withhold most of the content of pgs. 1790-1794 which appeared to be deliberative process | N/A |

| | | drafts of a QASP associated with the contract provisions. (There were no redactions on pg. 1795.) ICE has determined that pgs. 1790-1794 with the red-lined modifications were incorporated into the ICE contract with STG International Inc. and therefore reprocessed these pages to be released in full. | |
|---|---|---|---|
| 5th Release 2020-ICLI-00042 Pages 1809 and 1836 | Partial | **Document:** IHSC Captain/Contracting Officer's Representative for Health Operations Unit of IHSC emails dated June 2018 and July 2018 to ICE OAQ Contract Specialist and signatory re Amendment of Solicitation/Modification of Contract 70CDCR18C00000003 re position descriptions ("PDs") that had been changed since the Request for Proposal ("RFP") was released.<br><br>**b)(6),(b)(7)(C) Redactions:** ICE applied FOIA Exemptions (b)(6),(b)(7)(C) on pgs. 1809 and 1836 to the names of ICE contract representatives and signatories to the contracts, and IHSC employees' names and telephone numbers, federal employees, who have not signed a privacy waiver in this case.<br><br>**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information.<br><br>**Note:** ICE previously erroneously applied FOIA Exemption (b)(5) to withhold from these emails the ICE IHSC Contracting Officer Representative's statement regarding the extent of his authorization to modify the contract. ICE reprocessed pgs. 1809 and 1836 lifting those redactions. | Freedom of Information Act 5 U.S.C. §§ 552 (b)(6), (b)(7)(C) |
| 5th Release 2020-ICLI-00042 Pages 1917 to 1926, 1930, 1933 to 1937, and 1970 | None | **Document:** Sections C and G Attachments to Amendment of Solicitation/Modification of Contract 70CDCR18C00000003, Modification No. P00006 between ICE and STG International Inc. dated February 2018 and signed September 2018, with red-lined modifications to C-20 re Security Requirements, C-26 re Time Clock, C-33 re IHSC Invoicing and G-4 re Invoices/Payments.<br><br>**Note:** ICE previously erroneously applied FOIA Exemption (b)(5) to withhold some or all of the content of pgs. 1917-1926, 1930, 1933-1937 | N/A |

| | | and 1970 which appeared to be deliberative process drafts of contract provisions but were actually incorporated into the contract; ICE also previously erroneously applied FOIA Exemption (b)(6),(b)(7)(C) on pg. 1970 to an ICE email address for processing contract-related invoices. ICE reprocessed all of these pages to be released in full. | |
|---|---|---|---|
| 5th Release 2020-ICLI-00042 Pages 2008 to 2012, 2047 to 2056, and 2182 to 2194 | Partial | **Documents:** Pgs. 2008-2012 are portions of Attachment J-1 QASP Amendment 13 to Amendment of Solicitation/Modification of Contract – no redactions were made. Pgs. 2047-2056 are emails between ICE ERO Acting Deputy Executive Associate Director Enrique Lucero and IHSC Captain and Contracting Officer's Representative for the Resource Management Unit, and IHSC Assistant Director, dated December 2019 to January 2020, discussing contract modifications related to ICE's contract with STG International Inc. for healthcare services for ICE detainees. Pgs. 2182-2194 are draft Mod. Nos. PO00012 and PO00013 to Amendment of Solicitation/Modification of Contract 70CDCR18C00000003 between ICE and STG International Inc. - no redactions were made to pg. 2182.<br><br>**(b)(4) Redactions:** ICE applied FOIA Exemption (b)(4) to pg. 2056 to medical assistant bill rates submitted by STG International in their proposal to ICE contained in the text of an email message; to pg. 2183 to the net increase in contract cost by the modification to the contract, to pgs. 2185 to 2190 and pgs. 2192-2194 to similar cost increase information and total contract value for medical staffing to be provided by STG International.<br><br>**Reason:** FOIA Exemption (b)(4) is asserted to withhold STG International's pricing that is confidential and proprietary to the company. FOIA Exemption 4 protects trade secrets and commercial or financial information obtained from a company that is privileged or confidential. The term "financial/commercial" has been interpreted very broadly to encompass any information in which the submitter has a commercial interest and that generally pertains to commerce. To qualify as confidential, financial/commercial information must be both customarily treated as private by its owner and provided to the government under either an express or implied assurance of privacy. STG International is a for-profit private national firm which specializes in the areas of healthcare services, social services, training services and facility management on government contracts at the federal, state and local level, which competes for the awards of ICE contracts to provide such services to ICE detainees. The company has a clear commercial interest in maintaining competitive pricing to win contract awards. STG International customarily treats the pricing structure of their contracts as confidential. Further ICE does not customarily release this type of pricing information, belonging to a private, for-profit company, to the public.<br><br>**(b)(6),(b)(7)(C) Redactions:** ICE applied FOIA Exemptions (b)(6),(b)(7)(C) on pgs. 2047-2056 to the names of ICE personnel in the email strings, and on pgs. 2183-2184, and 2188-2189 to the ICE Office of Acquisition Management and IHSC Contracting Officer's Representatives, in the | Freedom of Information Act 5 U.S.C. §§ 552 (b)(4), (b)(6), (b)(7)(C), (b)(7)(E) |

| | | | |
|---|---|---|---|
| | | contract modifications, including their email addresses and telephone numbers, all of whom are federal employees and have not signed a privacy waiver in this case.<br><br>**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information.<br><br>**Note:** ICE previously erroneously applied FOIA Exemption (b)(5) on pgs. 2047-2056 to contents of the email messages between ERO personnel identified by name and/or title above regarding bill rates for new medical assistant position required under contract with STG International, the extent of coverage of inmates at certain detention sites under the contract that were factual rather than deliberative, including the ICE IHSC contracting officer representative's statement regarding the extent of his authorization to modify the contract. ICE has reprocessed those pages to lift the (b)(5) redactions but applied Exemption (b)(4) on pg. 2056 to bill rates for the new medical assistant positions submitted by STG International as justified above.<br><br>**(b)(7)(E) Redactions:** ICE applied FOIA Exemption (b)(7)(E) to ICE Accounting Information from ICE's Office of Acquisition Management on pgs. 2183, 2185-2192, and 2194.<br><br>**Reason:** FOIA Exemption (b)(7)(E) exempts from release information that would disclose law enforcement techniques or procedures, the disclosure of which could reasonably be expected to risk circumvention of the law. Disclosure of internal ICE account numbers could assist unauthorized parties in gaining improper access to ICE financial accounts where bad actors could alter information or perpetrate identity theft or other harm. The disclosure of this information serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. | |
| 7th Release 2020-ICLI-00042 Pages 2704 to 2707, 2718, 2721, 2736, 2739 | Partial | **Documents:** Amendment of Solicitation / Modification of Contract re DROIGSA-10-0003 70CDCR18FIGR00271, Mod. No. P00002 dated June 19, 2018, to provide additional funding for detention services for ICE detainees at Berks County facility under Intergovernmental Service Agreement DROIGSA-10-0003; Order for Supplies or Services dated June | Freedom of Information Act 5 U.S.C. §§ 552 (b)(4), |

| to 2742, and 2744 to 2747 | | 19, 2018, re same; Mod. No. P00007 dated June 19, 2018, to de-obligate excess funding re same and close out order re same; Mod. No. P00001 dated June 19, 2018, to provide additional funding for detention services for ICE detainees at Berks County re same; DROIGSA-10-0003 70CDCR19FIGR00249, Mod. No. P00001 dated June 20, 2019, to provide funding for certain contract line item numbers (CLINs) re bed space, education, the detainee voluntary work program, and dental costs.<br><br>**(b)(4) Redactions:** ICE applied Exemption (b)(4) to pricing information such as funding increases on contract line items (CLINs), costs per person/day, and hourly rates for detention-related services on pgs. 2704-2707, 2721, 2736, 2739-2742, 2744-2747.<br><br>**Reason:** FOIA Exemption (b)(4) is asserted to withhold Berks County pricing that, at least in part, contains subcontractor pricing for items such as dental services by private doctors and educational services provided by Berks County Intermediate Unit (BCIU), a private company that offers alternative and special educational services to public and private schools and other human service organizations in Berks County, such as the Berks County residential detention facility. Such pricing information is confidential and proprietary to these private entities. FOIA Exemption 4 protects trade secrets and commercial or financial information obtained from a company that is privileged or confidential. The term "financial/commercial" has been interpreted very broadly to encompass any information in which the submitter has a commercial interest and that generally pertains to commerce. To qualify as confidential, financial/commercial information must be both customarily treated as private by its owner and provided to the government under either an express or implied assurance of privacy. The doctors providing dental services and BCIU providing educational services to ICE detainees are for-profit private entities which partner with ICE via subcontracts with cities or counties contracting directly with ICE to provide safe environments where detainees can reside temporarily as they go through their immigration process. Such private entities compete for the awards of subcontracts with Berks County to provide such services to ICE detainees, and have a clear commercial interest in maintaining competitive pricing to win contract awards. Such private entities customarily treat the pricing structure of their contracts as confidential. Further ICE does not customarily release this type of pricing information contained in detention service contracts belonging to a private, for-profit entities, to the public.<br><br>**(b)(6),(b)(7)(C) Redactions:** ICE applied FOIA Exemptions (b)(6),(b)(7)(C) on pgs. 2704, 2718, 2739, and 2744 to the names of ICE ERO Detention Compliance & Removal Officers and IHSC Contract Officer Representatives, both federal employees, who signed the contract and orders for supplies, including their email addresses and telephone numbers, who have not signed a privacy waiver in this case. | (b)(6), (b)(7)(C), (b)(7)(E) |

| | | **Note:** ICE has reprocessed these pages to partially lift some of these redactions to reveal the email domain names and the area codes and first 3 digits of the telephone numbers.<br><br>**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information.<br><br>**(b)(7)(E) Redactions:** ICE applied FOIA Exemption (b)(7)(E) to ICE Accounting Information from ICE's Office of Acquisition Management on pgs. 2705-2706, 2721, 2736, 2740-2742, and 2746-2747.<br><br>**Reason:** FOIA Exemption (b)(7)(E) exempts from release information that would disclose law enforcement techniques or procedures, the disclosure of which could reasonably be expected to risk circumvention of the law. Disclosure of internal ICE account numbers could assist unauthorized parties in gaining improper access to ICE financial accounts where bad actors could alter information or perpetrate identity theft or other harm. The disclosure of this information serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities.<br><br>**Additional note:** ICE previously applied FOIA Exemption (b)(7)(E) in addition to Exemption (b)(4) to the pricing information on these pages as law enforcement techniques and procedures. ICE reprocessed these pages to lift the (b)(7)(E) exemption designation. | |
| 7ᵗʰ Release 2020-ICLI-00042 Page 2803 | Partial | **Document:** DROIGSA-09-0027 Intergovernmental Service Agreement between ICE and Berks County, PA signed August 6, 2009, to provide detentions services for residents/detainees at Berks County Institution at Leesport, PA.<br><br>**(b)(6),(b)(7)(C) Redactions:** ICE applied FOIA Exemptions (b)(6),(b)(7)(C) on pg. 2803 to the name of the ICE Contracting Officer who signed the contract. **Note:** ICE reprocessed this page to lift the redaction to the name of the Chairman, Board of Commissioners of Berks County as a public facing individual at the time of being a signatory to the contract. | Freedom of Information Act 5 U.S.C. §§ 552 (b)(6), (b)(7)(C) |

| | | **Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information. | |
|---|---|---|---|
| 7th Release 2020-ICLI-00042 Pages 2913, 2918, 2932, 2938-2939, and 2980 | Partial | **Documents:** Amendment of Solicitation/ Modification of Contract DROIGSA-10-0003, between ICE and Berks County, PA, Mod. No. P00001 dated March 30, 2010, signed February 1, 2012; Mod. No. P00002 dated March 30, 2010, signed May 15, 2013; Mod. No. P00007 dated March 30, 2010, signed January 16, 2014; Mod. No. P00009 dated March 30, 2010, signed June 24, 2015; Attachment A to Mod. P00023 dated August 1, 2019.<br><br>**Note:** ICE previously applied FOIA Exemption (b)(7)(E) on each of these pgs. to costs and funding information; upon litigation review, ICE reprocessed these pages to lift that redaction designation. ICE also previously applied FOIA Exemption (b)(4) to Berks County Youth Center costs, education costs for detainees, the Voluntary Work Program rate, and total current costs figures on these pages. Upon litigation review given the remote dates of these cost items, and that the Voluntary Work Program rate the government can pay is capped by Congress, ICE reprocessed each of these pages to lift the (b)(4) redaction to those items. | N/A |
| 7th Release 2020-ICLI-00042 Pages 3030 to 3034, 3049, and 3051 to 3053 | Partial | **Documents:** Emails dated February 2018 to July 2018 between ICE IHSC Deputy Assistant Director for Health Systems Support and ICE Contract Specialists and Berks County Fiscal Operations Manager re dental rate increase among other cost-related modifications re Contract No. DROIGSA-10-0003 for the Berks County Family Residential Center (detention facility).<br><br>**(b)(6),(b)(7)(C) Redactions:** ICE applied Exemption (b)(6),(b)(7)(C) on each of these pages to the names of ICE IHSC Deputy Assistant Director and ICE Contract Specialist, both federal employees, and Berks County Fiscal Operations Manager, a third party, who have not signed a privacy waiver in this case. **Note:** ICE has reprocessed these pages to partially lift some of these redactions to reveal the email domain names. | Freedom of Information Act 5 U.S.C. §§ 552 (b)(6), (b)(7)(C) |

| | | **Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information.<br><br>FOIA Exemptions (b)(6) and (b)(7)(C) protect from disclosure PII pertaining to third parties who have not provided consent, such as the non-public facing Berks County Fiscal Operations Manager, to prevent an unwarranted invasion of privacy by: (1) conceivably subjecting this individual to harassment and annoyance in conducting their official duties and in their private lives, and (2) potentially placing them in danger as targets of law enforcement may begrudge personnel for an indefinite time period and seek revenge. Furthermore, without explicit consent of the Berks County employee, ICE cannot release those records to any member of the public. Members of the public may draw adverse inferences from the mere fact that an individual is mentioned in the files of a criminal law enforcement agency. Moreover, Plaintiff has not shown how the privacy interests of the individuals in the records requested outweigh any minimal public interest in the disclosure of the information. Such disclosure would also not shed light on the operations or activities of the government.<br><br>**Additional note:** ICE previously applied Exemptions (b)(4) and (b)(5) to contents of emails on pgs. 3030-3034, (b)(5) on pg. 3049, and (b)(4),(b)(5) between ICE and Berks County contract representatives, and (b)(7)(E) on pg. 3052 to the County CFO's comments re certain proposed shortfall language in the contract modification with ICE. Upon litigation review, as a matter of discretion, ICE has reprocessed these records to lift these redactions. | |
| 7ᵗʰ Release 2020-ICLI-00042 Pages 3063 to 3065 | Partial | **Documents:** Emails dated March 2018 between ICE Section Chief for Detention, Compliance & Removals (DCR) and non-profit organization Abraxas Youth & Family Services Divisional Director re Berks County detention facility bed space and rate increases.<br><br>**(b)(6),(b)(7)(C) Redactions:** ICE applied Exemption (b)(6),(b)(7)(C) on each of these pages to the names of the ICE Section Chief for DCR, a federal employee and Abraxas Divisional Director, a private third party, who have not signed a privacy waiver in this case. **Note:** ICE has | Freedom of Information Act 5 U.S.C. §§ 552 (b)(6), (b)(7)(C) |

| | | reprocessed these pages to partially lift some of these redactions to reveal the email domain names.

**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information.

FOIA Exemptions (b)(6) and (b)(7)(C) protect from disclosure PII pertaining to third parties who have not provided consent, such as the non-public facing Abraxas Divisional Director, to prevent an unwarranted invasion of privacy by: (1) conceivably subjecting this individual to harassment and annoyance in conducting their official duties and in their private lives, and (2) potentially placing them in danger as targets of law enforcement may begrudge personnel for an indefinite time period and seek revenge. Furthermore, without explicit consent of the Berks County employee, ICE cannot release those records to any member of the public. Members of the public may draw adverse inferences from the mere fact that an individual is mentioned in the files of a criminal law enforcement agency. Moreover, Plaintiff has not shown how the privacy interests of the individuals in the records requested outweigh any minimal public interest in the disclosure of the information. Such disclosure would also not shed light on the operations or activities of the government.

**Additional note:** ICE reprocessed pgs. 3063-3065 to lift the (b)(5) redactions from email content related to bed space negotiations given the remote dates of the emails and that the content is more factual than deliberative. | |
|---|---|---|---|
| 7th Release 2020-ICLI-00042 Pages 3067 and 3070 to 3074 | Partial | **Documents:** Group Home/Institutional Facilities Title IV-E / Act 148 Maximum Allowable Reimbursement Budget Documentation for FY 2017/18 re Abraxas Academy

**(b)(6),(b)(7)(C) Redactions:** ICE applied Exemption (b)(6),(b)(7)(C) on pgs. 3067 to the names, email addresses and phone numbers for the Abraxas Divisional Vice President and Director of Financial Operation, private third parties, who have not signed a privacy waiver in this case.
**Note:** ICE has reprocessed these pages to partially lift some of these redactions to reveal the email domain names on pg. 3067 and the staff | Freedom of Information Act 5 U.S.C. §§ 552 (b)(6), (b)(7)(C) |

| | | identification numbers on pgs. 3070-3071 for institutional facility staff positions.<br><br>**Reason:** FOIA Exemptions (b)(6) and (b)(7)(C) protect from disclosure PII pertaining to third parties who have not provided consent, such as the non-public facing Abraxas employees, to prevent an unwarranted invasion of privacy by: (1) conceivably subjecting this individual to harassment and annoyance in conducting their official duties and in their private lives, and (2) potentially placing them in danger as targets of law enforcement may begrudge personnel for an indefinite time period and seek revenge. Furthermore, without explicit consent of the Abraxas employee, ICE cannot release those records to any member of the public. Members of the public may draw adverse inferences from the mere fact that an individual is mentioned in the files of a criminal law enforcement agency. Moreover, Plaintiff has not shown how the privacy interests of the individuals in the records requested outweigh any minimal public interest in the disclosure of the information. Such disclosure would also not shed light on the operations or activities of the government.<br><br>**Additional note:** ICE reprocessed pgs. 3070-3074 to lift all (b)(4),(b)(5) redactions as these documents are part of the Title IV-E audit review by a federal revenue source for this non-profit agency and are neither confidential nor deliberative. | |
| 7th Release 2020-ICLI-00042 Pages 3086 to 3090 | Partial | **Document:** Draft letter dated November 30, 2011, from ICE contracting officer to Berks County Chief Financial Officer re Berks County's proposed prices and terms and conditions for relocating the Family Residential Program from the Old Heim building to the CRC building.<br><br>**(b)(6),(b)(7)(C) Redactions:** ICE applied FOIA Exemptions (b)(6) and (b)(7)(C) on pg. 3090 to the name of the ICE Office of Acquisition Management Contracting Officer, a federal employee, who has not provided a privacy waiver in this case.<br><br>**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information. | Freedom of Information Act 5 U.S.C. §§ 552 (b)(6), (b)(7)(C) |

| | | **Note:** ICE previously withheld these pages in full under FOIA Exemption (b)(5) as the contents are a draft ICE counteroffer to Berks County that were deliberative in nature regarding pricing and terms and conditions. However, upon litigation review, given the remote date of the draft letter, publicly available information on the current location of the Family Residential Program at the Berks County CRC building, as a matter of discretion, ICE reprocessed these pages to lift the withhold in full redaction under (b)(5); ICE applied a partial redaction under (b)(6),(b)(7)(C) to pg. 3090 as mentioned above. | |
|---|---|---|---|
| 7th Release 2020-ICLI-00042 Pages 3169, 3208 and 3212 to 3216 | Partial | **Document:** May 2018 emails among ICE Office of Acquisition Management DCR Section Chief and ICE ERO's Contracting Officer Representative and the Fiscal Operations Manager for Berks County Residential Center re modifications to education subcontract related to 2015 Berks County contract with Berks County Intermediate Unit (BCIU) for delivery of educational services to residents placed at the Berks County Residential Center; emails dated June 2015 among the Executive Director for the Berks County Residential Center/Family Immigration Program and Office of Acquisition Management DCR Contracting Officer and staff from BCIU Office of Business Services re updates to BCIU contract for 2015-2016. | Freedom of Information Act 5 U.S.C. §§ 552 (b)(6), (b)(7)(C) |

**(b)(6),(b)(7)(C) Redactions:** ICE applied Exemption (b)(6),(b)(7)(C) on each of these pages, to the names and email addresses of the ICE personnel who are federal employees, and the names, email addresses and phone numbers of third party Berks County personnel and BCIU personnel, all of whom have not signed a privacy waiver in this case. **Note:** ICE has reprocessed these pages to partially lift some of these redactions to reveal the email domain names.

**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information.

FOIA Exemptions (b)(6) and (b)(7)(C) protect from disclosure PII pertaining to third parties who have not provided consent, such as the non-public facing Berks County and BCIU employees, to prevent an unwarranted invasion of privacy by: (1) conceivably subjecting this individual to harassment and annoyance in conducting their official

| | | duties and in their private lives, and (2) potentially placing them in danger as targets of law enforcement may begrudge personnel for an indefinite time period and seek revenge. Furthermore, without explicit consent of the Berks County and BCIU employees, ICE cannot release those records to any member of the public. Members of the public may draw adverse inferences from the mere fact that an individual is mentioned in the files of a criminal law enforcement agency. Moreover, Plaintiff has not shown how the privacy interests of the individuals in the records requested outweigh any minimal public interest in the disclosure of the information. Such disclosure would also not shed light on the operations or activities of the government.<br><br>**Additional note:** ICE previously applied (b)(4) and (b)(5) redactions to the content of emails on pgs. 3169, 3208 and 3212-3216 related to the contracting personnel from Berks County, BCIU and ICE identified by titles above, discussing proposed modifications to the BCIU contract for 2015-2016. Upon litigation review, given the remote dates and as a matter of discretion, ICE reprocessed these pages lifting these redactions. | |
|---|---|---|---|
| 8th Release 2020-ICLI-00042 Pages 3740 to 3746, 3755, and 3771 | Partial | **Document:** Schematics owned by Corrections Corporations of America (CCA), a private contractor, for proposed expansion for the South Texas Family Residential Center in Dilley, Texas<br><br>**(b)(4) and (b)(7)(E) Redactions: Note -** Upon litigation review, ICE would add Exemption (b)(4) to the Exemption (b)(7)(E) applied to the parts of the schematics on pgs. 3740-3746 and 3755 for proposed expansion of the detention facility to house ICE detainee family units. The redacted portions of the schematics show the proposed layout of the facility and locations of ingress/egress and security features.<br><br>**Reasons:** FOIA Exemption (b)(4) is asserted to partially withhold CCA's schematic drawings for proposed expansion of the South Texas Family Residential Center that is confidential and proprietary to CCA, now known as CoreCivic. FOIA Exemption 4 protects trade secrets and commercial or financial information obtained from a company that is privileged or confidential. The term "financial/commercial" has been interpreted very broadly to encompass any information in which the submitter has a commercial interest and that generally pertains to commerce. To qualify as confidential, financial/commercial information must be both customarily treated as private by its owner and provided to the government under either an express or implied assurance of privacy. CoreCivic, is a for-profit private national firm which partners with ICE directly or via contracts with cities or counties contracting with ICE to provide safe environments where detainees can reside temporarily as they go through their immigration process, including building and operating detention facilities. CoreCivic competes for the awards of ICE contracts to provide such services. The company has a clear commercial and proprietary interest in its schematics for build-to-suit detention facilities. CoreCivic customarily treats their schematics as confidential. | Freedom of Information Act 5 U.S.C. §§ 552 (b)(4), (b)(7)(E) |

| | | | |
|---|---|---|---|
| | | Further ICE does not customarily release this type of schematics information belonging to a private, for-profit company, to the public.<br><br>FOIA Exemption 7(E) protects records compiled for law enforcement purposes, the release of which would disclose techniques and/or procedures which could risk circumvention of the law. The portions of the schematics redacted display the layout of the planned development for the detention facility, including offices, holding cells, corridors, medical areas, types of walls, locations of exterior entries and exits, sally ports (which are secure locations used to transfer detainees from a building to a vehicle) and locations of security features, including perimeter fencing, surveillance, and lighting. This information could reasonably be expected to reveal where the detention facility would be most vulnerable to bad actors' efforts to avoid detection and apprehension when organizing an escape or disturbance, and how to frustrate or thwart security measures or procedures to prevent or quell such incidents. Public awareness of this operational information would aid those seeking to gain entry to a detention facility holding ICE detainees, as they would readily know the detention facility's layout, which could be exploited to overrun and gain unauthorized entry to the facility or undermine security measures taken while transporting ICE detainees. The disclosure of this information serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities.<br><br>**Note:** There were no redactions to pg. 3771. | |
| 9th Release 2020-ICLI-00042 Pages 3864 to 3868 | Partial | **Document:** Amendment of Solicitation/ Modification of Contract 70CDCR18DIG000012, Mod. Nos. P00001 and P00002 dated September 26, 2018 between ICE and the City of Dilley, TX incorporating terms and conditions.<br><br>**(b)(6),(b)(7)(C) Redactions:** ICE applied Exemption (b)(6),(b)(7)(C) to pgs. 3864, 3866, and 3868 to the names, signatures, telephone numbers, email addresses and office suite numbers for the ICE Office of Acquisition Management Contracting Officer Representatives and Contracting Officer, federal employees, who have not signed a privacy waiver in this case.<br><br>**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and | Freedom of Information Act 5 U.S.C. § § 552 (b)(6), (b)(7)(C) |

| | | would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information.<br><br>**Note:** There were no redactions to pgs. 3865 and 3867. | |
|---|---|---|---|
| 9th Release 2020-ICLI-00042 Pages 3906 to 3915 | Partial | **Document:** Amendment of Solicitation/ Modification of Contract 70CDCR18DIG000012, Mod. No. P00005 dated April 22, 2020, between ICE and the City of Dilley, TX to increase certain detention service rates which includes a CoreCivic Inc. schematic of the South Texas Family Residential Center and Mod. No. P00006 to update the contracting officer points of contact related to the South Texas Family Residential Center which is operated by private detention services contractor CoreCivic Inc.<br><br>**(b)(4) Redactions:** ICE applied FOIA Exemption (b)(4) to pgs. 3907-3910 and 3915 to cost information for Contract Line Item Numbers (CLINs) for detention services related to monthly rates for beds, bed day rates, retroactive back pay for detention services, mileage reimbursement rates, housekeeping/guard services, etc. **Note:** Upon litigation review, ICE would add Exemption (b)(4) to the (b)(7)(E) redaction to the CoreCivic schematic on pg. 3913.<br><br>**Reason:** FOIA Exemption (b)(4) is asserted to withhold CoreCivic's pricing reflected in the CLINs in the contract between ICE and the City of Dilly Texas and the schematic of the South Texas Family Residential Center that is confidential and proprietary to CoreCivic. FOIA Exemption 4 protects trade secrets and commercial or financial information obtained from a company that is privileged or confidential. The term "financial/commercial" has been interpreted very broadly to encompass any information in which the submitter has a commercial interest and that generally pertains to commerce. To qualify as confidential, financial/commercial information must be both customarily treated as private by its owner and provided to the government under either an express or implied assurance of privacy. CoreCivic is a for-profit private national firm which partners with ICE directly or via contracts with cities or counties contracting with ICE to provide safe environments where detainees can reside temporarily as they go through their immigration process, including building and operating detention facilities. CoreCivic competes for the awards of ICE contracts to provide such services. The company has a clear commercial interest in maintaining competitive pricing to win contract awards and clear proprietary interest in its schematics for build-to-suit detention facilities. CoreCivic customarily treats the pricing structure of their contracts and their schematics as confidential. Further ICE does not customarily release this type of pricing and schematics information belonging to a private, for-profit company, to the public.<br><br>**(b)(6),(b)(7)(C) Redactions:** ICE applied Exemption (b)(6),(b)(7)(C) on pgs. 3906, 3911-3912, and 3914 to the names, telephone numbers, | Freedom of Information Act 5 U.S.C. § § 552 (b)(4), (b)(6), (b)(7)(C), (b)(7)(E) |

email addresses, office suite numbers and signatures for ICE Contracting Officer Representatives, Contracting Officer, Contract Specialists, and signatories to the contract, who are federal employees and who have not signed a privacy waiver in this case.

**Note:** ICE reprocessed pg. 3906 to lift (b)(6),(b)(7)(C) redaction for the Dilley City Administrator who was public facing.

**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information.

**(b)(7)(E) Redaction:** ICE applied FOIA Exemption (b)(7)(E) to pg. 3913 which is a CoreCivic detailed schematic of the South Texas Family Residential Center which identifies the proposed layout of the facility and locations of ingress/egress and security features.

**Reason:** Exemption 7(E) protects records compiled for law enforcement purposes, the release of which would disclose techniques and/or procedures which could risk circumvention of the law. The schematic displays the layout of various locations that comprise the detention facility, including offices, holding cells, corridors, medical areas, types of walls, locations of exterior entries and exits, locations of security features, including perimeter fencing, surveillance, and lighting. Part of ICE's mission is to provide detention operations efficiently and effectively to ensure safety, security and care of noncitizens in custody while awaiting the outcome of their immigration proceedings. Releasing such information could reasonably be expected to reveal where the detention facility would be most vulnerable to efforts by bad actors to avoid detection and apprehension when organizing an escape or disturbance, and how to frustrate or thwart security measures or procedures to prevent or quell such incidents. Public awareness of this operational information would aid those seeking to gain entry to a detention facility holding ICE detainees, as they would readily know the detention facility's layout, which could be exploited to overrun and gain unauthorized entry to the facility or undermine security measures taken while transporting ICE detainees. The disclosure of this information serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities.

| 9th Release 2020-ICLI-00042 Pages 4119 to 4123 | Partial | **Document:** Amendment of Solicitation/ Modification of Contract 70CDCR19D00000001, Mod. No. P00002 dated December 4, 2018 between ICE and The GEO Group Inc., a private detention services contractor, to exercise all Option Contract Line Items Numbers (CLINs) extend terms and update wage rates related to the South Texas Detention Center in Pearsall, Texas.<br><br>**(b)(4) Redactions:** ICE applied FOIA Exemption (b)(4) on pgs. 4120-4123 to cost information for various Contract Line Item Numbers (CLINs) submitted by The GEO Group (GEO) for detention-related services.<br><br>**Reason:** FOIA Exemption (b)(4) is asserted to withhold GEO's pricing that is confidential and proprietary to GEO. FOIA Exemption 4 protects trade secrets and commercial or financial information obtained from a company that is privileged or confidential. The term "financial/commercial" has been interpreted very broadly to encompass any information in which the submitter has a commercial interest and that generally pertains to commerce. To qualify as confidential, financial/commercial information must be both customarily treated as private by its owner and provided to the government under either an express or implied assurance of privacy. GEO is a for-profit private national firm which partners with ICE directly or via contracts with cities or counties contracting with ICE to provide safe environments where detainees can reside temporarily as they go through their immigration process. GEO competes for the awards of ICE contracts to provide such services. The company has a clear commercial interest in maintaining competitive pricing to win contract awards. GEO customarily treats the pricing structure of their contracts as confidential. Further ICE does not customarily release this type of pricing information belonging to a private, for-profit company, to the public.<br><br>**(b)(6),(b)(7)(C) Redactions:** ICE applied Exemption (b)(6),(b)(7)(C) on pg. 4119 to the names, telephone numbers, email addresses, office suite numbers and signatories to the contract for the ICE Field Office POC and Contracting Officer, who are federal employees, and GEO Group Executive Vice President for Contract Administration, a private third party, who have not signed a privacy waiver in this case.<br><br>**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this | Freedom of Information Act 5 U.S.C. § § 552 (b)(4), (b)(6), (b)(7)(C) |

| | | PII outweighs any minimal public interest that could possibly exist in the disclosure of this information.<br><br>FOIA Exemptions (b)(6) and (b)(7)(C) protect from disclosure PII pertaining to third parties who have not provided consent, such as the non-public facing GEO employee, to prevent an unwarranted invasion of privacy by: (1) conceivably subjecting this individual to harassment and annoyance in conducting their official duties and in their private lives, and (2) potentially placing them in danger as targets of law enforcement may begrudge personnel for an indefinite time period and seek revenge. Furthermore, without explicit consent of the GEO employee, ICE cannot release this information to any member of the public. Members of the public may draw adverse inferences from the mere fact that an individual is mentioned in the files of a criminal law enforcement agency. Moreover, Plaintiff has not shown how the privacy interests of the individual in the records requested outweigh any minimal public interest in the disclosure of the information. Such disclosure would also not shed light on the operations or activities of the government. | |
|---|---|---|---|
| 9th Release 2020-ICLI-00042 Page 4218 | None | **Document:** Excerpt from ICE document bearing Contract No. 70CDCR19D00000009 related to generic ICE Evaluation Factors as to Cost/Price.<br>**Note:** ICE reprocessed this page to lift the (b)(5),(b)(7)(E) redaction. | N/A |
| 9th Release 2020-ICLI-00042 Pages 4226 to 4228 | Partial | **Document:** Attachment 12 – Subcontracting Plan Model re ICE Contract No. 70CDCR1900000001 with The GEO Group Inc. related to the Florence ICE Service Processing Center.<br><br>**(b)(6),(b)(7)(C) Redactions:** ICE applied Exemption (b)(6),(b)(7)(C) on pg. 4226 to the name of the ICE Contracting Officer, a federal employee, who has not signed a privacy waiver in this case.<br><br>**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information.<br><br>**Note:** As a matter of discretion, ICE reprocessed these pages to lift the (b)(4) and (b)(5) redactions on pgs. 4226-4228 to total contract values | Freedom of Information Act 5 U.S.C. §§ 552 (b)(6), (b)(7)(C) |

| | | | |
|---|---|---|---|
| | | and what appears to be some notional dollar percentages for using small business concerns, etc., in the example of how to calculate the Subcontracting Plan Model on an attachment to a contract between ICE and The GEO Group Inc. for detention related services at South Texas Detention Center dated 2018. | |
| 10th Release 2020-ICLI-00042 Pages 4658 to 4667 | None | **Document:** Walkthrough List on Change Orders for South Texas Family Residential Center, Phase II Dashboard "Punch List Items" re DROIGSA-06-002, Mod. No. P00013 signed April 20, 2015, between ICE and the City of Eloy and involving private detentions services subcontractor Creative Corrections of America.<br><br>**Note:** Upon litigation review, given the remote dates and as matter of discretion, ICE reprocessed these pages to lift the (b)(4), (b)(5) and (b)(7)(E) redactions to all of these pages. | N/A |
| 10th Release 2020-ICLI-00042 Pages 4670 to 4672 | Partial | **Document:** Floorplan schematics updated March 17, 2015 for Change Orders for South Texas Family Residential Center re DROIGSA-06-002, Mod. No. P00013 signed April 20, 2015 between ICE and the City of Eloy and owned by private detention services contractor Corrections Corporation of America (CCA), now known as CoreCivic, which identify the layout of certain portions of the facility and locations of ingress/egress and security features.<br><br>**(b)(4) and (b)(7)(E) Redactions: Note -** Upon litigation review, ICE would add Exemption (b)(4) to same portions of the schematics redacted under Exemption (b)(7)(E).<br><br>**Reason:** FOIA Exemption (b)(4) is asserted to withhold CCA's schematic for change orders for certain areas of the South Texas Family Residential Center that is confidential and proprietary to CCA, now known as CoreCivic. FOIA Exemption 4 protects trade secrets and commercial or financial information obtained from a company that is privileged or confidential. The term "financial/commercial" has been interpreted very broadly to encompass any information in which the submitter has a commercial interest and that generally pertains to commerce. To qualify as confidential, financial/commercial information must be both customarily treated as private by its owner and provided to the government under either an express or implied assurance of privacy. CoreCivic is a for-profit, private national firm which partners with ICE directly or via contracts with cities or counties contracting with ICE to provide safe environments where detainees can reside temporarily as they go through their immigration process, including building and operating detention facilities. CoreCivic competes for the awards of ICE contracts to provide such services. The company has a clear commercial interest in maintaining competitive pricing to win contract awards and clear proprietary interest in its schematics for build-to-suit detention facilities. CoreCivic customarily treats their schematics as confidential. | Freedom of Information Act 5 U.S.C. § § 552 (b)(4), (b)(7)(E) |

| | | Further ICE does not customarily release this type of schematics information belonging to a private, for-profit company, to the public.<br><br>**(b)(7)(E) Redactions:** ICE also applied Exemption (b)(7)(E) on these pages to portions of the CCA floorplan schematics that show the exact proposed layout of rooms and hallways, security features and ingress and egress of portions of the detention facility under plans for revision.<br><br>**Reason:** Exemption 7(E) protects records compiled for law enforcement purposes, the release of which would disclose techniques and/or procedures which could risk circumvention of the law. The schematic displays the layout of various locations that comprise the detention facility, including offices, holding cells, corridors, medical areas, types of walls, and locations of exterior entries and exits. This information could reasonably be expected to reveal where the detention facility would be most vulnerable to bad actors' efforts to avoid detection and apprehension when organizing an escape or disturbance, and how to frustrate or thwart security measures or procedures to prevent or quell such incidents. Public awareness of this operational information would aid those seeking to gain entry to a detention facility holding ICE detainees, as they would readily know the detention facility's layout, which could be exploited to overrun and gain unauthorized entry to the facility or undermine security measures taken while transporting ICE detainees. The disclosure of this information serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. | |
| 11th Release 2020-ICLI-0042 Pages 4901 to 4908 | Partial | **Document:** ICE internal email dated July 30, 2014, and Attachment 4 providing a sample draft side by side analysis of jail cost statements for Corrizo Springs location vs. the South Texas Family Residential Center in Dilley, TX.<br><br>**(b)(6),(b)(7)(C) Redactions:** ICE applied Exemption (b)(6),(b)(7)(C) to pg. 4903 to the name, and phone numbers of the ICE Deportation Officer and the names of ICE Office of Acquisition Management Contracting Officers, who are federal employees, and Corrections Corporation of America (now known as CoreCivic) contracting personnel in the email, private third parties (whose titles are not provided), all of whom have not signed privacy waivers in this case.<br><br>**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future | Freedom of Information Act 5 U.S.C. § § 552 (b)(6), (b)(7)(C) |

| | | | |
|---|---|---|---|
| | | investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information.<br><br>FOIA Exemptions (b)(6) and (b)(7)(C) protect from disclosure PII pertaining to third parties who have not provided consent, such as the CCA employees, to prevent an unwarranted invasion of privacy by: (1) conceivably subjecting these individuals to harassment and annoyance in conducting their official duties and in their private lives, and (2) potentially placing them in danger as targets of law enforcement may begrudge personnel for an indefinite time period and seek revenge. Furthermore, without explicit consent of the CCA employees, ICE cannot release this information to any member of the public. Members of the public may draw adverse inferences from the mere fact that an individual is mentioned in the files of a criminal law enforcement agency. Moreover, Plaintiff has not shown how the privacy interests of the individual in the records requested outweigh any minimal public interest in the disclosure of the information. Such disclosure would also not shed light on the operations or activities of the government.<br><br>**Note:** ICE previously applied Exemption (b)(5) to pgs. 4901-4902 and Exemptions (b)(5) and (b)(7)(E) to pgs. 4904-4908 which consists of a side by side comparison of costs and the pros and cons of having a Corrizo Springs location vs. the South Texas Family Residential Center location for detention services. Upon litigation review, although the pricing information on pgs. 4901-4902 which involves private detention service contractor CCA could have been withheld under Exemption (b)(4) as commercial/financial information, as a matter of discretion, given the remote dates and old pricing information, ICE reprocessed these pages without applying these exemptions. | |
| 11th Release 2020-ICLI-00042 Page 5085 | Partial | **Document:** Staffing Plan for the South Texas Family Residential Center dated September 8, 2014.<br><br>**(b)(7)(E) Redaction:** ICE applied Exemption (b)(7)(E) on pg. 5085 to the staff deployment by shift and position for Security Operations and Unit Management.<br><br>**Reason:** Exemption 7(E) protects records compiled for law enforcement purposes, the release of which would disclose techniques and/or procedures which could risk circumvention of the law. Releasing this information on the number and type of security personnel on each shift could reasonably be expected to reveal a vulnerability to being overrun by detainees and/or detainees in concert with non-detainees who enter the facility to facilitate escape or other disturbance and potentially compromising facility staff and detainee safety or undermine security | Freedom of Information Act 5 U.S.C. § 552 (b)(7)(E) |

| | | | |
|---|---|---|---|
| | | measures taken while transporting ICE detainees.  The disclosure of this information serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. | |
| 13th Release 2020-ICLI-00042 Pages CoreCivic 1 to 16 | Partial | **Documents:**    Emails dated August 19, 2014, from Corrections Corporation of America (CCA), now known as CoreCivic, to ICE re revised pricing for South Texas Family Residential Center attaching proposed pricing for various Contract Line Item Nos. (CLINs) for options covering period September 1, 2014 to August 31, 2018; Jail Services Cost Statement Cost Sheet for Detention Services, and Target Cost Justification to Support Lease and Food Service Calculations. | Freedom of Information Act 5 U.S.C. § § 552 (b)(4), (b)(6), (b)(7)(C) |

**(b)(4) Redactions:**  ICE applied FOIA Exemption (b)(4) on pgs. CoreCivic 3-4, and CoreCivic 7-16  to cost information submitted by CCA.

**Reason:**  FOIA Exemption (b)(4) is asserted to withhold CCA's pricing that is confidential and proprietary to CCA, now known as CoreCivic. FOIA Exemption 4 protects trade secrets and commercial or financial information obtained from a company that is privileged or confidential. The term "financial/commercial" has been interpreted very broadly to encompass any information in which the submitter has a commercial interest and that generally pertains to commerce.   To qualify as confidential, financial/commercial information must be both customarily treated as private by its owner and provided to the government under either an express or implied assurance of privacy.  CoreCivic is a for-profit, private national firm which partners with ICE directly or via contracts with cities or counties contracting with ICE to provide safe environments where detainees can reside temporarily as they go through their immigration process.  CoreCivic competes for the awards of ICE contracts to provide such services.  The company has a clear commercial interest in maintaining competitive pricing to win contract awards.   CoreCivic customarily treats the pricing structure of their contracts as confidential. Further ICE does not customarily release this type of pricing information belonging to a private, for-profit company, to the public.

**(b)(6),(b)(7)(C) Redactions:**  ICE applied Exemptions (b)(6),(b)(7)(C) on pgs. CoreCivic 1 and 5 to the names, phone numbers and email addresses of the ICE Detention Management Division, Deputy Assistant Director, a federal employee, and CCA Senior Director of Proposal Development, a private third party, who have not signed privacy waivers in this case.

**Reason:**  Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of  law enforcement investigations may

| | | | |
|---|---|---|---|
| | | begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations.  The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities.  As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information.

FOIA Exemptions (b)(6) and (b)(7)(C) protect from disclosure PII pertaining to third parties who have not provided consent, such as the CCA employee, to prevent an unwarranted invasion of privacy by: (1) conceivably subjecting these individuals to harassment and annoyance in conducting their official duties and in their private lives, and (2) potentially placing them in danger as targets of  law enforcement may begrudge personnel for an indefinite time period and seek revenge. Furthermore, without explicit consent of the CCA employee, ICE cannot release this information to any member of the public. Members of the public may draw adverse inferences from the mere fact that an individual is mentioned in the files of a criminal law enforcement agency. Moreover, Plaintiff has not shown how the privacy interests of the individual in the records requested outweigh any minimal public interest in the disclosure of the information. Such disclosure would also not shed light on the operations or activities of the government.

Note: There were no redactions to Pgs. CoreCivic 2 or 6. | |
| 13th Release 2020-ICLI-00042 Pages CoreCivic 31 to 36, and CoreCivic 62 | Partial | **Documents:** Proposed floorplan schematics by CCA dated September 5, 2014 for South Texas Family Residential Center which identify the layout of certain portions of the facility and locations of ingress/egress and security features.

**(b)(4) and b)(7)(E) Redactions:** ICE applied Exemption (b)(4) and (b)(7)(E) to the floorplan schematics  on pgs. CoreCivic 31 to 36  and  CoreCivic 62, that show design, structural features, ingress and egress locations and security features.

**Reasons:**  FOIA Exemption (b)(4) is asserted to withhold portions of CCA's schematic drawings for certain areas of proposed expansion of the South Texas Family Residential Center that is confidential and proprietary to CCA, now known as CoreCivic. FOIA Exemption 4 protects trade secrets and commercial or financial information obtained from a company that is privileged or confidential.  The term "financial/commercial" has been interpreted very broadly to encompass any information in which the submitter has a commercial interest and that generally pertains to commerce.  To qualify as confidential, financial/commercial information must be both customarily treated as private by its owner and provided to the government under either an express or implied assurance of privacy. CoreCivic is a for-profit, private national firm which partners with ICE directly or via contracts with cities or counties contracting with ICE to provide safe environments where detainees can reside temporarily as | Freedom of Information Act 5 U.S.C. § § 552 (b)(4), (b)(7)(E) |

| | | they go through their immigration process, including building and operating detention facilities. CoreCivic competes for the awards of ICE contracts to provide such services. The company has a clear commercial and proprietary interest in its schematics for build-to-suit detention facilities. CoreCivic customarily treats their schematics as confidential. Further ICE does not customarily release this type of schematics information belonging to a private, for-profit company, to the public.<br><br>FOIA Exemption 7(E) protects records compiled for law enforcement purposes, the release of which would disclose techniques and/or procedures which could risk circumvention of the law. The schematics display the layout of various locations that comprise the detention facility, including offices, holding cells, corridors, medical areas, types of walls, locations of exterior entries and exits, sally ports, locations of security features, including perimeter fencing, surveillance, and lighting. This information could reasonably be expected to reveal where the detention facility would be most vulnerable to bad actors' efforts to avoid detection and apprehension when organizing an escape or disturbance, and how to frustrate or thwart security measures or procedures to prevent or quell such incidents. Public awareness of this operational information would aid those seeking to gain entry to a detention facility holding ICE detainees, as they would readily know the detention facility's layout, which could be exploited to overrun and gain unauthorized entry to the facility or undermine security measures taken while transporting ICE detainees. The disclosure of this information serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. | |
| 15th Release 2020-ICLI-00042 Pages GEO Group 1 to 34 | Partial | **Document:** Amendment of Solicitation/Modification of Contract HSCEDM-11-D-00003/70CDCR19FR0000089, Mod. Nos. P00004 and P00005 and related Order for Supplies or Services Schedule dated September 11, 2019, between ICE and The GEO Group Inc. to provide additional funding for Detention and Transportation services at Aurora Contact Detention Facility.<br><br>**(b)(4) Redactions:** ICE applied Exemption (b)(4) on pgs. GEO Group 2-28 and GEO Group 34, to obligated amounts on the task orders, discount terms, bed day rates, other cost items, transport service miles to be under fixed fee annually, and not to exceed cost amounts.<br><br>**Reason:** FOIA Exemption (b)(4) is asserted to withhold GEO's pricing and related contract items such as discount terms and transport service miles, that is confidential and proprietary to GEO. FOIA Exemption 4 protects trade secrets and commercial or financial information obtained from a company that is privileged or confidential. The term "financial/commercial" has been interpreted very broadly to encompass any information in which the submitter has a commercial interest and that generally pertains to commerce. To qualify as confidential, financial/commercial information must be both customarily treated as private by its owner and provided to the government under either an | Freedom of Information Act 5 U.S.C. § § 552 (b)(4), (b)(6), (b)(7)(C), (b)(7)(E) |

express or implied assurance of privacy. GEO is a for-profit, private national firm which partners with ICE directly or via contracts with cities or counties contracting with ICE to provide safe environments where detainees can reside temporarily as they go through their immigration process. GEO competes for the awards of ICE contracts to provide such services. The company has a clear commercial interest in maintaining competitive pricing and terms to win contract awards. GEO customarily treats the pricing structure of their contracts as confidential. Further ICE does not customarily release this type of pricing information belonging to a private, for-profit company, to the public.

**(b)(6),(b)(7)(C) Redactions:** ICE applied Exemption (b)(6),(b)(7)(C) on pgs. GEO Group 1-2, 9-10, 17-20, and GEO Group 22-23 to the names, phone numbers, email addresses and office suite numbers of ICE Contracting Officer's Representatives and Contract Specialists, federal employees who have not signed privacy waivers in this case.

**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information.

**(b)(7)(E) Redactions:** ICE applied FOIA Exemption (b)(7)(E) to ICE Accounting Information from ICE's Office of Acquisition Management on pgs. GEO Group 3-8, GEO Group 11-21 and GEO Group 23-28.

**Reason:** FOIA Exemption (b)(7)(E) exempts from release information that would disclose law enforcement techniques or procedures, the disclosure of which could reasonably be expected to risk circumvention of the law. Disclosure of internal ICE account numbers could assist unauthorized parties in gaining improper access to ICE financial accounts where bad actors could alter information or perpetrate identity theft or other harm. The disclosure of this information serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities.

| 18th Release 2020-ICLI-00042 Pages STGi 12 to | Partial | **Document:** Amendment of Solicitation/Modification of Contract 70CDCR18C00000003, Mod. No. P00009 dated February 20, 2018 between ICE and STG International Inc. signed February 4, 2019 to provide funding and clarify duties of nurse practitioner-pediatric and STG | Freedom of Information Act 5 U.S.C. § |

| 15 and STGi 47 to 49 | | International Inc.'s IHSC staffing model and bill rates for Contract 70CDCR18C00000003.<br><br>**(b)(4) Redactions:** ICE applied Exemption (b)(4) on pgs. STGi 12-15 for cost increase for CLIN 0001 related to healthcare services and pgs. STGi 47-49 for bill rates for healthcare providers submitted by STG International.<br><br>**Reason:** FOIA Exemption (b)(4) is asserted to withhold STG International's pricing information that is confidential and proprietary to the company. FOIA Exemption 4 protects trade secrets and commercial or financial information obtained from a company that is privileged or confidential. The term "financial/commercial" has been interpreted very broadly to encompass any information in which the submitter has a commercial interest and that generally pertains to commerce. To qualify as confidential, financial/commercial information must be both customarily treated as private by its owner and provided to the government under either an express or implied assurance of privacy. STG International is a for-profit, private national firm which specializes in the areas of healthcare services, social services, training services and facility management on government contracts at the federal, state and local level, and which competes for the awards of ICE contracts to provide such services to ICE detainees. The company has a clear commercial interest in maintaining competitive pricing to win contract awards. STG International customarily treats the pricing structure of their contracts as confidential. Further ICE does not customarily release this type of pricing information, belonging to a private, for-profit company, to the public. **Note:** ICE reprocessed pgs. STGi 12-15 lifting the (b)(4) redactions to the DUNS No. on pg. STGi 12; to the Contract No., and, as a matter of discretion, to the total contract value, and sensitive award "PII" on pg. STGi 13. ICE also lifted the (b)(4) redaction to the Accounting Information and funded amounts of $0.00 on STGi pgs. 14 and 15.<br><br>**(b)(6),(b)(7)(C) Redactions:** ICE applied Exemption (b)(6),(b)(7)(C) on pgs. STGi 12-13 to the names, phone numbers, email addresses and office suite numbers of ICE Contracting Officer's Representatives and Contracting Officer, federal employees who have not signed privacy waivers in this case.<br><br>**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying | § 552 (b)(4), (b)(6), (b)(7)(C), (b)(7)(E) |

| | | | |
|---|---|---|---|
| | | out its statutory responsibilities.  As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information.  **Note:** ICE lifted the (b)(6),(b)(7)(C) redaction to the name of the President and CEO of STG International as a public facing individual.<br><br>**(b)(7)(E) Redactions:**  ICE applied Exemption (b)(7)(E) to Accounting Information from ICE's Office of Acquisition Management on pgs. STGi 14 -15.<br><br>**Reason:**  FOIA Exemption (b)(7)(E) exempts from release information that would disclose law enforcement techniques or procedures, the disclosure of which could reasonably be expected to risk circumvention of the law.  Disclosure of internal ICE account numbers could assist unauthorized parties in gaining improper access to ICE financial accounts where bad actors could alter information or perpetrate identity theft or other harm.  The disclosure of this information serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. | |
| 20th Release 2020-ICLI-00042 Pages 7428 to 7432, 7490 to 7492 and 7502 | Partial | **Document:**  Section C – Description/Specifications for Contractor-Owned, Contractor-Operated Detention Facility in the Denver Metropolitan Area; Section H – Special Contract Requirements, subsection H-18 – Firearms/Body Armor.<br>**(b)(7)(E) Redaction:**  ICE applied Exemption (b)(7)(E) on pg. 7432 to special security requirements for certain locations in the facility, and on pgs. 7490-7492 to sections delineating contract requirements for the use and storage of firearms, ammunition and other defensive weapons, and body armor.<br><br>**Reason:**  Exemption (b)(7)(E) protects records compiled for law enforcement purposes, the release of which would disclose techniques and/or procedures which could risk circumvention of the law.  Disclosing information regarding special security measures for certain locations in a detention facility and details on requirements for weapons and body armor used and stored at the facility could reveal where the detention facility would be most vulnerable to efforts by bad actors to avoid detection and apprehension when organizing an escape or disturbance, and how to frustrate or thwart security measures or procedures to prevent or quell such incidents.  Public awareness of this operational information would aid those seeking to gain unauthorized entry to or to escape from the detention facility holding ICE detainees, or to cause other disturbance and potentially compromising facility staff and detainee safety or undermine security measures taken while transporting ICE detainees.  The disclosure of this information serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. **Note:** ICE reprocessed Pg. 7502 to lift the (b)(7)(E) redaction to subpart (c) regarding examples of tasks | Freedom of Information Act 5 U.S.C. § 552 (b)(7)(E) |

| | | that require security provisions. There were no redactions to pgs. 7428-7431. | |
|---|---|---|---|
| 22nd Release 2020-ICLI-00042 Pages GEO Group 386, 387, 390, 392 to 394, 404, 407, 661 and GEO Group 770 to 775. | Partial | **Documents:** Amendment of Solicitation/Modification of Contract HSCEDM-11-D-00003 dated September 15, 2011, between ICE and The GEO Group Inc., Mod. No. P00045 signed June 3, 2020, to increase the not to exceed amounts for certain CLINs; Mod. No. P00044 to extend the Surge CLIN through September 16, 2021, and incorporate further guidance for care of ICE transgender detainees; Award/Contract HSCEDM-11-D-00003 between ICE and The GEO Group Inc. signed September 15, 2011; Mod. No. P00040 signed April 12, 2019, to extend a certain CLIN for additional 60 days and to add certain language re staffing levels; Mod. No. P00012 signed July 13, 2012, to fund certain CLINs; Mod. No. P00008 signed June 23, 2015, to increase the obligated amount of funds to cover the period through August 31, 2015, and Order for Supplies or Services in re Contract No. HSCEDM-11-D-00003, dated September 2, 2016 for detention and transportation service for ICE detainees in Aurora, Colorado.

**(b)(4) Redactions:** ICE applied Exemption (b)(4) to pgs. GEO Group 387, 393-394, 407, and GEO Group 770-772 to cost increase values and not to exceed cost values, and hourly rates, bed counts, discounts terms, and year rate increase percentages. **Note:** ICE lifted the (b)(4) redaction on pg. GEO Group 387 for the new total contract value, as a matter of discretion. ICE also lifted the (b)(4) redaction on pgs. GEO Group 392 and 394 for the Product/Service Code, and on pgs. GEO Group 773-775 for $0.00 carried forward.

**Reason:** FOIA Exemption (b)(4) is asserted to withhold GEO's pricing and related contract items such as discount terms and year rate increase percentages that is confidential and proprietary to GEO. FOIA Exemption 4 protects trade secrets and commercial or financial information obtained from a company that is privileged or confidential. The term "financial/commercial" has been interpreted very broadly to encompass any information in which the submitter has a commercial interest and that generally pertains to commerce. To qualify as confidential, financial/commercial information must be both customarily treated as private by its owner and provided to the government under either an express or implied assurance of privacy. GEO is a for-profit, private national firm which partners with ICE directly or via contracts with cities or counties contracting with ICE to provide safe environments where detainees can reside temporarily as they go through their immigration process. GEO competes for the awards of ICE contracts to provide such services. The company has a clear commercial interest in maintaining competitive pricing and terms to win contract awards. GEO customarily treats the pricing structure of their contracts as confidential. Further ICE does not customarily release this type of pricing information belonging to a private, for-profit company, to the public. | Freedom of Information Act 5 U.S.C. § § 552 (b)(4), (b)(6), (b)(7)(C), (b)(7)(E) |

**(b)(6),(b)(7)(C) Redactions:** ICE applied Exemptions (b)(6),(b)(7)(C) to pgs. GEO Group 386-387, 390, 393-394, 404, 407, 661, and GEO Group 770 to the names, signatures, email addresses, suite numbers, and phone numbers of ICE Contracting Officer's Representatives, Contracting Officer, Contract Specialists, ICE Finance POC and ICE Program POC, federal employees who have not signed privacy waivers in this case. **Note:** ICE reprocessed pgs. GEO Group 386, 393 and GEO Group 404 to lift the (b)(6),(b)(7)(C) redaction of the name of the Executive Vice-President of The GEO Group as a public-facing individual, and reprocessed pg. GEO Group 661 to reveal the email domain for the ICE Contracting Officer's Representatives.

**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information.

**(b)(7)(E) Redactions:** ICE applied Exemption (b)(7)(E) to Accounting Information from ICE's Office of Acquisition Management on pgs. GEO Group 771-772.

**Reason:** FOIA Exemption (b)(7)(E) exempts from release information that would disclose law enforcement techniques or procedures, the disclosure of which could reasonably be expected to risk circumvention of the law. Disclosure of internal ICE account numbers could assist unauthorized parties in gaining improper access to ICE financial accounts where bad actors could alter information or perpetrate identity theft or other harm. The disclosure of this information serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities.

| | | | |
|---|---|---|---|
| 23rd Release 2020-ICLI-00042 Pages 8133, 8136 to 8145, 8178 to 8180 and 8247 | Partial | **Documents:** Amendment of Solicitation/Modification of Contract HSCEDM-15-D-00015 dated September 24, 2015, Mod. No. P0024, between ICE and The GEO Group Inc. (GEO) to exercise 5th Option Period of the Contract for the period of September 28, 2020 through September 27, 2021 and to replace attachment 2 of the Contract with the new Dept. of Labor Wage Determinations; Award/Contract HSCEDM-15-D-00015 signed September 24, 2015; Section C – Description/Specification Performance Work Statement for Contract HSCEDM-15-D-00015 and | Freedom of Information Act 5 U.S.C. §§ 552 (b)(4), (b)(6), (b)(7)(C), (b)(7)(E) |

Amendment of Solicitation/Modification of Contract HSCEDM-15-D-00015, Mod. No. P00003 signed January 7, 2016.

**(b)(4) Redactions:** ICE applied Exemption (b)(4) to pgs. 8136-8145 to discount terms, bed day rates, transportation rates including lodging, cost increase values and not to exceed cost values and hourly rates submitted by GEO. **Note:** ICE lifted the (b)(4) redaction on pg. 8144 to the Voluntary Work Program rate of $1 per day maximum that the government can pay which is capped by Congress.

**Reason:** FOIA Exemption (b)(4) is asserted to withhold GEO's pricing and related contract items such as discount terms and not to exceed cost values that is confidential and proprietary to GEO. FOIA Exemption 4 protects trade secrets and commercial or financial information obtained from a company that is privileged or confidential. The term "financial/commercial" has been interpreted very broadly to encompass any information in which the submitter has a commercial interest and that generally pertains to commerce. To qualify as confidential, financial/commercial information must be both customarily treated as private by its owner and provided to the government under either an express or implied assurance of privacy. GEO is a for-profit, private national firm which partners with ICE directly or via contracts with cities or counties contracting with ICE to provide safe environments where detainees can reside temporarily as they go through their immigration process. GEO competes for the awards of ICE contracts to provide such services. The company has a clear commercial interest in maintaining competitive pricing and terms to win contract awards. GEO customarily treats the pricing structure of their contracts as confidential. Further ICE does not customarily release this type of pricing information belonging to a private, for-profit company, to the public.

**(b)(6),(b)(7)(C) Redactions:** ICE applied Exemptions (b)(6),(b)(7)(C) to pgs. 8133, 8136-8137, and 8247 to the names, signatures, email addresses, suite numbers, and phone numbers of ICE Contracting Officer Representatives and ICE Finance POCs, federal employees who have not signed privacy waivers in this case. **Note:** ICE reprocessed pgs. 8247 to lift the (b)(6),(b)(7)(C) redaction to the name of the Executive Vice-President for GEO which is a public facing position.

**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying

| | | out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information.

**(b)(7)(E) Redactions:** ICE applied Exemption (b)(7)(E) to pgs. 8178 and 8180 to language in the Performance Work Statement specifying the types of security-related equipment required of a contractor providing detention-related services for ICE detainees in the Seattle, Washington area. **Note:** ICE lifted the (b)(7)(E) redaction to the code for contractor GEO Group on pgs. 8133, 8136 and 8247.

**Reason:** FOIA Exemption (b)(7)(E) protects records compiled for law enforcement purposes, the release of which would disclose techniques or procedures which could risk circumvention of the law. Disclosing information regarding security equipment for detention officers could aid those seeking to gain unauthorized entry to the detention facility or to escape from the detention facility holding ICE detainees, or to cause other disturbance and potentially compromise facility staff and detainee safety, or undermine security measures taken while transporting ICE detainees. The disclosure of this information serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities.

**Note:** There were no redactions to pg. 8179. | |
|---|---|---|---|
| 24th Release 2020-ICLI-00042 Pages 8729 to 8734, 8905, 8980, 9151 to 9153 and 9201 | Partial | **Documents:** Amendment of Solicitation/Modification of Contract HSCEDM-15-D-00015/HSCEDM-15-J-00038 dated September 24, 2015 between ICE and The GEO Group Inc. (GEO), Mod. No. P00008 signed August 29, 2016, to fund task order associated with various CLINs and to extend the ending date to September 27, 2016 and Mod. No. P00009 signed January 17, 2017, to de-obligate funds and close out the task order(pgs. 8729-8734); Amendment of Solicitation/Modification of Contract ODT-5-C-003/70CDCR18FR0000080 dated June 26, 2018 between ICE and CoreCivic Inc. (CoreCivic), Mod. No. P00011 signed May 15, 2019 to add funding and the period of performance through June 30, 2019 (pg. 8905); Amendment of Solicitation/Modification of Contract 70CDCR20C00000007 dated December 19, 2019 between ICE and CoreCivic Inc., Mod. No. P00001 to add POCs for the contract and update pricing, et al (pg. 8980).; ICE Section C Performance Work Statement – Detention Services (California-Wide)(October 25, 2019), subsection X. Firearms/Body Armor (pgs. 9151-9153); CoreCivic's Otay Mesa Detention Center Contract Staffing Pattern (pg. 9201).

**(b)(4) Redactions:** ICE applied Exemption (b)(4) to pgs. 8729-8734 to the net increase and net decrease to the contract amount between ICE and GEO, including pricing for various Contract Line Item Nos. (CLINs) that caused the adjustments, discount terms, guaranteed minimum detention beds, and quantities and types of vehicles for transportation services. Exemption (b)(4) was applied to pg. 8905 to net increase to the contract | Freedom of Information Act 5 U.S.C. §§ 552 (b)(4), (b)(6), (b)(7)(C), (b)(7)(E) |

amount between ICE and CoreCivic based on adjustment to various CLINs. Exemption (b)(4) was also applied to pg. 9201 to portions of CoreCivic's Contract Staffing Pattern for the Otay Mesa Detention Center that revealed deployment per shift per position for Management/Support and Security Operations. **Note:** ICE reprocessed and lifted the (b)(4) redaction on pg. 8731 to CLIN 0003 re Detainee Volunteer Wages which is capped by Congress, and to the PSC (code) on pg. 8980.

**Reason:** FOIA Exemption (b)(4) is asserted to withhold GEO and CoreCivic's pricing and related contract items and CoreCivic's staffing plan information that is confidential and proprietary to those companies. FOIA Exemption 4 protects trade secrets and commercial or financial information obtained from a company that is privileged or confidential. The term "financial/commercial" has been interpreted very broadly to encompass any information in which the submitter has a commercial interest and that generally pertains to commerce. To qualify as confidential, financial/commercial information must be both customarily treated as private by its owner and provided to the government under either an express or implied assurance of privacy. GEO and CoreCivic are for-profit, private national firms which partner with ICE directly or via contracts with cities or counties contracting with ICE to provide safe environments where detainees can reside temporarily as they go through their immigration process. GEO and CoreCivic compete for the awards of ICE contracts to provide such services. The companies have clear commercial interests in maintaining competitive pricing and terms to win contract awards. GEO and CoreCivic customarily treat the pricing structure of their contracts and staffing plans as confidential. Further ICE does not customarily release this type of pricing and staffing information belonging to a private, for-profit companies, to the public.

**(b)(6),(b)(7)(C) Redactions:** ICE applied Exemptions (b)(6),(b)(7)(C) to pgs. 8729, 8732, 8905, and 8980 to the names, signatures, email addresses, suite numbers, and phone numbers of ICE Contracting Officer's Technical Representative POCs, ICE Finance POC, ICE Contract Specialists and Contracting Officers, federal employees who have not signed privacy waivers in this case.

**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this

| | | | |
|---|---|---|---|
| | | PII outweighs any minimal public interest that could possibly exist in the disclosure of this information.<br><br>**(b)(7)(E) Redactions:** ICE applied Exemption (b)(7)(E) to Accounting Information from ICE's Office of Acquisition Management on pgs. 8730-8731 and 8733-8734; to Performance Work Statement requirements related to firearms and body armor on pgs. 9151-9153, and to security-related staffing deployment by shift and position pg. 9201. **Note:** ICE reprocessed and lifted the (b)(7)(E) redaction to GEO's code on pgs. 8729 and 8732, the CoreCivic code on pg. 8905, and the NAICS code on pg. 8980. ICE added Exemption (b)(7)(E) to security-related staffing deployment by shift and position on pg. 9201.<br><br>**Reasons:** FOIA Exemption (b)(7)(E) exempts from release information compiled for law enforcement purposes that would disclose law enforcement techniques or procedures, the disclosure of which could reasonably be expected to risk circumvention of the law. Disclosure of internal ICE account numbers could assist unauthorized parties in gaining improper access to ICE financial accounts where bad actors could alter information or perpetrate identity theft or other harm. Disclosing information regarding security equipment for detention officers could aid those seeking to gain unauthorized entry to the detention facility or to escape from the detention facility holding ICE detainees, or to cause other disturbance and potentially compromise facility staff and detainee safety, or undermine security measures taken while transporting ICE detainees. Disclosing information on the number of security-related staff on duty per shift could reveal a vulnerability to being overrun by detainees and/or detainees in concert with non-detainees who enter the facility to facilitate escape or other disturbance and potentially compromising facility staff and detainee safety. The disclosure of this information serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. | |
| 25th Release 2020-ICLI-00042 Pages 9202 to 9204, 9382, 9383, 9445 and CoreCivic 122 and 127 and CoreCivic 143 to 145 | Partial | **Documents:** Amendment of Solicitation/Modification of Contract 70CDCR20D00000007 dated December 19, 2019, between ICE and CoreCivic Inc., Mod. No. P00004 signed June 10, 2020, to add new CLINs for medical services, incorporate revised sections of the Performance Work Statement, and incorporate medical services staffing pattern; ICE Health Services Design Standards with schematics for Ambulatory Care Unit and materials to be used for walls; and CoreCivic schematic drawing for visitation area, staffing for armed transportation of detainees, and key and change of lock management for facility operations at the Otay Mesa Detention Center submitted in response to ICE Request for Proposal 70CDCR20R00000002.<br><br>**(b)(4) Redactions:** ICE applied Exemption (b)(4) to pgs. 9203-9204 to cost information submitted by CoreCivic including total amount for the modification, total increase caused by increases to costs for medical services. Exemption (b)(4) was also applied on pg. CoreCivic 122 to a | Freedom of Information Act 5 U.S.C. §§ 552 (b)(4), (b)(6), (b)(7)(C), (b)(7)(E) |

schematic drawing submitted by CoreCivic detailing the layout and proposed addition of five VTC booths to the visitation area in the detention facility.

**Reason:** FOIA Exemption 4 protects trade secrets and commercial or financial information obtained from a company that is privileged or confidential. The term "financial/commercial" has been interpreted very broadly to encompass any information in which the submitter has a commercial interest and that generally pertains to commerce. To qualify as confidential, financial/commercial information must be both customarily treated as private by its owner and provided to the government under either an express or implied assurance of privacy. CoreCivic is a for-profit, private national firm which partners with ICE directly or via contracts with cities or counties contracting with ICE to provide safe environments where detainees can reside temporarily as they go through their immigration process, including building and operating detention facilities. CoreCivic competes for the awards of ICE contracts to provide such services. The company has a clear commercial and proprietary interest in its pricing and schematics for build-to-suit detention facilities. CoreCivic customarily treats their pricing information and schematics as confidential. Further ICE does not customarily release this type of pricing and schematics information belonging to a private, for-profit company, to the public.

**(b)(6),(b)(7)(C) Redactions:** ICE applied Exemptions (b)(6),(b)(7)(C) to pg. 9202 to the names, signatures, email addresses, suite numbers, and phone numbers of ICE Contracting Officer's Representatives, ICE Contracting Officer's Technical POC, and ICE Contracting Officer, federal employees who have not signed privacy waivers in this case. **Note:** ICE reprocessed pg. 9202 to lift the (b)(6),(b)(7)(C) redaction to the name of the CoreCivic Inc. Vice President, Partnership Contracts Counsel who is a public-facing individual.

**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information.

**(b)(7)(E) Redactions:** ICE applied Exemption (b)(7)(E) to pgs. 9382-9383 re ICE Health Services Design Standards that contain schematics showing

| | | ingress/egress and sally port locations for the Ambulatory Care Unit, and proximity of guard stations and details re security surveillance of such areas within the detention facility; to pgs. 9445 to the materials used for walls in a detention site unit; to pgs. CoreCivic 122 to a schematic drawing for the visitation area that shows ingress and egress locations and the layout of private rooms; to pgs. CoreCivic 127 detailing the staffing and procedures for armed transportation, and pgs. CoreCivic 143-145 detailing procedures for managing the keys and locks at the detention facility including schedules for inventory of keys and lock checks.<br><br>**Reason:** FOIA Exemption (b)(7)(E) exempts from release information compiled for law enforcement purposes that would disclose law enforcement techniques or procedures which could reasonably be expected to risk circumvention of the law. Disclosure of schematics of portions of detention facilities that show points of ingress/egress and locations of guard stations, material used for walls, and information on staffing and procedures for armed transportation and procedures for managing keys and locks would reveal where the detention facility would be most vulnerable to efforts by bad actors to avoid detection and apprehension when organizing an escape or disturbance, and how to frustrate or thwart security measures or procedures to prevent or quell such incidents. Public awareness of this operational and detention facility design information would aid those seeking to gain unauthorized entry to or to escape from the detention facility holding ICE detainees, or to cause other disturbance and potentially compromising facility staff and detainee safety, or undermine security measures taken while transporting ICE detainees. The disclosure of this information serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. | |
| 26th Release 2020-ICLI-00042 Pages 9536 to 9538, 9827, 10029 to 10031 and 10037 to 10038. | Partial | **Documents:** Attachments to Detention Services Agreement between ICE and Pinal County, Arizona for Pinal County Adult Detention Center in Florence, Arizona , signed August 16, 2006, re Staffing Plan and Bus Route Schedule; Section C – Statement of Work for ICE detention services contractors, Subsection K. Uniform Requirements; ICE National Firearms & Tactical Training Unit (NFTTU) Guidelines and Interim ICE Firearms Policy dated July 7, 2004.<br><br>**(b)(7)(E) Redactions:** ICE applied Exemption (b)(7)(E) to pgs. 9537-9538 to security-related staffing deployment by position and shift, and to the daily bus schedule between Pinal County Jail and the Florence ICE Processing Center; to pg. 9827 as to detailed specifications for ICE contractor employees identification credentials; to pgs. 10030-10031 to details on the manufacturer, model and type of handcuffs, flexible restraints and other miscellaneous restraints and safety-related equipment approved for use by ICE's NFTTU, and to pgs. 10037-10038 to the Carriage of Firearms section of the Interim ICE Firearms Policy. **Note:** ICE lifted the (b)(7)(E) redactions on pg. 9536 for non-security-related staffing plans. There were no redactions to pg. 10029. | Freedom of Information Act 5 U.S.C. § 552 (b)(7)(E) |

| | | | |
|---|---|---|---|
| | | **Reasons:** FOIA Exemption (b)(7)(E) exempts from release information compiled for law enforcement purposes that would disclose law enforcement techniques or procedures which could reasonably be expected to risk circumvention of the law. Disclosing information on the staffing levels per shift for security-related detention services positions; the route and schedule for the bus carrying detainees; details on requirements for detention contractor identification credentials, the types of handcuffs or other restraints used, and detailed information on ICE officer's carriage of firearms both on and off duty could undermine the safety of the ICE officer and public and reduce the effectiveness of those procedures. Releasing operational information related to security measures may also reveal a vulnerability to being overrun by detainees and/or detainees in concert with bad actor non-detainees who enter the facility to facilitate escape or other disturbance and potentially compromise facility staff and detainee safety or undermine security measures taken while transporting ICE detainees. The disclosure of this information serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. | |
| 27th Release 2020-ICLI-00042 Pages 10322 to 10323, 10324, 10350, 10364 to 10375, 10428 and 10429, 10542 to 10552, 10602 and 10603, 10607 and 10608, and 10616 | Partial | **Documents:** Amendment of Solicitation/Modification of Contract HSCEDM-09-D-0007 dated April 22, 2009, between ICE and Corrections Corporations of America (now known as CoreCivic Inc.), Mod. No. P00012 signed March 21, 2012, to change contracting officer's technical representative; Mod. No. P00013 signed March 26, 2012, to exercise option period three for the Houston Detention Service Facility and incorporate wage determinations; Mod. No. P00021 signed April 24, 2014, to extend detention related services at the Houston Detention Facility and incorporate wage determinations; Mod. No. P00029 signed April 7, 2017; Mod. No. P00015 (unsigned) to correct monthly rate of CLIN 4001 to correct error in Mod. P00014; Mod. No. P00038 (unsigned) to extend the period of performance from March 1, 2019 through March 17, 2019, at no additional cost to Government and attached detention service-related cost schedules for proposed period January 2017 to December 2017; Section C – Performance Work Statement, Subsection IV subparts D. Securely Operate the Facility, H. Maintain Detainee Accountability, I. Collect and Disseminate Intelligence Information and Subsection VII subparts F. Detainee Counts, G. Daily Inspections, and H. Control of Contraband, and Subsection X. Health Services, subpart C. re direct security supervision of detainees in the health unit.

**(b)(4) Redactions:** ICE applied FOIA Exemption (b)(4) on pg. 10350 to cost information related to postage stamps; on pgs. 10365-10375 to bed day rates, transportation-related costs, guard services and detainee clothing costs; on pgs. 10428-10429 to monthly detention services costs, and to pgs. 10544-10552 for proposed detention services costs, including personnel and equipment for 2017 for the Houston ICE Processing Center, all proprietary and confidential information submitted by CoreCivic. | Freedom of Information Act 5 U.S.C. § § 552 (b)(4), (b)(6), (b)(7)(C), (b)(7)(E) |

**Reason:** FOIA Exemption 4 protects trade secrets and commercial or financial information obtained from a company that is privileged or confidential. The term "financial/commercial" has been interpreted very broadly to encompass any information in which the submitter has a commercial interest and that generally pertains to commerce. To qualify as confidential, financial/commercial information must be both customarily treated as private by its owner and provided to the government under either an express or implied assurance of privacy. CoreCivic is a for-profit, private national firm which partners with ICE directly or via contracts with cities or counties contracting with ICE to provide safe environments where detainees can reside temporarily as they go through their immigration process, including building and operating detention facilities. CoreCivic competes for the awards of ICE contracts to provide such services. The company has a clear commercial and proprietary interest in its pricing for such services. CoreCivic customarily treats their pricing information as confidential. Further, ICE does not customarily release this type of pricing information belonging to a private, for-profit company, to the public.

**(b)(6),(b)(7)(C) Redactions:** ICE applied Exemptions (b)(6),(b)(7)(C) to pgs. 10322-10324, 10364, 10428-10429, 10542, and 10544-10545 to the names, signatures, email addresses, suite numbers, and phone numbers of ICE Contracting Officer's Technical Representatives, ICE Contracting Officer, ICE Program Office POC, ICE Contract Specialist, who are federal employees, and CoreCivic personnel on pg. 10544, a third party whose title is not provided, all of whom have not signed privacy waivers in this case. **Note:** ICE reprocessed pgs. 10364 and 10545 to lift the (b)(6),(b)(7)(C) redaction to the names of the Vice President of Partnership Development for CoreCivic Inc. and the Vice President of Treasury Tax who are public-facing individuals.

**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information.

FOIA Exemptions (b)(6) and (b)(7)(C) protect from disclosure PII pertaining to third parties who have not provided consent, such as the Core Civic employee (whose title was not provided), to prevent an unwarranted invasion of privacy by: (1) conceivably subjecting these

individuals to harassment and annoyance in conducting their official duties and in their private lives, and (2) potentially placing them in danger as targets of law enforcement may begrudge personnel for an indefinite time period and seek revenge. Furthermore, without explicit consent of the CoreCivic employee, ICE cannot release this information to any member of the public. Members of the public may draw adverse inferences from the mere fact that an individual is mentioned in the files of a criminal law enforcement agency. Moreover, Plaintiff has not shown how the privacy interests of the individual in the records requested outweigh any minimal public interest in the disclosure of the information. Such disclosure would also not shed light on the operations or activities of the government.

**(b)(7)(E) Redactions:** ICE applied FOIA Exemption (b)(7)(E) to Accounting Information from ICE's Office of Acquisition Management on pg. 10428. ICE also applied FOIA Exemption (b)(7)(E) on pgs. 10602-10603, 10607-10608 and 10616 to details in the Contract Performance of Work Statement Subsection IV subparts D., H., and I. and Subsection VII subparts F., G. and H., and Subsection X regarding procedures for the maintenance and security of keys and locking mechanisms; schedule for perimeter surveillance of the facility; procedures regarding detainee use of certain tools; the frequency and schedule for detainee counts; procedures for the types of information gathered regarding issues affecting safety and security of the facility; procedures to follow when the physical detainee count does not show all detainees accounted for; procedures for daily inspections of security aspects of the facility and control of contraband, and details on security staffing for the health unit. **Note:** ICE lifted the (b)(7)(E) redactions on pgs. 10322, 10324, 10364, 10428 and 10542, to the code for ICE contractor Corrections Corporation of America/CoreCivic.

**Reason:** FOIA Exemption (b)(7)(E) exempts from release information compiled for law enforcement purposes that would disclose law enforcement techniques or procedures which could reasonably be expected to risk circumvention of the law. Disclosure of internal ICE account numbers could assist unauthorized parties in gaining improper access to ICE financial accounts where bad actors could alter information or perpetrate identity theft or other harm. Disclosing details for detention contractor's maintenance and security of keys and locking mechanisms; schedule for perimeter surveillance of the facility; procedures regarding detainee use of tools that could be used as weapons; schedule for detainee counts; procedures for daily inspections of security aspects of the facility and control of contraband; and security staffing for the health unit could reveal where the detention facility would be most vulnerable to bad actors' efforts to avoid detection and apprehension when organizing an escape or disturbance, and how to frustrate or thwart security measures or procedures to prevent or quell such incidents. Public awareness of this operational information would aid those seeking to gain unauthorized entry to or to escape from the detention facility holding ICE detainees, or to cause other disturbance

| | | and potentially compromise facility staff and detainee safety or undermine security measures taken while transporting ICE detainees. The disclosure of this information serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. | |
|---|---|---|---|
| 28th Release 2020-ICLI-00042 Pages 11086 to 11087, 11088 to 11090, and 11091 to 11093 | Partial | **Documents:** Amendment of Solicitation/Modification of Contract DROIGSA-07-0015/70CDCR20FIGR0008 dated November 12, 2019, between ICE and LaSalle Economic Development District (which subcontracts with private detention services contractor The GEO Group Inc.), Mod. No. P00004 signed March 30, 2020, to increase CLIN 0010 in accordance with wage adjustment and obligate funding as result of increase; Mod. No. P00005 signed May 18, 2020, to increase obligated funding for task order for detention and care of persons detained and transportation/guard service for detention contract; Order for Supplies or Services re DROIGSA-07-0015/ 70CDCR20FIGR00008 dated and signed November 12, 2019, between ICE and LaSalle Economic Development District to establish a new order under IGSA No. DROIGSA-07-0015 for the counties of LaSalle and Rapides increasing the obligated amount to provide detention and care of persons detained and transportation/guard service for detention contract.

**(b)(4) Redactions:** ICE applied Exemption (b)(4) to pgs. 11086-11093 to cost increase values for various CLINs, daily rates, bed counts, and discount terms as proprietary and confidential information of private detention services contractor GEO.

**Reason:** FOIA Exemption 4 protects trade secrets and commercial or financial information obtained from a company that is privileged or confidential. The term "financial/commercial" has been interpreted very broadly to encompass any information in which the submitter has a commercial interest and that generally pertains to commerce. To qualify as confidential, financial/commercial information must be both customarily treated as private by its owner and provided to the government under either an express or implied assurance of privacy. GEO is a for-profit, private national firm which partners with ICE directly or via contracts with cities or counties contracting with ICE, such as LaSalle Economic Development District, to provide safe environments where detainees can reside temporarily as they go through their immigration process. GEO competes for the awards of ICE contracts to provide such services. The company has a clear commercial and proprietary interest in its pricing for such services. GEO customarily treats their pricing information as confidential, and ICE does not customarily release this type of pricing information belonging to a private, for-profit company, to the public.

**(b)(6),(b)(7)(C) Redactions:** ICE applied Exemption (b)(6),(b)(7)(C) to pgs. 11086, 11088, 11091 and 11092 to the names, signatures, email addresses, suite numbers, and phone numbers of ICE Contracting Officer Representatives, Contracting Officers, and a Contract Specialist who are | Freedom of Information Act 5 U.S.C. § § 552 (b)(4), (b)(6), (b)(7)(C), (b)(7)(E) |

federal employees, and the name and email address of a LaSalle Corrections Contractor POC, a third party, all of whom have not signed privacy waivers in this case.

**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information.

FOIA Exemptions (b)(6) and (b)(7)(C) protect from disclosure PII pertaining to third parties who have not provided consent, such as the LaSalle Corrections employee, to prevent an unwarranted invasion of privacy by: (1) conceivably subjecting these individuals to harassment and annoyance in conducting their official duties and in their private lives, and (2) potentially placing them in danger as targets of law enforcement may begrudge personnel for an indefinite time period and seek revenge. Furthermore, without explicit consent of the LaSalle Corrections employee, ICE cannot release this information to any member of the public. Members of the public may draw adverse inferences from the mere fact that an individual is mentioned in the files of a criminal law enforcement agency. Moreover, Plaintiff has not shown how the privacy interests of the individual in the records requested outweigh any minimal public interest in the disclosure of the information. Such disclosure would also not shed light on the operations or activities of the government.

**(b)(7)(E) Redactions:** ICE applied Exemption (b)(7)(E) to Accounting Information from ICE's Office of Acquisition Management on pgs. 11087, 11090 and 11093. **Note:** ICE lifted the (b)(7)(E) redactions on pgs. 11086 and 11088 to the code for contractor LaSalle Economic Development District, and on pg. 11093 to the ICE invoice email address.

**Reason:** FOIA Exemption (b)(7)(E) exempts from release information that would disclose law enforcement techniques or procedures, the disclosure of which could reasonably be expected to risk circumvention of the law. Disclosure of internal ICE account numbers could assist unauthorized parties in gaining improper access to ICE financial accounts where bad actors could alter information or perpetrate identity theft or other harm. The disclosure of this information serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities.

| 34th Release 2020-ICLI-00042 Pages 11975 to 11976 | Partial | **Documents:** Email dated April 11, 2014, between DHS personnel - Deputy Assistant Director, Custody Management for ICE Enforcement and Removal Operations (ER0); Kevin Landy, Assistant Director, Office of Detention Policy and Planning; Tae D. Johnson, Assistant Director for Custody Management; Deputy Assistant Director for Custody Programs; Chief of Staff for Custody Management; Deputy Press Secretary and Press Secretary for ICE, among other DHS federal employees - re coordinating a response to a New York Times reporter regarding whether ICE detainees at Butler County Jail are not getting paid for working cleaning jobs and which detention facilities that hold ICE detainees do not pay or pay less than $1 per day (for Voluntary Work Programs); what ICE guidelines require, and what facilities provide non-monetary payment.

**(b)(6),(b)(7)(C) Redactions:** ICE applied Exemptions (b)(6),(b)(7)(C) on pgs. 11975-11976 to the names in the "From:", "To:" and "Cc:" section of the email of the Deputy Assistant Director for Custody Management; Deputy Assistant Director for Custody Programs; Chief of Staff for Custody Management; ICE Press Secretary and Deputy Press Secretary; Chief of Staff for Custody Management; a Custody Management Detention Monitoring Unit personnel (whose name and phone numbers are also redacted from the signature line), and the name of the Chief of the Detention Monitoring Unit for Custody Management who were non-public facing, and to the names of other DHS personnel whose titles are not provided anywhere in all pages in the 34th interim release and it cannot be confirmed whether or not these individuals held a public facing position about a decade ago. **Note:** Upon litigation review, ICE would lift the redaction to the name of Brian P. Hale in the "Cc" section of the emails on pg. 11975 as he held the position of Assistant Director and then Director for ICE Office of Public Affairs around this time, the latter of which is public facing.

**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information. | Freedom of Information Act 5 U.S.C. § § 552 (b)(6), (b)(7)(C) |
| 34th Release 2020-ICLI-00042 Page 11986 | Partial | **Document:** Email dated April 28 and May 27, 2014, between DHS personnel – Kevin Landy, Assistant Director, Office of Detention Policy and Planning; Tae D. Johnson, Assistant Director for Custody Management (ERO); ICE Press Secretary; DHS Deputy Press Secretary; a Custody Management Unit Chief (ERO), and Assistant Director of ICE OPA, among | Freedom of Information Act 5 U.S.C. § § 552 (b)(6), (b)(7)(C) |

| | | other DHS federal employees - re coordinating a response to a New York Times reporter on the subject of detention facilities holding ICE detainees with Voluntary Work Programs (VWPs) that provide monetary compensation vs. non-monetary compensation, and referencing a list of ICE-owned and contracted facilities.

**(b)(6),(b)(7)(C) Redactions:** ICE applied Exemptions (b)(6),(b)(7)(C) on pg. 11986 to the names in the "From:", "To:" and "Cc:" section of the email of the ICE Press Secretary (whose name and phone numbers are also redacted in the signature line); the DHS Deputy Press Secretary, and a Unit Chief of Custody Management who were non-public facing, and to the names of other DHS personnel whose titles are not provided anywhere in all pages in the 34th interim release and it cannot be confirmed whether or not these individuals held public-facing positions about a decade ago. **Note:** Upon litigation review, ICE would lift the redaction to the name of Brian P. Hale in the "Cc" section of the emails on pg. 11986.

**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information. | |
| 34th Release 2020-ICLI-00042 Page 12002 | Partial | **Document:** Email dated May 4, 2015, between DHS personnel – Kevin Landy, Assistant Director, Office of Detention Policy and Planning; the Deputy Division Director, Office of Detention Oversight of ICE Office of Professional Responsibility (OPR); the Deputy Assistant Director, Custody Management (ERO); Deputy Assistant Director for the Office of Policy and Planning; Tae D. Johnson, Assistant Director for Custody Management (ERO); the Deputy Assistant Director of Custody Programs (ERO); Deputy Principal Legal Advisor of ICE Office of Principal Legal Advisor (OPLA); the Chief of the Detention Monitoring Unit, Custody Management (ERO), among others - re the ICE OPR Office of Detention Oversight Close Out Report (preliminary findings) related to an inspection of the Butler County, Hamilton, Ohio Detention Center conducted April 28-30, 2015.

**(b)(6,(b)(7)(C) Redactions:** ICE applied Exemptions (b)(6),(b)(7)(C) on pg. 12002 to the names in the "From:", "To:" and "Cc:" section of the email of ICE OPR's Deputy Division Director for the Office of Detention Oversight)(whose first name is also redacted from the text of the email | Freedom of Information Act 5 U.S.C. § § 552 (b)(6), (b)(7)(C) |

| | | sent May 4, 2015 at 3:52 p.m.); the Deputy Assistant Director for ERO Custody Management (whose email address is also redacted); the Deputy Assistant Director for Office of Detention Policy and Planning; two ICE contractors, and a Creative Corrections employee (ICE detention service contractor) who were all non-public facing federal employees, and to the names of other DHS personnel and other potentially non-DHS personnel third parties whose titles and email addresses are not provided anywhere in all pages in the 34th interim release and it cannot be confirmed whether or not these individuals held public facing positions about nine years ago.<br><br>**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing DHS/ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information.<br><br>FOIA Exemptions (b)(6) and (b)(7)(C) protect from disclosure PII pertaining to third parties who have not provided consent to prevent an unwarranted invasion of privacy by: (1) conceivably subjecting these individuals to harassment and annoyance in conducting their official duties and in their private lives, and (2) potentially placing them in danger as targets of law enforcement may begrudge personnel for an indefinite time period and seek revenge. Furthermore, without explicit consent of the third parties, ICE cannot release this information to any member of the public. Members of the public may draw adverse inferences from the mere fact that an individual is mentioned in the files of a criminal law enforcement agency. Moreover, Plaintiff has not shown how the privacy interests of the individual in the records requested outweigh any minimal public interest in the disclosure of the information. Such disclosure would also not shed light on the operations or activities of the government. | |
| 34th Release 2020-ICLI-00042 Page 12018 | Partial | **Document:** Email dated April 28, 2014, between DHS personnel – DHS Deputy Press Secretary and ICE Press Secretary; Assistant Director for ICE OPA, and a Unit Chief for Custody Management (ERO), among other DHS personnel - regarding coordinating a response to the New York Times reporter about detention facilities holding ICE detainees with VWPs that provide monetary compensation vs. non-monetary compensation.<br><br>**(b)(6),(b)(7)(C) Redactions:** ICE applied Exemptions (b)(6),(b)(7)(C) on pg. 12018 to names in the "From:", "To:" and "Cc:" section of the email of | Freedom of Information Act 5 U.S.C. §§ 552 (b)(6), (b)(7)(C) |

| | | the DHS Deputy Press Secretary; the ICE Press Secretary (whose name, email address and phone numbers are also redacted in the signature line), and a Unit Chief for Custody Management (ERO) who were not public-facing, and to the names of other DHS personnel whose titles are not provided anywhere in all the pages in the 34th interim release and it cannot be confirmed whether or not these individuals held a public facing position about a decade ago. **Note:** Upon litigation review, ICE would lift the redaction to the name of Brian P. Hale in the "Cc" section of the emails on pg. 12018. | |
| | | **Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing DHS/ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information. | |
| 34th Release 2020-ICLI-00042 Page 12028 | Partial | **Document:** Email dated April 25, 2014, between DHS personnel – ICE Press Secretary; Deputy Assistant Director, Custody Management (ERO); a Unit Chief for Custody Management (ERO); the Chief and other personnel from the Detention Monitoring Unit of Custody Management (ERO); Kevin Landy, Assistant Director, Office of Detention Policy and Planning, and Tae D. Johnson, Assistant Director for Custody Management (ERO) – related to coordinating a response to the New York Times reporter inquiry about detention facilities holding ICE detainees that have VWPs (although the subject line references an inquiry regarding automatic license plate readers from McClatchy News, The Kansas City Star). | Freedom of Information Act 5 U.S.C. § § 552 (b)(6), (b)(7)(C) |
| | | **(b)(6),(b)(7)(C) Redactions:** ICE applied Exemptions (b)(6),(b)(7)(C) on pg. 12028 to the names in the "From:", "To:" and "Cc:" section of the email of the ICE Press Secretary; Deputy Assistant Director, Custody Management (ERO); a Unit Chief for Custody Management (ERO); the Chief and other personnel from the Detention Monitoring Unit of Custody Management (ERO) who were not public-facing. **Note:** Upon litigation review, ICE would lift the (b)(6),(b)(7)(C) redaction to the first line of email text as to the name "Paul" that follows the words, "Yes, it had that and", because it was determined that it was a reference to Paul Rosen, the DHS Chief of Staff, who was public facing. | |
| | | **Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing DHS/ICE personnel in these records, which | |

| | | were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information. | |
|---|---|---|---|
| 34th Release 2020-ICLI-00042 Page 12038 | Partial | **Document:** Email dated April 25, 2014, between DHS personnel – Kevin Landy, Assistant Director, Office of Detention Policy and Planning; a Unit Chief for Custody Management (ERO); ICE Press Secretary; Deputy Assistant Director, Custody Management (ERO); Assistant Director, ICE OPA; Chief of the Detention Monitoring Unit, Custody Management (ERO); Phillip T. Miller, Assistant Director, Field Operations (ERO), and personnel from the Detention Monitoring Unit, Custody Management (ERO) - related to coordinating a response to the New York Times reporter inquiry about detention facilities holding ICE detainees that have VWPs (though the subject line references an unrelated inquiry regarding automatic license plate readers from McClatchy News, The Kansas City Star).

**(b)(6),(b)(7)(C) Redactions:** ICE applied Exemptions (b)(6),(b)(7)(C) on pg. 12038 to the names in the "From:", "To:" and "Cc:" section of the email of a Unit Chief for Custody Management (ERO) (whose first name is also redacted from the text of the email at the top of the pg.); ICE Press Secretary (whose name and phone numbers are also redacted in the signature line); Deputy Assistant Director, Custody Management (ERO); Chief of the Detention Monitoring Unit, Custody Management (ERO), and personnel from the Detention Monitoring Unit, Custody Management (ERO) who were not public-facing. **Note:** Upon litigation review, ICE would lift the redaction to the name of Brian P. Hale in the "Cc" section of the emails on pg. 12038.

**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing DHS/ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this | Freedom of Information Act 5 U.S.C. §§ 552 (b)(6), (b)(7)(C) |

| | | | |
|---|---|---|---|
| | | PII outweighs any minimal public interest that could possibly exist in the disclosure of this information. | |
| 34th Release 2020-ICLI-00042 Pages 12056-12058 | Partial | **Document:** Emails dated April 11 and 14, 2014y, between DHS personnel – Kevin Landy, Assistant Director, Office of Detention Policy and Planning; ICE Deputy Press Secretary; a Unit Chief, Custody Management (ERO); Deputy Assistant Director, Custody Programs (ERO); Deputy Assistant Director Custody Management (ERO); Chief of Staff, Custody Management (ERO); ICE Press Secretary, and Assistant Director, ICE OPA – regarding formulating a response to questions from the New York Times reporter regarding detention facilities holding ICE detainees that have VWPs, specifically in response to Sheriff Jones from Butler County Jail reporting that ICE detainees at his jail perform cleaning work without pay in the section of the jail where they are held.<br><br>**(b)(5) Redactions:** ICE applied FOIA Exemption (b)(5) to segregable portions of the content of the email message on pg. 12058 sent at 1:15 p.m. where Kevin Landy, Assistant Director, Office of Detention Policy and Planning is responding to the ICE Deputy Press Secretary as to media news of Sheriff Jones' statement about immigrant detainees doing work on cleaning and upkeep of the section of the jail where they are housed without being paid, and Mr. Landy provides his opinion on whether the report, if true, violates ICE detention standards and what actions should be taken to address the issue. FOIA Exemption (b)(5) was applied to portions of the content of the email message on pg. 12057 sent at 1:31 p.m. where the Deputy Assistant Director for Custody Management is seeking clarification from the ICE Deputy Press Secretary on whether the reporter is alleging ICE detainees are not receiving monetary compensation at two other named detention facilities that house ICE detainees but then asks that the question be disregarded as the Chief of Staff for Custody Management had sent follow up questions. FOIA Exemption (b)(5) was applied to segregable portions of the content of email message on pgs. 12056 and 12057 sent on April 11, 2014 at 1:55 p.m. which is Deputy Assistant Director of Custody Programs' proposed statement to be released to the media which Kevin Landy opposes as indicated in his email response sent April 14, 2014 at 9:52 a.m. FOIA Exemption (b)(5) was also applied on pg. 12056 to segregable portions of Kevin Landy's email sent April 11, 2014 at 4:03 p.m. providing his opinion that ERO Custody Management's reading of ICE's 2011 Performance-Based National Detention Standards (PBNDS) contradicts his reading of its requirements with regard to the VWP, and his opinion that the proposed statement for the media also contradicts information previously released to the media and how that might adversely affect the agency, and providing recommendations for addressing the issue.<br><br>**Reason:** FOIA Exemption (b)(5) protects information that is pre-decisional and deliberative. The emails between Kevin Landy, the Assistant Director, Office of Detention Policy and Planning and executives from the Custody Management Division set forth discussion points, questions, thoughts, comments and suggestions for addressing the | Freedom of Information Act 5 U.S.C. §§ 552 (b)(5), (b)(6), (b)(7)(C) |

media's questions related how the VWP in implemented at detention facilities that house ICE detainees. These emails do not contain final policy or position of ICE on the matter as shown by Tae D. Johnson, Director of Custody Management's email on pg. 12055 (not part of the *Vaughn* sampling) replying to Kevin Landy that he disagrees with Mr. Landy's opinion on his reading of the PBNDS on the VWP. The email from the Deputy Assistant Director for Custody Management asking the ICE Deputy Press Secretary whether the reporter is alleging ICE detainees are not being paid for work at two other named facilities was withdrawn so that more information could be obtained from the Chief of Staff for Custody Management. Such pre-decisional and deliberative information is expressly protected by FOIA Exemption (b)(5), which is applied to protect the integrity of the deliberative or decision-making processes within the agency and by exempting from mandatory disclosure opinions, conclusions, and recommendations, and pre-decisional information that if released could cause public confusion as to facts. The identifiable and foreseeable harm that would be caused by disclosure of this information that it would discourage the expression of candid opinions and inhibit the free and frank exchange of information and ideas between agency personnel, which would hinder the ability of the agency executives to be fully informed to make quality decisions about responding to the questions and issues raised by the media, resulting in a chilling effect on intra-agency communications.

**(b)(6),(b)(7)(C) Redactions:** ICE applied Exemptions (b)(6),(b)(7)(C) to these pages as follows:

On pg. 12056 to the names in the "From:", "To:" and "Cc:" section of the emails of ICE's Deputy Press Secretary; Deputy Assistant Director, Custody Programs (ERO); Deputy Assistant Director, Custody Management (ERO); Chief of Staff, Custody Management (ERO), and ICE Press Secretary who were not public facing, and to the name of one other DHS personnel whose title is not provided anywhere in all pages of the 34th interim release and it cannot be confirmed whether or not the individual held a public facing position about a decade ago.

On pg. 12056 in the text of the email sent on April 14, 2014, at 9:59 a.m. to the name of a Unit Chief from Custody Management (ERO) and to the first name of another ICE personnel whose identity and title cannot be determined to confirm whether the individual held a public facing position about a decade ago. **Note:** Upon litigation review, ICE would lift the redaction to the name of Brian P. Hale in the "Cc:" section of the emails on pg. 12056 sent at 1:55 p.m. and 4:03 p.m.

On pg. 12057 in the email signature line to the name, phone numbers and email address of the Deputy Assistant Director, Custody Programs (ERO), and to the names in the "From:", "To:" and "Cc:" section of the email of the Deputy Assistant Director, Custody Management (ERO); ICE Deputy Press Secretary; Deputy Assistant Director, Custody Programs (ERO; Chief of Staff, Custody Management (ERO) (whose first name is also redacted from the text of the April 11, 2014 email sent at 1:33 p.m.), and

| | | ICE Press Secretary who were not pubic facing, and to the name of one other DHS personnel whose title is not provided anywhere in all pages of the 34th interim release and it cannot be confirmed whether or not the individual held a public facing position about a decade ago. **Note:** Upon litigation review, ICE would lift the redaction to the name of Brian P. Hale in the "Cc:" section of emails on pg. 12057 sent at 1:31 p.m. and 1:33 p.m.<br><br>On pg. 12058 to the names in the "From:", "To:" and "Cc:" section of the email of ICE Deputy Press Secretary; Deputy Assistant Director, Custody Management (ERO); Deputy Assistant Director, Custody Programs(ERO); Chief of Staff, Custody Management (ERO), and ICE Press Secretary, who were not public-facing. **Note:** Upon litigation review, ICE would lift the redaction to the name of Brian P. Hale in the "Cc:" section of all emails on pg. 12058.<br><br>**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing DHS/ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information. | |
| 34th Release 2020-ICLI-00042 Page 12060 | Partial | **Document:** Email dated April 11, 2014 from Tae D. Johnson, Assistant Director for Custody Management to ERO Executives and the Acting Director of ICE regarding a drafted proposed statement in response to the New York Times reporter questions regarding the VWP.<br><br>**(b)(5) Redaction:** ICE applied FOIA Exemption (b)(5) to the text of the email with the preface "Proposed Statement:". The proposed statement is a draft proposed response to the media regarding its inquiry about the VWP and is pre-decisional and deliberative.<br><br>**Reason:** FOIA Exemption (b)(5) protects information that is pre-decisional and deliberative. The redacted proposed statement sets forth suggestions for interpreting the reading of ICE's PBNDS related to the VWP before and after the 2011 PBNDS revisions; how detention facilities, prior to the 2011 PBNDS, operating under the National Detention Standards (NDS) may have been directed to provide monetary compensation under the VWP, and whether there were historical incidents of some facilities not providing monetary compensation, and | Freedom of Information Act 5 U.S.C. § § 552 (b)(5), (b)(6), (b)(7)(C) |

| | | | |
|---|---|---|---|
| | | whether the monetary compensation requirement should be included as part of the NDS annual inspections for county jails that house mixed populations of federal, state and local inmates as well as ICE detainees. Such pre-decisional and deliberative information is expressly protected by FOIA Exemption (b)(5), which is applied to protect the integrity of the deliberative or decision-making processes within the agency and by exempting from mandatory disclosure opinions, conclusions, and recommendations. The deliberative and pre-decisional nature of the proposed statement is further supported by the email exchange between Kevin Landy and the ICE Press Secretary dated April 14, 2014 on pg. 12056, which indicates Mr. Landy's strong objection to using the proposed statement, and the reply from the Deputy Press Secretary that she agrees and that a revised statement was being prepared. The identifiable and foreseeable harm that would be caused by disclosure of this information is that it would discourage the expression of candid opinions and inhibit the free and frank exchange of information and ideas between agency personnel, which would hinder the ability of the agency executives to be fully informed to make quality decisions about responding to the questions and issues raised by the media, resulting in a chilling effect on intra-agency communications.<br><br>**(b)(6),(b)(7)(C) Redactions:** ICE applied Exemptions (b)(6),(b)(7)(C) on pg. 12060 to the names in the "From:", "To:" and "Cc:" section of the emails of a Unit Chief of Custody Management (ERO) who was not public facing, and a DHS personnel whose title is not provided anywhere in all pages of the 34th interim release and it cannot be confirmed whether or not the individual held a public facing position about a decade ago. ICE also applied Exemptions (b)(6),(b)(7)(C) on pg. 12060 to the email addresses of then public-facing ICE Executives Timony S. Robbins and Thomas Homan.<br><br>**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing DHS/ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information. | |
| 34th Release 2020-ICLI-00042 Page 12070 | Partial | **Document:** Email dated April 22 and 23, 2014 between Custody Management Executives (ERO); Assistant Director for ICE OPA, and ICE Press Secretary, among other ICE personnel, pertaining to preparing a | Freedom of Information Act 5 U.S.C. § § 552 (b)(6), |

| | | | |
|---|---|---|---|
| | | Custody Management Division authorized list of facilities with VWPs in responding to the New York Times inquiry.<br><br>**(b)(6),(b)(7)(C) Redactions:** ICE applied Exemptions (b)(6),(b)(7)(C) on pg. 12070 to the names in the "From:", "To:" and "Cc:" section of the emails of the Deputy Assistant Director, Custody Management (ERO) (whose first name is also redacted from the text of the April 22, 2014 email sent at 7:42 p.m.); ICE Press Secretary, and Acting Chief of the Detention Standards Compliance Unit (ERO) who are not public-facing. **Note:** Upon litigation review, ICE would lift the redaction to the name of Brian P. Hale in the "From:" section of the email on pg. 12070 sent on April 23, 2014 at 2:06 p.m., and in the "Cc:" section of the email sent on April 22, 2014 at 7:42 p.m. and 2:48 p.m.<br><br>**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing DHS/ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information. | (b)(7)(C) |
| 34th Release 2020-ICLI-00042 Page 12217 | N/A | **Document:** Emails dated April 22, 2014 between Executives of ICE OPLA and ICE OPA, ERO and the ICE Front Office regarding concurrence for the updated proposed statement for release to the New York Times pertaining to the VWP.<br><br>**Note:** Upon litigation review, ICE would lift the redaction to the name Paul Rosen in the "Cc:" section of each of the emails as he was DHS Chief of Staff, a public-facing position, and to the names of Riah Ramlogan in the "From:" section and Brian P. Hale in the "To:" section of the email at the bottom of the page as they held public-facing positions of Acting Principal Legal Advisor and Director of ICE OPA, respectively, at that time. | N/A |
| 34th Release 2020-ICLI-00042 Page 12222 | Partial | **Document:** Emails dated May 2 and 28, 2014, among Executives of ICE OPLA, ICE OPA, ERO and the ICE Front Office regarding OPLA's legal analysis of compensation rates for ICE detainees who participate in the VWP.<br><br>**(b)(5) Redactions:** ICE applied FOIA Exemption (b)(5) to segregable sections of the text in the emails on pg. 12222 which consist of ICE Acting Principal Legal Advisor Riah Ramlogan's analysis of the 1979 | Freedom of Information Act 5 U.S.C. §§ 552 (b)(5), (b)(6), (b)(7)(C) |

Appropriations Act and opinion on the sources of ICE's legal authority to pay voluntary detainee workers at the rate of $1 per day since that level was set by Congress in 1979; Assistant Director, Office of Detention Policy and Planning, Kevin Landy's comment and response to OPLA's analysis and opinion, and OPLA providing further background and opinion for Mr. Landy on whether the $1 per day rate was a maximum or a minimum for ICE and/or detention service contractors implementing the VWP at detention facilities. This information is deliberative, attorney-client privileged and attorney work product privileged.

**Reason:** FOIA Exemption (b)(5) protects information that is pre-decisional, deliberative, attorney-client privileged and attorney work product privileged. The email exchanges between and among ICE OPLA and ICE Front Office Executives set forth discussion points, thoughts, comments and opinions between ICE at its legal counsel (OPLA) on ICE's legal authority to pay voluntary detainee workers and reimburse detention service contractors implementing the program at the rate of $1 per day; the ICE Front Office is seeking input and advice in connection with addressing potential or pending media inquiries on the topic which may raise litigation risk. Such pre-decisional and deliberative information is expressly protected by FOIA Exemption (b)(5), which is applied to protect the integrity of the deliberative or decision-making processes within the agency and by exempting from mandatory disclosure opinions, conclusions and recommendations. The identifiable and foreseeable harm that would be caused by disclosure of this information is that it would discourage the expression of candid opinions and inhibit the free and frank exchange of information and ideas between agency personnel and their attorneys, which would hinder the ability of the agency executives to be fully informed to make quality decisions, including legal decisions, in responding to the questions and issues raised by the media, resulting in a chilling effect on intra-agency communications.

The information being withheld also contains attorney-client privileged information that was shared between ICE attorneys (OPLA) and their client (the ICE Front Office). Specifically, the client and OPLA are discussing whether paying the $1 per day rate is legally permissible and authorized by statute and Congressional appropriations language. Though the OPLA attorney opines that the "bottom line" is that the $1 per day is legally permissible, which information is not redacted, the portions of the email redacted contain the attorney's opinions and advice related to how that position was reached based upon interpretation of appropriations language and public law related to compensating detainee workers, and discusses questions that remain for the agency to determine on the topic. The purpose of this FOIA Exemption is to protect the confidential communications between OPLA and its client relating to a legal matter for which the client has sought professional advice.

**(b)(6),(b)(7)(C) Redactions:** ICE applied FOIA Exemptions (b)(6),(b)(7)(C) on pg. 12222 to names in the "Cc:" section and in the text of the May 28, 2014 email sent at 9:29 a.m.; to names in the "Cc:" section of the May

| | | | |
|---|---|---|---|
| | | 28, 2014 email sent at 9:18 a.m., and to names in the "To:" section of the May 2, 2014 email whose titles are not provided anywhere in all the pages in the 34th interim release and it cannot be determined whether or not these individuals held a public-facing positions about a decade ago. ICE also applied FOIA Exemptions (b)(6),(b)(7)(C) on pg. 12222 to the names of ICE personnel in the "To:" and "Cc:" section of the May 2, 2014 email consisting of the ICE Press Secretary and Deputy Press Secretary and a Unit Chief for Custody Management (ERO), who were not public facing.<br><br>**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing DHS/ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations.  The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities.  As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information. | |
| 34th Release 12225 | Partial | **Document:** Email dated April 22, 2014 from the Acting Unit Chief, Detention Standards Compliance Unit (ERO) to the Deputy Assistant Director, Custody Management (ERO), transmitting an excel spreadsheet pertaining to VWPs at ERO Custody Management authorized detention facilities, and copying Tae D. Johnson, Assistant Director, Custody Management (ERO); Kevin Landy, Assistant Director, Office of Detention Policy and Planning, and Assistant Director ICE OPA and ICE Press Secretary. Email reply from Kevin Landy dated April 22, 2014, copying the same parties.<br><br>**(b)(5) Redactions:** ICE applied Exemption (b)(5) to segregable content in the text of Kevin Landy's reply email sent April 22, 2014 at 2:51 p.m. which contain his advice, comments and suggestions regarding the information included in the excel spreadsheet in anticipation of sharing such information with the media.  The information is deliberative.<br><br>**Reason:** Mr. Landy, in the redacted portions of his email reply, is providing his advice and opinions on problematic issues he sees regarding a draft excel spreadsheet being prepared by ERO regarding detention facilities with work programs, in anticipation of its release to the media.  Such pre-decisional and deliberative information is expressly protected by FOIA Exemption (b)(5), which is applied to protect the integrity of the deliberative or decision-making processes within the agency and by exempting from mandatory disclosure opinions, conclusions, and recommendations that have not been finalized. The identifiable and | Freedom of Information Act 5 U.S.C. §§ 552 (b)(5), (b)(6), (b)(7)(C) |

foreseeable harm that would be caused by disclosure of this information is that it would discourage the expression of candid opinions and inhibit the free and frank exchange of information and ideas between agency personnel which would hinder the ability of the agency executives to be fully informed to make quality decisions in responding to the questions and issues raised by the media, resulting in a chilling effect on intra-agency communications.

**(b)(6),(b)(7)(C) Redactions:** ICE applied FOIA Exemptions (b)(6),(b)(7)(C) on pg. 12225 to names in the "From:", "To:" and "Cc:" section of the emails to the names of the Acting Unit Chief, Detention Standards Compliance Unit (ERO) (whose name, cubicle number and phone numbers are also redacted in the signature line); Deputy Assistant Director, Custody Management (ERO), and ICE Press Secretary, who were not public-facing. **Note:** Upon litigation review, ICE would lift the redaction to the name of Brian P. Hale in the "Cc" section of the email on pg. 12225 sent at 2:48 p.m.

**Reason:** Under FOIA exemptions (b)(6) and (b)(7)(C), the disclosure of the PII of non-public facing DHS/ICE personnel in these records, which were compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy by: (1) conceivably subjecting ICE personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations. The disclosure of this PII serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. As a result, the privacy interest in this PII outweighs any minimal public interest that could possibly exist in the disclosure of this information.